UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 20 Cr. 110 (LJL)

LAWRENCE RAY,

Defendant. Trial

------------------------------x

New York, N.Y.
March 21, 2022
9:15 a.m.

Before:

HON. LEWIS J. LIMAN,

District Judge
and a jury

APPEARANCES

DAMIAN WILLIAMS,
United States Attorney for the
Southern District of New York
DANIELLE R. SASSOON
MOLLIE BRACEWELL
LINDSEY KEENAN
Assistant United States Attorneys

FEDERAL DEFENDERS OF NEW YORK, INC.
Attorneys for Defendant
MARNE L. LENOX
ALLEGRA GLASHAUSSER
NEIL P. KELLY
PEGGY CROSS-GOLDENBERG

Also Present: Kelly Maguire, FBI
Claudia Hernandez, Paralegal-USAO
Larissa Archondo, Paralegal-FDNY

(Trial resumed; jury not present)

THE COURT: Good morning, everybody.

Before we bring the jury out, a couple of items I wanted to raise with the parties, and I'll see whether you have anything to raise with me.

First, with respect to the schedule, a modification of what I said on Friday, we will sit from 9 o'clock to 4 p.m., Monday through Thursday, with a 45-minute lunch break. One of the jurors had an issue with going until 4:30, and so I'm going to end it by 4 o'clock, just to accommodate that juror, and in the hope that the government can streamline its case and get everything done we need to get done.

I'm also going to have the jurors take breaks up here; so the mid-morning break and the mid-afternoon break will be up here. That will mean those breaks will be limited to 15 minutes.

Second, and unfortunately, my courtroom deputy received a call this morning from Juror 16 informing us that Juror 16 could no longer report to jury duty. At my instruction, my deputy returned the call. Juror 16 -- it's Juror 16, informed us that he would no longer be able to serve because of a medical emergency related to his mother. His mother is already in the hospital and is going to be put on dialysis. She may need to have a limb removed. He reported that he needed to be present and available for her.

That juror also, along the way, has called us and my deputy a couple of times to report that his mother was in the hospital; and that if things got worse, he might not be able to continue because he would have to be available for her.

It's my view that reasonable cause exists to excuse that juror; and that to delay the trial for an indefinite time period — and it would be an indefinite time period — would not be reasonable. I don't think that I need to call the juror myself, and I haven't spoken to the juror myself. But if either party wants the Court to call the juror and ask questions, with counsel and Mr. Ray present, I'm prepared to do it. Again, I don't think it's necessary, but let me hear from the government and I'll hear from the defense.

MS. SASSOON: We have no objection to excusing the juror.

THE COURT: Ms. Lenox.

MS. LENOX: Nor do we, your Honor. Thank you.

THE COURT: Okay. So Juror 16 will be excused.

The last thing that I have is that the government at the end of the day on Friday raised the question of whether -- with respect to the immunized witness, my preference would be for the witness to invoke on the stand outside of the presence of the jury, or whether it would be sufficient for there to be a letter from counsel. It is my preference that the witness invoke on the stand outside the presence of the jury.

So when that witness is up to be called, if we're lucky and it's during a time period when the jury would have a break naturally, we'll do it during the break. If it's not at that time, we'll ask the jurors to step out and then we'll have the witness invoke.

Anything further from the government before we bring Ms. Drury in?

MS. SASSOON: No. Thank you, your Honor.

THE COURT: Anything from the defense?

MS. LENOX: I just want to make a note for the record, your Honor, that Mr. Ray did not receive his laptop at all this weekend, despite asking for it.

THE COURT: Okay. If you want me to issue a further order, I will. I didn't hear from the defense over the weekend, so I didn't issue a further order. But, again, if you would like me to issue an order making his laptop available over the weekend, given the fact that trial is taking up his time during the week, I'm prepared to do that. And you can send me a form of the order.

MS. LENOX: We will do that. Thank you, your Honor.

THE COURT: Okay. Let's bring Ms. Drury in.

All right. Let's bring the jury in.

Good morning, Ms. Drury.

(Jury present)

THE COURT: Good morning, members of the jury.

Welcome back. I hope you all had a good weekend.

We'll continue with the testimony of Ms. Drury.

Ms. Drury, you're reminded that you're still under oath.

The government may inquire.

CLAUDIA DRURY,

called as a witness by the Government,

having been previously duly sworn, testified as follows:

DIRECT EXAMINATION (continued)

BY MS. SASSOON:

Q. Good morning, Ms. Drury.

When we ended the day on Friday, you were testifying about events leading up to your medical leave from Sarah Lawrence. Do you remember that?

A. Yes.

Q. And we listened to a recording where the defendant asked if you told your mom you wanted to make Isabella kill herself, do you remember that?

A. Yes.

Q. Who first suggested that you wanted to harm Isabella?

A. Larry did.

Q. Who first suggested that you wanted to harm your parents?

A. Larry did.

Q. Looking back, did you want to harm Isabella or your parents?

A. No.

MS. SASSOON: Your Honor, permission for Special Agent Maguire to hand the witness a binder of documents.

THE COURT: You may approach.

Make sure that the defense has a copy of the binder.

MS. SASSOON: Special Agent Maguire, will you show the defense the transcript binder and the binder of emails which they've previously seen.

Q. Ms. Drury, you are being handed a binder that includes Government Exhibits 3092, 3103, 3115, 3116, 3120, 3121, 3186A, 3155, 3150, 3151A, 3217, 3220, and 3473.

Do you recognize that binder?

A. Yes.

Q. Have you reviewed it previously?

A. Yes.

Q. What does it contain?

A. Emails, mostly that I sent to people involved in this case.

Q. And are you on all of those emails?

A. Yes.

Q. Are they true and accurate copies of emails that you sent or received?

A. Yes.

MS. SASSOON: The government offers these email exhibits. I can list the numbers again, if it would be helpful.

THE COURT: Any objection?

MS. LENOX: Only any objection that the defense has already raised and the Court has already ruled on.

THE COURT: Okay. Those objections are preserved and the Court's ruling stands.

The exhibits are received subject to any limitations in my prior order.

(Government's Exhibits 3092, 3103, 3115, 3116, 3120, 3121, 3186A, 3155, 3150, 3151A, 3217, 3220, 3473 received in evidence)

MS. SASSOON: Ms. Hernandez, can you please publish Government Exhibit 3092.

Q. Ms. Drury, looking at the second header information underneath the words "forwarded message," who is this email from?

A. Me.

Q. What's the date on this email?

A. The 1st of November 2012.

Q. What is the subject?

A. Request letter for spring readmission.

Q. Who is the recipient of this email?

A. Al Green, the dean of Sarah Lawrence College at the time.

Q. Generally, what is this email about?

A. It was an email that I wrote to Al, essentially, what the title says, requesting to be readmitted and telling -- writing,

you know, the events as I knew them at the time.
Q. Why did you write this letter to Dean Al Green?
A. Actually don't remember if -- if I had to write a letter to Al Green. I know I had to write one to the school psychiatrist. But I'm not sure if I had to or otherwise why.
Q. Did you draft this letter alone?
A. No.
Q. Who helped you draft this letter?
A. Larry.
Q. And what, if anything, did the defendant say about the purpose of the letter?
A. He said -- he said the letter was -- was going to be helpful to me to get me readmitted, and that the best way to be readmitted would be to tell the truth. And he specifically emphasized his role that he played, and how he helped me so much in essentially -- sort of like he was the hero of this entire story. And he emphasized that I should stand up for the truth, which was that he helped me and he was good to me when I wrote this.

MS. SASSOON: Ms. Hernandez, can you please turn to the third page of this document.

Q. And Ms. Drury, once we get there, if you could please read the first two lines at the top.
A. Sarah Lawrence is the place this journey began for me when I met Larry for the first time two years ago. His -- I think

it's "friendship"; it's cut off on my screen. His friendship changed my life. It changed my parents' life. He has helped me through so much pain and confusion.

Q. Did the defendant give you input on what you're expressing here in this letter?

A. We -- I sent him drafts and we went over it.

MS. SASSOON: Ms. Hernandez, you can take that down.

Q. Is that how you felt at the time, that the defendant's friendship was helpful to you?

A. Yes.

Q. What did you do once you were released from the hospital?

A. I was off for that semester. I think I started working or I did start working at a dog walking -- a Biscuits and Bath. I had different therapy, like, assignments that they had given me coming out, so I was working at Biscuits and Bath and going to group therapy, etc.

Q. You testified on Friday about the defendant's involvement in your therapy. Did that continue?

A. Yes.

Q. How so?

A. After I left or in the hospital?

Q. After you left the hospital.

A. In that semester?

Q. While you were -- while you were taking a semester off from school.

A. Well, my parents and I started going to group therapy together. And I would write everything that happened down at group therapy, and email Larry emails about, like what my parents said, what I said, how it made me feel. I did the same thing with all the therapy sessions I was going to for probably like 90 percent of the session.

Q. Why did you report to Larry on your therapy sessions with your parents?

A. At the time it was, like, part of my understanding of what was happening, that I would try to manipulate the truth or play with the truth or, you know, basically turn the people in my life against Larry by making insinuations in therapy. I thought this because Larry told me I was doing this on multiple occasions before and in different ways. And so I started keeping these, like, records. So, basically, to have proof of what I did or to be able to go back and see, you know, how I was turning people against Larry or other things too, like how -- my family dynamic, etc.

Q. How would you describe your relationship with your parents at the time? And I'll just remind you to speak into the microphone.

A. It was -- it was very rocky. Larry was like a big -- a big problem between us. We got in a lot of fights about it. I was becoming increasingly sure that my parents, like, just wanted to hurt me in various ways. I thought we had had a

breakthrough during the hospitalization. But through further conversations with Larry, I came to believe that they were just -- essentially only had bad intentions for me. And so I was just really, sort of, falling into believing that they really wanted to hurt me and were bad.
Q. Were you the only one of your roommates to take a leave of absence from Sarah Lawrence?
A. No.
Q. Who else took a leave?
A. Santos Rosario.
Q. Did the defendant talk to you about the circumstances?
A. Yes.
Q. What did he say?
A. He said that Santos was having thoughts of wanting to hurt Talia, cut Talia's face, kill Talia, and he -- Santos ended up confessing this to a professor that he and Talia shared, and was placed on a leave of absence.
Q. Were you readmitted for the spring semester at Sarah Lawrence?
A. Yes.
Q. Where did you live for that semester?
A. At home. I lived at my apartment on 87th and Third.
Q. About how often were you seeing the defendant during that semester?
A. Frequently. Not as frequently as the summer in 2011, the

first summer that we lived there certainly, but frequently.
Q. Were you also seeing your sophomore-year roommates that semester?
A. Yes.
MS. SASSOON: Ms. Hernandez, can you please publish Government Exhibit 3103.
Q. Do you see the date at the top, March 2nd, 2013?
A. Yes.
Q. And who's this email from?
A. Me.
Q. And who did you send this email to?
A. Larry, Talia, Isabella, Santos, and Dan.
Q. What is the subject of this email?
A. "In response: Talking changed my world."
Q. Direct your attention to the first line that says, "Just submitted this to Wujing's blog." What is Wujing's blog?
A. Wujing was either Talia's friend or Talia's roommate at Sarah Lawrence. And she had a blog called "Shall We Talk," which I think just consisted of pieces where people wrote about how talking or having conversations, like, could be life-changing or very impactful.
Q. Why did you write this email about what you submitted to Wujing's blog?
A. I was spending a lot of time with Talia. And she was saying how upset she was that everyone was trying to twist the

truth about her and her family. And -- and she told me about Wujing's blog. And I just felt a lot of pressure to, like, stand up for the truth, because I had done so much wrong. And I don't think it was, like, a specific conversation; but over the course of this time, the spring semester, I heard a lot from Talia and from Larry about standing up for the truth and, like, how I had hurt them, essentially. And so I just felt really compelled to do this, and this, like, avenue that was available to me.

MS. SASSOON: Ms. Hernandez, can you please turn to page 3 of this email.

Q. And Ms. Drury, can you please read from the bottom of the page where it says, "Larry has stuck by me."

MS. SASSOON: And Ms. Hernandez, if you can zoom in on those last few lines.

THE COURT: And let me remind you, Ms. Sassoon, give the -- also a moment for the jurors to get -- to be able to view what's on their screen.

MS. SASSOON: Yes. I appreciate the reminder, your Honor.

Your Honor, it appears the public monitor might not be on.

THE COURT: Thank you. We'll take care of that.

MS. LENOX: Your Honor, while we're waiting, can we have a brief sidebar?

THE COURT: Is it necessary? I think the monitor is coming up.

MS. LENOX: It's related to this. I'm happy to do it afterwards.

THE COURT: Okay. Let's do it afterwards. I just want to make sure we're using the time efficiently.

BY MS. SASSOON:

Q. Ms. Drury, if you could read these five lines, please.

A. Larry has stuck by me through two years of me confronting my own demons, but also two years of Isabella, Dan, Iban, Santos, Yalitza, Felicia, and I confronting our demons independently and sometimes together. Larry and Talia withstood vicious rumors about what was going on and what was Larry's relationship to all of us. Larry always made it clear: He would never abandon any of us because of what other people said or thought. And he didn't, even when I threatened to put him back in jail.

MS. SASSOON: Ms. Hernandez, if you could go to the next page, please.

Q. And Ms. Drury, if you could continue reading the rest of this paragraph on this page.

A. We were all angry, frustrating, and looking for our parents' attention. For one reason or another, we all took it out on Larry and Talia at different points in our process. While we were living there, we made Larry and Tal's apartment

such an unbearable mess that it was impossible to move without tripping over something. We broke things on purpose, hid things on purpose, threw important papers out, hid food so it would get moldy, and did anything we could to delay and sabotage Larry's efforts. Some examples include deliberately getting spray paint all over Talia's tree's leaves, breaking Larry's $8,000 stove, throwing his power tools on the floor, ruining Talia's Loro Piana sweaters, scraping the bottom of a $500 pot with a wire steal brush so it would get ruined, breaking and bending the needles of several of Larry's $3,000-plus HLVP spray guns, as well as mixing up parts, throwing parts out, so the guns could not be used without ordering very expensive replacement parts, and deliberately dropping and bashing computer with information in them that was vital and important to Larry's job. And this is just the tip of the iceberg. A few examples in thousands of incidents of property damage over two years.

Q. You can stop there.

MS. LENOX: Your Honor, may we have a brief sidebar?

THE COURT: Yes.

(Continued on next page)

(At sidebar)

MS. LENOX: I know that your Honor ruled *in limine* that the government would be able to elicit the fact that Mr. Ray had previously been incarcerated for child custody purposes to complete the narrative of him first arriving at the dorm. I'm concerned, because on direct on Friday the government elicited, three separate times, that Mr. Ray had been incarcerated previously, and just now twice more the fact of his prior imprisonment. And I think at this point it's becoming slightly gratuitous and unnecessary. And so I would ask that the Court direct the government not to elicit this fact from this witness anymore.

THE COURT: What rule are you relying on?

MS. LENOX: I think it's prejudicial, your Honor.

MS. SASSOON: Your Honor, we'll take a look at our upcoming exhibits. This is one that the defense has been on notice we were going to introduce, and there was no request to redact that part of the email; and so we had no basis to think we couldn't read from it.

There is going to be testimony that the defendant repeatedly made threats to Ms. Drury about prison. In the course of describing those threats, it is possible she might mention him drawing on his own experience in prison. I'm not sure, I'm just trying to think of places where this might come up.

In terms of exhibits, at the next break I'll take a look to make sure we're not reading from anything that refers to it. I'm a little caught off guard because we weren't put on notice about this before we began the testimony today, but I'll try to be mindful.

THE COURT: Try to limit it. I won't know that, having listened to the testimony last week, the fact of -- or the report by Mr. Ray, in particular by his daughter, that he was -- had been in prison and that he was released, and that he had been in prison in part as a result of a plot by Bernie Kerik was, in fact, inextricably intertwined with the evidence. And it would be hard to imagine how the evidence could come in in terms of the impact on the victims of Mr. Ray portraying himself something as a superman without that portion of the story.

It also came out in a way that this was the story that Talia and Mr. Ray were telling about Mr. Ray, and not in a way that is -- I viewed it could be understood for the -- stating that Mr. Ray had been, in fact, imprisoned. But that said, try to limit it.

MS. LENOX: Can I just make one brief record -- can I just put one more thing on the record?

Just very briefly with respect to the notice issue, we did litigate this issue *in limine*, which is why I did not object on Friday, because it was part of the story, and that

was what your Honor had ruled on previously. It now seems like this may come up more frequently than just as part of telling that narrative.

To the extent that the government does elicit or the witness begins to testify about Mr. Ray drawing on his own personal experience incarcerated to scare this witness, that was not the intended purpose of Mr. Ray's prior incarceration coming in, and so I do -- I would object to those mentions.

THE COURT: Make your objections as they come up. I did not in my *in limine* ruling give the government blanket permission to use the fact of incarceration or the report of incarceration for any purpose. In fact, I thought I was quite clear in stating that as to any specific questions, you should make an objection.

MS. LENOX: Thank you, your Honor.

MS. SASSOON: The government also remains obviously amenable to a limiting instruction if the Court or the defense thinks it's appropriate.

(Continued on next page)

(In open court)

THE COURT: You may proceed, Ms. Sassoon.

BY MS. SASSOON:

Q. Ms. Drury, on the last page of this email that we were looking at, you referred to, I believe, sabotage. Who characterized your actions as sabotage?

A. Larry.

Q. And these things you describe in your email about breaking a stove and damaging a spray gun and ruining Talia's sweaters, are those things that you had previously confessed to before or that your roommates had confessed to before?

A. Yes.

MS. SASSOON: You can take that down, Ms. Hernandez.

Q. During this time, did you continue to witness the defendant's treatment of your Slonim 9 roommates?

A. Yes.

Q. Around this time, did the defendant tell you about an incident involving Dan Levin and a dress?

A. Yes.

MS. LENOX: Objection, your Honor. The witness was asked on direct examination -- I'm happy to make a record at sidebar.

THE COURT: What rule are you relying on?

MS. LENOX: I'm not relying on a rule, your Honor. When the witness was asked a similar question on

Friday, she indicated that she did not recall having learned anything else with respect to Dan Levin in 2012.

MS. SASSOON: That was in reference to --

THE COURT: I don't need the colloquy.

The objection is overruled.

You may proceed, Ms. Sassoon.

Q. Around this time — and we're now talking about 2012 — did the defendant tell you about an incident involving Dan Levin and a dress?

A. Yes.

Q. What did he tell you?

A. He told me that he was having a confrontation or conversation with Dan over Dan's sexuality that started because Dan was experiencing uncertainty over his sexuality. And that in the course of this conversation they were having, Isabella was, like, folding laundry. And Dan kept eyeing a dress of hers. And so Larry asked Dan, Do you want to wear the dress? And he told me that Dan actually did really want to wear the dress.

And so he made Dan put on the dress and go down and get mail wearing -- wearing the dress. The incident from there on escalated to -- to Larry telling Isabella to go get her bag. She had, like, a duffel bag of different sex toys and dildos, and to go get her biggest one. And he showed me a picture of Dan trying to fit it in his mouth. And, you know, this was all

framed as, like, Dan really wanted to do this, and this is something that Dan wanted and was helpful in clarifying for Dan.
Q. When you say that he showed you a photo of Dan Levin trying to put a dildo in his mouth, who showed you the photo?
A. Larry.
Q. Who else was there when the defendant was telling you this story and showing you the photo?
A. Isabella and Talia.
Q. How would you describe their demeanor in relaying this story?
A. Very bemused and can't believe Dan would want to do something so weird, and sort of just found it funny and, like, bemused, basically.
Q. When was the last time you looked at the photo?
A. When Larry showed it to me.
Q. What do you remember about Dan Levin's expression in the photo?
A. Well, his face is very contorted because he's trying to --
MS. LENOX: Objection as to what Dan Levin is trying to do.
THE COURT: I think it comes in under 701.
This is not coming in with respect to what Mr. Levin was trying to do, but what the witness perceived from the photograph that Mr. Levin was trying to do.

You may proceed.

A. He's trying to fit the dildo in his mouth. But, like, it's so big, he's trying to fit it in from the side of his mouth. And so his face is, like, very contorted. I think he's actually staring right at the camera, his eyes, and he looks, like, panicked and, like -- like, very questioning and very scared and -- and just like -- it's not a look I've actually ever seen on anyone's face.

MS. LENOX: Objection. Move to strike.

THE COURT: Overruled.

It comes in under 701. It's lay opinion testimony.

Go ahead.

Q. Did the defendant describe any other incidents involving Daniel Levin and his sexuality?

MS. LENOX: Objection. Leading.

THE COURT: Overruled. It's a new subject.

A. He told me an incident, like another confrontation. I forget what the cause of it was or what he said the cause of it was, but -- which -- in which he, like, at the peak of the confrontation created like a noose out of tin foil or some sort of metal foil, and put it around Dan's testicles, and was asking him questions. And, like, as Dan was answering incorrectly or still, like, playing with the truth or hiding or however he put it, was like pulling -- pulling it tighter.

Q. I want to turn now to the summer of 2013.

Where did you spend that summer?
A. I spent the first half of it in Pinehurst, North Carolina; and the second part of it in my -- living in my apartment with my parents in New York.
Q. At a general level, what happened in Pinehurst, North Carolina?
A. I went down there to help Larry do yardwork. He was working on his stepfather's lawn. And shortly after I got there, it became just -- it's hard to describe. We were doing work, like, all day, every day. We weren't eating a lot. The people who were down there, myself, Isabella, and Felicia, were on, like, a daily basis having mental breakdowns, essentially what I would describe as mental breakdowns.
There were multiple confrontations between myself and Larry, and at least I remember Felicia and Larry, that were extremely disturbing and physical in a way they hadn't been before. I had never done any yardwork before. And we were doing very difficult, demanding, physical, like, labor tasks that I had never -- I had no idea how to do. And constantly Larry would tell us we did them wrong and were trying to sabotage them and had to redo them. And so we'd spend sometimes till like three or four a.m. redoing, like, laying sod. It was -- I'm not really sure how to sum it up.
Q. I'll ask you some more specific questions, Ms. Drury, about that time.

MS. SASSOON: Ms. Hernandez, can you publish Government Exhibit 304.

Q. Do you recognize this?

A. Yes.

Q. What is it?

A. That is the house in Pinehurst, North Carolina, that I was working at.

Q. What was your understanding of whose house it was?

A. Gordon Ray, Larry's stepfather. His house.

Q. When you were at this house, was there anywhere to go within walking distance?

A. Just other houses. No. I mean, there are no stores or anything within walking distance.

Q. How did you get around the area?

A. Either Felicia or Talia would drive us if we left the property.

Q. Did you know how to drive?

A. No.

Q. How long were you in Pinehurst, North Carolina in the summer of 2013?

A. Six weeks.

Q. Around when did you first go down there?

A. Actually, I think I went down on Father's Day.

Q. Would that be in June of 2013?

A. Yes.

Q. How did you get there?
A. I took the Amtrak.
Q. When you went down there, who, if anyone, was already there?
A. Isabella, Talia, Felicia, and Larry.
MS. SASSOON: Ms. Hernandez, can you show the witness what has been marked as Government Exhibit 4207.
Q. Do you recognize the people in this photograph?
A. Yes.
Q. Who are they?
A. Talia and Gordon.
MS. SASSOON: The government offers Government Exhibit 4207.
MS. LENOX: I'd object on relevance grounds, your Honor.
MS. SASSOON: Your Honor, she testified that she was at the property belonging to these individuals and the others feature heavily in her testimony.
THE COURT: Overruled. 4207 is admitted.
(Government's Exhibit 4207 received in evidence)
MS. SASSOON: Ms. Hernandez, please publish Government Exhibit 4207.
Q. Ms. Drury, who is in this photograph?
A. Talia Ray and Gordon Ray and her cat.
Q. Why did you go to North Carolina?

A. They were down there, and so I hadn't been able to spend a lot of time with Larry, and he -- either I called him -- I think probably I called him. And we were having a conversation while he was down there. And he asked if I wanted to come and help and do some work. And I said yes.
Q. And why did you say yes?
A. Because, I mean, as I've said before, like, I was very dependent on Larry. The relationship meant pretty much the world to me at that point. So for him offering for me to come on like a trip and help them was appealing to me.
Q. And what was your understanding when you traveled to North Carolina what you would be doing there?
A. I'd heard that they had been laying sod. So I definitely thought that I would be doing -- helping with projects.
Q. When you got to North Carolina, what did you observe about the defendant's behavior towards Felicia while you were there?
A. I think it was -- it was worse than I had ever seen him treat her, certainly. She -- she was -- she was different than I had ever seen her. She started, like, talking very childishly and acting very childishly in like a way that was very -- like I had never -- she was completely normal before this point, or I observed her being completely normal before this point. And it was like, suddenly, like, she was no longer like a fully competent person in the same way, like. And it got worse over the time period. And Larry was just -- so it

made -- it made it even more marked, like how bad he was to her.

I saw him hit her. She -- Felicia went to Harvard and Columbia med school, and would wear her sweatshirts from that time. And Larry, like, had cut them. And she'd walk around with them cut, like wearing these cut sweatshirts. I saw -- there was one time when she -- like, after a long night of working, I forget what he was confronting her or what the circumstances were, but we were all standing in the garage, myself, Isabella, and Talia were sitting on the back steps of the garage, and Felicia was just outside the back steps of the garage. And Larry was on the edge of the garage in the road. And Felicia was begging to come back into the house, like, Please just let me in, and saying stuff, like, I'll be good. I'm not bad.

And Larry had like a push broom and was, like, keeping her away from coming in with the push broom. So -- and even -- even just normal things, like the normal ways that he was mean or harsh with us, were much worse because of how Felicia was at this time. He had accused her of sabotaging stuff at the house and told her that she was going to go to jail. And they talked about that for a while, like, had multiple confrontations over how she damaged all this property and was going to go to jail.

Until, like, Larry was, like, one night, Okay, Felicia. You're going to go to prison or jail tomorrow.

You're going to turn yourself in. And she was like, Okay.

And to the extent that he even went out, we weren't allowed to eat carbs at the time, like at all. And he went out -- or someone went out and bought, like, hamburgers and fries and a milkshake. And Larry was like, This is your last meal, Felicia. You can have whatever you want. You can eat carbs. So we even had like a last meal before he drove her in the morning to turn herself in.

Q. Did he, as far as you know --

A. I think she actually drove herself. Sorry. He didn't drive.

Q. Did you observe them drive together that morning?

A. Yes.

Q. And as far as you understood it, did she, in fact, turn herself into jail?

A. No. He said, like, at the last minute they had some sort of discussion in the car where she had, like, a breakthrough; so it was no longer necessary for her to turn herself in because she had already come to, like, whatever breakthrough she needed, or that was going to be achieved by her going to jail.

Q. Taking a step back, when you arrived in North Carolina, what was the state of the property?

A. It was, like, completely ripped up; like the side yard was just dirt. There were plants in, like, potters everywhere.

There were buckets of stone and sand. The front yard was also ripped up because they were laying sod. So there were pallets of sod that had, like, yet to be laid or had been laid and taken up that were, like, rotting. It was -- it was like very -- it was clear that there was just a lot of work to do to even get the house back to anything remotely acceptable.

MS. SASSOON: Ms. Hernandez, can you publish Government Exhibit 1856.

Q. Do you recognize this?

A. Yes.

Q. Where is this?

A. This is the backyard of Pinehurst.

Q. During the time you were in Pinehurst, was the property ever in this condition as depicted in this photograph?

A. Yes.

Q. While you were in Pinehurst, was there machinery on the property, like the machinery depicted in this photograph?

A. Yes.

Q. Who was using the machinery?

A. Larry.

Q. And can you describe what kind of manual labor you were doing while you were in Pinehurst?

A. Digging ditches, grading -- trying to grade yards that looked like that. Moving a lot of rock, a lot of sand, like wheelbarrows full of, like, clay, using pickaxes, using

shovels, certainly -- certainly more physical labor than I had ever done in my life before.
Q. You said more physical labor than you had ever done. Did you have experience with this type of work?
A. No.
Q. What kinds of things was Talia doing while you were in Pinehurst?
A. Talia sometimes helped with the labor outside, but she was freely allowed to be in the house and to come and go from the house. So most of the time she spent doing things in the house.
There was some sort of court case involving -- involving Gordon, Larry's stepfather's divorce from his mother, and she was -- I was told she was working on -- on helping with that. I think she was studying for the LSAT as well, things like that. Organizing the house.
Q. You said that Talia was free to go in and out of the house. Were you free to go in and out of the house?
A. No.
Q. How would you describe your access to the house?
A. Very limited. Going to use the rest room. If we were in the house for too long, there would be a confrontation. I think some days it was even locked, like we couldn't even get in the house, even if we wanted to.
(Continued on next page)

BY MS. SASSOON: (Continued)

Q. Ms. Hernandez, can you show the witness what has been marked as page 2 and page 3 of Government Exhibit 304. And please show the witness both pages.

Do you recognize these photographs?

A. Yes.

Q. What are they? Just at a general level, what do these two photographs depict?

A. This is the front yard in Pinehurst. I believe -- I was never there when it was like this, but I believe that's sod to lay in the yard.

This was when I was there. This is the ditch we dug in the front yard to put a drainage pipe in.

MS. SASSOON: The government offers pages 2 and 3 of Government Exhibit 304.

MS. LENOX: No objection.

THE COURT: Received.

(Government's Exhibits Pages 2 and 3 of Ex. 304 received in evidence))

Q. Ms. Hernandez, can you please publish page 2.

THE COURT: Does one of the jurors have an issue? Just give us a moment.

Why don't we take a brief break for -- a rest room break for all of the jurors, and we'll be back in ten minutes.

(Continued on next page)

(Jury not present)

MS. SASSOON: Your Honor, may the witness step down?

THE COURT: Yes. Why don't you step down.

(Witness not present)

This is a bit earlier than what I anticipated for our mid-morning break, but we will see if we can go until 12:45 after we come back from the break. If it looks like the jurors' attentions are flagging or they need another break, we'll take another short break.

I'll see you all back here in ten minutes.

(Recess)

(Continued on next page)

(Pages 840 and 841 sealed)

(In open court)

THE COURT: Mr. Fishman, do you want to bring in the jury.

(Jury present)

THE COURT: Members of the jury, we are going to take a recess for the remainder of the day. We will resume tomorrow morning with the testimony and the trial starting at 9:00 a.m. and we'll continue until 4:00 tomorrow.

For your information, in terms of the schedule what we're going to do going forward is, we will keep the mid-morning breaks and the mid-afternoon breaks relatively short. You'll take them up here on the 24th floor, and we'll try to keep lunch to 45 minutes.

Please do not discuss the case, either amongst yourselves or with anybody else. My instruction stands. If anybody asks you about the case, you are to tell them that the judge has instructed you not to have any conversations about the case.

Do not look at any news media about the case. Do not do any research about the case. Do not look at any information about either the case, the participants involved in it, or anything else related to the case.

If my instruction was not clear, last week I told you that we would sit from 9:00 to 4:30. I'm revising that. To accommodate you all, we are going to sit from 9:00 to 4:00, and

I've talked to the parties about streamlining the presentation of the case to make the most efficient use of your time.

So, once again, thank you for your service, and we will see you tomorrow morning at 9:00.

(Continued on next page)

(Jury not present)

THE COURT: I understand that there is a legal issue that the parties wish to raise.

Who wants to go first? Is that you Ms. Lenox?

MS. LENOX: Yes, it's my motion, I believe, so I'm happy to go first.

I have copies to hand up for your Honor of Ms. Drury's -- pages from Ms. Drury's medical records.

THE COURT: You may approach.

MS. LENOX: Thank you. These are pages from Ms. Drury's medical records that the defense seeks to introduce into evidence.

THE COURT: For the record, they're marked Defendant's Exhibit 01 and 02.

MS. LENOX: That's correct, your Honor. They are both excerpts from certified hospital records. One was produced to the defense in discovery, that's 01. And one was produced to Ms. Drury's counsel pursuant to the Rule 17 subpoena.

THE COURT: Okay.

MS. LENOX: I believe we have come to agreement with respect to redactions in the 01 exhibit, although the government can correct me if I'm wrong, but with respect to the 02 exhibit, there is one redaction that we have proposed that the government would like to be heard on. It is on the second page which is labeled Jane Doe 2, 000335. It's the second

paragraph on that page.

The defense would like to redact the sentence, "He does not think that Larry is physically abusive but notes that he may have a 'cult-like relationship with her.'"

In addition, the defense is willing to redact, as noted, the word pedophile, which is about in the middle of the page under past psychiatric history. We're also willing to redact similar references in 01. What we have flagged for the government is that while we will redact that reference, should the witness -- when questioned on cross-examination whether she ever had thoughts of harming individuals, should she deny that, then we would want to unredact that portion for impeachment purposes only, but we do not otherwise see the need to introduce that evidence.

THE COURT: Just so I'm clear, Ms. Lenox, with respect to the first redaction that begins, "He does not think Larry is physically abusive" but then goes on to talk about cult-like relationship, is it the defense's motion to have this introduced with that language redacted?

MS. LENOX: Correct.

THE COURT: In other words, you're asking permission to offer the document but without that language.

MS. LENOX: That's correct, your Honor.

THE COURT: And then with respect to the second reference with the language pedophile, is it the same point or

is that something that you're willing to do, but if the government wants it, you are fine with it?

MS. LENOX: Well, I don't think the government wants it, and so -- and we understand why the government would not want reference to that. The only reason we would need to reference it would be to impeach the witness. So absent that, we are happy to redact it.

THE COURT: Give me a moment to look at the document and then I'll hear from the government.

Ms. Sassoon is it you?

MS. SASSOON: Yes, your Honor.

THE COURT: First on 01, is there any issue?

MS. SASSOON: We would object to these exhibits as we did with Santos Rosario medical records, but we understand that your Honor has ruled that such records are admissible.

THE COURT: What's the basis of the objection?

MS. SASSOON: That the medical records contain hearsay that breaks the link of reliability, and at this point the probative value has not been established to outweigh any prejudice.

THE COURT: I don't think I've ruled with respect to a 403 issue. That tends to be specific to the witness and to the line of questioning. So if that's an objection you intend to press, I'll hear from the parties with respect to it.

I have ruled on the hearsay issue. So before we talk

about 02, I take it on the redactions of 01, there are no issues.

MS. SASSOON: Correct.

THE COURT: Okay. 02, and then I'll hear from Ms. Lenox with respect to relevance, and then I'll let you make your argument about relevance.

MS. SASSOON: I anticipate we'll be in a better position to make that argument when she seeks to introduce it in the midst of cross-examination.

THE COURT: That's fine. My rule with respect to both of you is that if you've got an objection that you think is better presented based upon the facts and the testimony that's come out, you should make it at the relevant time.

MS. SASSOON: Yes, your Honor.

THE COURT: 02.

MS. SASSOON: The only dispute, since we've met and conferred on this exhibit, pertains to the paragraph beginning "patient's father" and ending with "cult-like relationship with her." It's our position that the words "cult-like relationship" should stay in or the entire paragraph should be redacted under the rule of completeness. It's misleading to redact that language which imputes some culpability on the defendant for Ms. Drury's condition and her situation of having done bad things, and her father not wanting her to deal with the consequences, and the fact that he doesn't think he's

physically abusive but nonetheless has this suspect relationship with Ms. Drury. Without that, the information being conveyed by the patient's father for the purpose of medical treatment is incomplete and can't be properly understood without that additional context for Ms. Drury's behavior.

THE COURT: Let me make sure I understand what the records are saying. So the second clause of that first sentence which -- let me step back. That whole paragraph purports to reflect a conversation with Ms. Drury's father. Is that right?

MS. SASSOON: Yes.

THE COURT: And then the second clause of that first sentence where it refers to the patient having done bad things which he does not want to reveal because he does not want her -- I take it, it should be "to deal," not just "her deal with consequences"?

MS. SASSOON: Yes.

THE COURT: And what's your understanding of what that clause refers to?

MS. SASSOON: It's hard to say for sure because we don't have her father testifying or the doctor testifying. One potential interpretation is that he does not want to report her for any supposed criminal acts because he doesn't want anything bad to happen to his daughter as a result of that, but that is

only one potential interpretation.

THE COURT: Why do you think that the -- let me ask Ms. Lenox a question before I ask about the cult-like relationship.

Ms. Lenox, are you asking to have that whole second sentence received or are you asking for the whole second sentence to be received?

MS. LENOX: The entire second sentence to be redacted.

THE COURT: Including that he does not think that Larry is physically abusive.

MS. LENOX: Correct.

THE COURT: Ms. Sassoon, why is that second sentence necessary to put the preceding material in context?

MS. SASSOON: The purpose of this conversation, presumably, is to provide information to her treating doctor about her condition and about what has landed her in the hospital for treatment. And without the full scope of what he said for purposes of her treatment, his statements to the doctor are misleading, particularly because the statement "cult-like relationship with her" helps characterize whatever bad things that he's referring to his daughter having done, and it also links her condition that her father is reporting on to the defendant, which, if this is redacted, it's going to present a misleading impression to the jury that this is unrelated to the defendant, when in fact what her father is

conveying is that her position is bound up in this cult-like relationship that she has with the defendant.

THE COURT: I'll hear from Ms. Lenox in a moment.

What about the second redaction?

MS. SASSOON: That is at the request of the government. We've reached an agreement with the defense, as stated by Ms. Lenox, that this topic won't be pursued with Ms. Drury absent an impeachment purpose for doing so.

THE COURT: There is no disagreement that that language will be redacted if the document is received.

MS. SASSOON: Correct.

THE COURT: Ms. Lenox, let me hear from you with respect to relevance if you're prepared to discuss it now, but I also need to know enough about relevance to be able to rule on the rule of completeness issue.

MS. LENOX: So I think Ms. Sassoon may be correct that the relevance issue is better handled when the witness is under cross-examination.

With respect to the rule of completeness argument that Ms. Sassoon is forwarding, I think the redaction that the defense is proposing is the one that strikes that balance. We are not proposing that we eliminate only "cult-like relationship with her." We understand the government's concern about the first clause of that sentence saying "he does not think Larry is abusive but notes" is related to the cult-like

relationship, which is why we are proposing redacting the entire sentence rather than just the second clause of the sentence.

I don't see, however, though why the cult-like relationship at the end of the second sentence is necessarily implicated in the father's concerns with respect to the first sentence. I don't think that redacting the second sentence will leave anyone without any context or without the context necessary to interpret the first sentence, and it's not clear from the way that it is written that the tail end of the second sentence is intended in any way to have any influence on or impact the first sentence.

THE COURT: Well, with respect to the first sentence where it talks about the patient having done bad things which he does not want to reveal, isn't that a plain reference to bad things with respect to Mr. Ray, with respect to the defendant?

MS. LENOX: No, not necessarily because he doesn't mention -- he doesn't mention Mr. Ray until the second sentence. So he doesn't say Mr. Ray's name within the context of having potentially done bad things. He also, this comes after a line -- sorry.

I think that it's actually notable that Mr. Ray's name is not in that first sentence whereas it is in the second sentence, and it's clear that the context that he is providing for the second sentence has to do with the relationship, but

that is not clear from the first sentence.

THE COURT: The only testimony that's been offered so far in trial about Ms. Drury having done "bad things" is her perception that she did bad things with respect to the defendant. Isn't that actually the reason you want any of that paragraph in? I mean, there's no evidence that she was doing -- that this would support her doing bad things somehow unrelated to her relationship to Mr. Ray.

MS. LENOX: I mean, there is indication that her past psychiatric history, there is indication that she has done things or thought things in the past that were not particularly good. And when she is cross-examined, we intend to elicit testimony about hospitalization when she was a teenager which is referenced in the paragraph just below this which indicates potential harm to others. And so it's not clear based on the context that the first sentence that the government seeks to redact is actually directly linked to Mr. Ray.

THE COURT: I think from the context it is pretty clear that they're linked. In fact, they're in the same paragraph together. And the second sentence is fairly read to refer to a report by the father generally with respect to what's in the first sentence which has to do with the relationship with Mr. Ray. That's the way I read the -- and also states that the patient has done bad things, which is that it's separate from the troubled relationship with the parents.

So I'm going to -- if the document comes in, I'm going to overrule the defense motion and receive it with the full paragraph as to the rule of completeness.

What's next, anything from the government?

MS. SASSOON: No. Thank you, your Honor.

THE COURT: It would be useful for me at some point to have the proposed form of order with respect to the immunized witness if you've got a written order that you will ask me to sign.

MS. SASSOON: We will submit that today.

THE COURT: Copy the defense on that, obviously.

Ms. Lenox, anything?

MS. LENOX: No. Thank you, your Honor.

THE COURT: We will see you at 9:00.

Ms. Lenox, send me a proposed form of order with respect to the laptop over the weekend. Share the proposed form with the government first.

MS. LENOX: Certainly, your Honor. Thank you.

THE COURT: Thank you.

(Adjourned to March 22, 2022 at 9:00 a.m.)

INDEX OF EXAMINATION

Examination of: Page

CLAUDIA DRURY

Direct By Ms. Sassoon . . . . . . . . . . . . . 812

GOVERNMENT EXHIBITS

Exhibit No. Received

3092, 3103, 3115, 3116, 3120, 3121, . . . . . . 814
3186A, 3155, 3150, 3151A,
3217, 3220, 3473

4207 . . . . . . . . . . . . . . . . . . . . . 832

Pages 2 and 3 of Ex. 304 . . . . . . . . . . . 838