```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    UNITED STATES OF AMERICA,

 4              v.                        20 Cr. 110 (LJL)

 5    LAWRENCE RAY,

 6              Defendant.                Trial

 7    ------------------------------x

 8                                        New York, N.Y.
                                          April 4, 2022
 9                                        9:05 a.m.

10
      Before:
11
                       HON. LEWIS J. LIMAN,
12
                                          District Judge
13                                        and a jury

14                      APPEARANCES

15
      DAMIAN WILLIAMS
16         United States Attorney for the
           Southern District of New York
17    DANIELLE R. SASSOON
      MOLLIE BRACEWELL
18    LINDSEY KEENAN
           Assistant United States Attorneys
19
      FEDERAL DEFENDERS OF NEW YORK, INC.
20         Attorneys for Defendant
      MARNE L. LENOX
21    ALLEGRA GLASHAUSSER
      NEIL P. KELLY
22    PEGGY CROSS-GOLDENBERG

23    Also Present:  Kelly Maguire, FBI
                     Peter Charlambous, Paralegal-USAO
24                   Larissa Archondo, Paralegal-FDNY

25
```

1          (Trial resumed; jury not present)

2          THE COURT:  Good morning, everybody.

3          Ms. Lenox, I understand that it is the defendant's

4     decision not to defense in his own defense.

5          MS. LENOX:  That's correct, your Honor.

6          THE COURT:  Any objection to me inquiring of Mr. Ray?

7          MS. LENOX:  Certainly not.

8          THE COURT:  Mr. Ray, I want to make sure that you

9     understand that you have an absolute right to testify in your

10    own defense.  Do you understand that?

11         THE DEFENDANT:  Yes, I do.

12         THE COURT:  Have you discussed that issue with your

13    lawyer?

14         THE DEFENDANT:  Yes.

15         THE COURT:  Do you understand that it is your

16    decision, and your decision alone, whether to testify?

17         THE DEFENDANT:  Yes.

18         THE COURT:  It's not your lawyer's decision, it's not

19    anybody else's decision.  It's only your decision.  You

20    understand that?

21         THE DEFENDANT:  Yes.

22         THE COURT:  Do you understand that once you make the

23    decision not to testify, that decision is irrevocable.  You

24    won't be testifying in your own defense in this case.  Do you

25    understand that?

1              THE DEFENDANT:  Yes.

2              THE COURT:  What is your election?  Do you wish to

3   testify or not to testify?

4              THE DEFENDANT:  Not.

5              THE COURT:  Does the defense wish me to ask any other

6   questions of Mr. Ray?

7              MS. LENOX:  No, your Honor.

8              THE COURT:  Does the government wish me to ask any

9   other questions of Mr. Ray?

10             MS. SASSOON:  No, your Honor.

11             THE COURT:  I conclude that Mr. Ray has knowingly made

12   a decision and his own decision not to testify.

13             There are a couple of other issues before we bring the

14   jury in.

15             Mr. Kelly, you asked the question about whether you

16   may be permitted to ask leading questions of Mr. Ripa.  Does

17   the government have any objection to that?

18             MS. KEENAN:  We do, your Honor.

19             THE COURT:  Tell me what your objection is.  I fairly

20   narrowly circumscribed what Mr. Ripa will be permitted to

21   testify to, and I do think that with respect to a number of the

22   preliminary questions, such as whether Mr. Ripa became aware of

23   the claim and the confession by Ms. Drury that she had poisoned

24   Mr. Ray and whether there came a time that he provided

25   information to Mr. Ray regarding the taxability of proceeds of

1  prostitution, that it would be helpful for there to be leading

2  questions.

3      MS. KEENAN:  I agree with those two particular precise

4  questions.  It seems like it would be fine to have a yes/no

5  answer, but generally it was clear from Mr. Ripa's testimony

6  that he remembers almost nothing about his conversations with

7  the defendant or anyone else related to these subjects, and we

8  think it's important for the jury to hear that.

9      THE COURT:  Mr. Kelly.

10     MR. KELLY:  Just to be clear, I don't intend to lead

11 the entire -- first of all, the testimony will be brief,

12 consistent with the Court's order, and I don't intend to lead

13 the entire examination.  It is specific to the questions about

14 which the Court does not want us opening the door to other

15 testimony, and I won't, frankly, be leading as I would on

16 cross.  For lack of a better term, it will be a gently leading

17 to make sure that we don't tread into territory the Court has

18 ordered we not.  Again, I'm just trying here to make this as

19 streamlined as possible and to avoid going beyond the scope of

20 the Court's order.

21     THE COURT:  Let me look at my order on page 12 and try

22 to give you some guidance.

23     Mr. Kelly, do you also intend to inquire of Mr. Ripa

24 regarding the representation of Mr. Ray with respect to the

25 claims of poisoning?

1          MR. KELLY:  Yes.  Again, consistent -- I intend to

2     inquire into the topics the Court has permitted us to, so all

3     of them, and as narrowly as possible to elicit the facts that

4     the Court has ordered we are allowed to elicit.

5          THE COURT:  If you've got page 12 of my order in front

6     of you, let me tell you what I'll permit you to lead on.

7          You can lead on the questions in number 1.

8          You can lead with respect to number 2.  In other

9     words, you can ask Mr. Ripa whether at some point between 2015

10    and 2017 he heard that Ms. Drury was engaged in prostitution.

11         With respect to number 3, you can ask him the leading

12    question whether at some point thereafter or at some point he

13    gave information to Mr. Ray regarding the taxability of

14    payments for alleged poisoning that came from prostitution.

15    You cannot ask him a leading question as to what that

16    information was.

17         I am going to instruct you that you should make sure

18    that Mr. Ripa has been carefully advised just to answer the

19    question that you have asked him.  So the question you will ask

20    him is, what information did you provide him with respect to

21    the taxability.

22         With respect to number 4, you can also ask a leading

23    question with respect to his credentials.  You are not going to

24    ask leading questions.

25         MR. KELLY:  No.  That's exactly what I intended to do

1    for those questions, your Honor.  Thank you.

2            THE COURT:  My plan for the day is, I understand the

3    defense case will be Mr. Ripa and then the cell site expert.

4            MR. KELLY:  I think it will be the reverse, Mr. Minor

5    and then Mr. Ripa.

6            THE COURT:  How long do we expect Mr. Minor's

7    testimony to be?

8            MS. GLASHAUSSER:  Not long, your Honor.  It also will

9    be limited, as your Honor had ordered, but I would anticipate

10   maybe 45 minutes.

11           THE COURT:  That's longer than I would have that, but

12   that's fine.

13           Mr. Ripa's testimony, you said, is going to very

14   short.

15           MR. KELLY:  Very short, your Honor.  Ten minutes on

16   direct.  I can't give a speed to the cross.

17           THE COURT:  Then that will conclude the defense case,

18   is that right?

19           MS. GLASHAUSSER:  Yes, your Honor.  Except we will

20   first be reading a stipulation before we start with the two

21   witnesses.

22           THE COURT:  Does the government right now anticipate

23   any rebuttal case?

24           MS. SASSOON:  No.  Although we may, depending on Mr.

25   Ripa's testimony, want to introduce as substantive evidence

1   prior inconsistent statements from his sworn testimony on

2   Friday under Rule 801(d).

3          THE COURT:  Then what we will do is, we will finish

4   the testimony.  I will then have the jury take a break, and we

5   will discuss with the parties the theory-of-the-defense charge

6   and, as I indicated from my order yesterday, any additional

7   objections to the charge before we roll into summations.  We

8   will conclude with respect to those.

9          I did receive the theory-of-the-defense charge this

10  morning from the defense.  Does the government have a view?

11         MS. GLASHAUSSER:  I apologize to interrupt.  We are

12  having a technical issue over here that I am hoping we can

13  address while we are having this conversation.  Maybe Matt can

14  call a tech person.  Our screens are not working, is my

15  understanding of the situation.

16         THE COURT:  Thank you for bringing that to our

17  attention.

18         Does the government yet have a view with respect to

19  the charge on theory of the defense?

20         MS. SASSOON:  Yes.  We have some objections to the

21  proposal.

22         THE COURT:  I have, and I will hand out, a proposed

23  revision of the theory of the defense.  It's tentative.  I

24  haven't heard the government's objections and I haven't heard

25  the defense's argument.  But this is language that I would ask

1   the parties to consider, and I will hear the parties at the

2   close of all of the evidence with respect to the charge.

3          My law clerk is giving that to you.

4          The last thing I have is that in response to

5   Ms. Sassoon's inquiry of yesterday regarding the location of

6   the podium, I think my deputy has given both sides some

7   information.  Hopefully, you'll have the time to make whatever

8   arrangements you need to if you wish to argue from a podium

9   that's closer to the jury.

10          MR. KELLY:  Your Honor, while we are on the topic of

11   the jury charge, I believe we found one reference still to

12   robbery on page 36 that I think needs to be eliminated.

13          THE COURT:  Great.

14          Mr. Kelly, anything else that you see right now from

15   the charge besides the theory of the defense?

16          MR. KELLY:  Not at the moment.

17          THE COURT:  What about from the government, anything

18   that you see right now other than the theory of the defense?

19          MS. SASSOON:  No.  We reviewed the changes and we did

20   not see anything.

21          THE COURT:  Anything from the government before we

22   bring the jury?

23          MS. SASSOON:  No.  Thank you, your Honor.

24          THE COURT:  Anything from the defense before we bring

25   the jury?

1          MS. GLASHAUSSER:  No, your Honor.

2          THE COURT:  I would propose that we bring in Mr. Minor

3     right now and then you can formally call him.

4          While my deputy is getting the jury ready to be

5     brought in, why don't you bring in Mr. Minor.

6          THE COURT:  Mr. Minor, you may be seated for now.  You

7     may take your mask off.

8          (Jury present)

9          THE COURT:  Welcome back, members of the jury.  I hope

10    you all had a nice weekend.  We will proceed now with the

11    defense case.

12         Ms. Glashausser, do you want to call your first

13    witness.

14         MS. GLASHAUSSER:  Your Honor, first, I'd like to read

15    a stipulation into the record.  May I do that from the podium?

16         THE COURT:  You may.  Just identify what the

17    stipulation is by exhibit number.

18         MS. GLASHAUSSER:  Thank you, your Honor.

19         This has been marked as Defense Exhibit A52.

20         Larissa, could you please pull it up and publish it.

21         It is hereby stipulated and agreed between the parties

22    that:

23         1.  Carlos Pagan met with FBI Special Agent Kelly

24    Maguire on November 19, 2021.  During that meeting, Agent

25    Maguire asked Mr. Pagan about an interaction with Felicia

1   Rosario in the lobby of 300 East 93rd Street.  Mr. Pagan did

2   not say that he saw any bruises on Felicia Rosario.

3          It is stipulated and agreed and this stipulation may

4   be received in evidence as a defense exhibit at the trial.

5          THE COURT:  Call your next witness, please.

6          MS. GLASHAUSSER:  Thank you, your Honor.  The defense

7   calls John B. Minor.

8   JOHN B. MINOR,

9       called as a witness by the Defendant,

10      having been duly sworn, testified as follows:

11  DIRECT EXAMINATION

12  BY MS. GLASHAUSSER:

13  Q.  Good morning, Mr. Minor.

14  A.  Good morning.

15  Q.  What do you do for a living?

16  A.  These days my primary employment is self employment as a

17  technical expert focused on forensic cell site analysis.

18  Q.  And how long have you worked in the field of cell site

19  analysis?

20  A.  Oh, about 20 years.

21  Q.  What's your professional training in the field of cell site

22  analysis?

23  A.  Well, I joined the technology revolution when IBM

24  introduced a PC in the early 1980s.  So I've had thousands of

25  hours of training by the likes of, of course, IBM, but also

1    AT&T Lucent, a company by the name of iBwave, Cisco, Qualcomm,

2    a variety of technology companies that produce related software

3    and hardware products that are used in the cellular network,

4    and I was trained by AT&T Lucent in the optical network

5    technology in the mid '80s.

6    Q.   What about more recently.  Do you teach any training cores?

7    A.   I do teach -- I teach for Espionage Research International

8    or ERII.org, in Washington D.C., and I teach internationally

9    with a group called CTSCT Canada.

10   Q.   What about teaching specifically in the field of forensic

11   cell site analysis?

12   A.   Well, both of these are espionage/counterespionage groups,

13   and forensic cell site analysis is one of the key areas that I

14   have trained in with these groups, in addition to radio

15   frequency spectrum related, and particularly my specialty

16   photonics or fiberoptic network technologies.

17   Q.   Have you won any awards with respect to your training in

18   cell site analysis?

19   A.   I did.  In 2019, before the pandemic onset, at our

20   conference I was awarded the Glenn H. Whitten Award at the ERII

21   conference for best presentation and it was related to 5G

22   technology and forensic cell site analysis.

23   Q.   Do you have any certifications in cell site analysis?

24   A.   Yes, ma'am.  I started certifying in the early 1990s.  I

25   was certified as a network engineer in 1991.  Later in the

1    1990s, I received a variety of certifications in communications

2    technology that relate to satellite and wireless like

3    microwave, the photonics areas.

4            But then I began to focus, as the certifications began

5    to arrive, because there were no classes, much less

6    certifications, I began to certify in the early 2000s, and I

7    received a certification as a GPS and cell site analyst with

8    Paraben in Washington, D.C. for that, and there were others as

9    well.

10   Q.  Have you written any papers in the field of cell site

11   analysis?

12   A.  Yes, ma'am.  I have submitted two peer-reviewed or

13   double-blind peer-reviewed research papers over the years that

14   are specifically focused on forensic cell site analysis.

15   Q.  Have you received any patents in the field of cell site

16   analysis?

17   A.  Yes, ma'am.  I filed a patent in 2013 and was awarded in

18   2015 a patent for a validation and air mitigation methodology

19   directly related to the cell site evidence used and forensic

20   cell site analysis.

21   Q.  Are you a member of any professional organizations in the

22   field?

23   A.  Yes, ma'am.  I'm a senior lifetime member of IEEE, the

24   Institute of Electrical and Electronic Engineers, as well as a

25   voting member of the Internet Engineering Task Force, which

1  creates all the standards for the Internet, as well as the ASTM

2  International Group, which is basically where ANSI standards

3  come from, and I belong to the E30 Forensics Group, which also

4  relates to digital as well as physical evidence handling and

5  the forensics that are related.

6  Q.  That's probably good.  Thank you.

7       Have you testified as an expert before in court?

8  A.  Yes, ma'am.  A number of times.

9  Q.  Approximately how many?

10 A.  Over 50.

11 Q.  And for which sides have you testified?

12 A.  I've testified for both prosecution and defense in criminal

13 cases, and for plaintiffs and defendants in civil cases.

14      MS. GLASHAUSSER:  Your Honor, I offer Mr. Minor as a

15 rebuttal expert in the field of forensic cell site analysis.

16      MS. KEENAN:  No objection.

17      THE COURT:  Received.

18 Q.  Mr. Minor, turning your attention to this case, did you

19 review any maps created by the defense in this case?

20 A.  I did.

21      MS. GLASHAUSSER:  Larissa, can you please pull up what

22 has been marked as Defense Exhibits P1, 2, and 7 for the

23 parties and the witness.

24 Q.  Larissa is going to move through these maps slowly.  As you

25 look at them, can you tell us if you recognize these maps?

1    A.  I do recognize the maps.

2    Q.  What are they, generally?

3    A.  These are maps that relate to, I believe, map slides from

4    the prosecution and are depicting the location on specific

5    dates and times of devices that are related to this case.

6    Q.  Mr. Minor, can you look again.  These are the Defense

7    Exhibits P1, 2, and 7.

8    A.  Yes.

9    Q.  Did you review these maps for accuracy?

10   A.  I did.

11   Q.  With respect to these maps I think you may have misspoke.

12   Are these maps that were created by the prosecution or by the

13   defense?

14   A.  These are produced by the defense.

15   Q.  Are these fair and accurate depictions of the tower

16   locations of the calls that you see on the maps?

17   A.  They are.

18           MS. GLASHAUSSER:  I move to admit these Exhibits P1,

19   P2, and P7.

20           MS. KEENAN:  No objection.

21           THE COURT:  Received.

22           (Defendant's Exhibits P1, P2, and P7 received in

23   evidence).

24   Q.  Did you also review maps that were created by the

25   prosecution in this case?

 1  A.  Yes, ma'am, I did.

 2  Q.  So I'd like to focus your attention on the timing of the

 3  calls from Mr. Ray's phone on the government maps.

 4          MS. GLASHAUSSER:  Larissa, can you please pull up

 5  Government Exhibit 1410, page 71.

 6  Q.  On this map from August 13, did you reach any conclusions

 7  about the call from Mr. Ray's phone at 6:42:16?

 8  A.  Yes, ma'am.  I noticed the time stamp on the call, and I

 9  reviewed the actual evidence, the CDR CSLI evidence, for

10  Mr. Ray's device, and I did not find that time stamp in the

11  record.

12  Q.  When you say the actual evidence, can you explain what that

13  is.

14  A.  Yes.  The maps that are produced are a representation by an

15  analyst during the analytic process, called forensic cell site

16  analysis.  The evidence actually that we depend on is the

17  record from the phone company.  The record is produced.  It's

18  called a charging data record, or a CDR, and the CDR contains

19  very precise information about the date and time, what we call

20  metadata, of calls or texting, data usage, and that's what we

21  really solely depend on as the evidence.

22  Q.  I'd like you to walk us through how you determine that that

23  call time wasn't in the record.

24          MS. GLASHAUSSER:  Can we turn to Government Exhibit

25  224, Larissa, around line 144.

1    Q.   What is this document?

2    A.   Well, I reviewed -- the first two columns, A and B, there

3    to the left contain the date and time in local and in what

4    would be UTC, or GMT.  UTC and GMT are the same, essentially.

5    And I looked for an entry, and you will look at -- line 144 was

6    the closest entry on that date, the closest entry to the time

7    that was depicted in the map.  But it is not the time depicted

8    in the map and, therefore is not in synch -- the mapping is not

9    in synch with any record that I can see from Mr. Ray's device.

10   Q.   Is this record what you were calling the actual evidence?

11   A.   This is.  This is typical of Verizon production.  AT&T

12   production or T-Mobile production might look somewhat

13   different, but they all have commonality in the type of

14   information that is produced for each call, text message, or

15   data usage session.

16   Q.   Just to make sure it's clear, we are looking at a record

17   from August 13, right, around 6:00?

18   A.   Yes.

19        MS. GLASHAUSSER:  Larissa, can you go back to the

20   previous map, map 71.

21   Q.   Did you find Mr. Ray's call at 6:42:16 in that actual

22   evidence?

23   A.   No, ma'am, I did not.

24        MS. GLASHAUSSER:  Turning to another map, Larissa,

25   could you please pull up page 97.

1    Q.  Looking at this map for November 22, did you reach any

2    conclusion about the times of the calls listed from Mr. Ray's

3    phone on this map?

4    A.  Yes, ma'am, I did.

5    Q.  And what conclusion did you reach?

6    A.  I used the same process to review the actual evidence and

7    did not find either -- any of those calls in the actual

8    evidence at those precise times.

9    Q.  So, for example, there is one call listed at 8:03:24.  Did

10   you find that one in the actual evidence?

11   A.  No, ma'am.

12   Q.  And there is another call listed at 11:53.  Did you find

13   that call in the evidence?

14   A.  No, ma'am.

15   Q.  Turning your attention to the box at the bottom of the map,

16   the box that lists a call that is not part of the map itself?

17   A.  Yes, ma'am.

18   Q.  Did you reach any conclusions about the call listed as

19   occurring between Mr. Ray's device and Ms. Pollok's device at

20   7:46?

21   A.  I did.

22   Q.  And what conclusion did you reach?

23   A.  I reviewed, again, that date and exact time stamp and

24   reviewed Mr. Ray's device records, the evidence, and did not

25   find that call within the records.

```
 1            MS. GLASHAUSSER:  Larissa, can you actually highlight

 2    the call box at the bottom, please.

 3    Q.   Did you find any call close to 7:46 from Mr. Ray's device

 4    to Ms. Pollok's device?

 5    A.   No, ma'am.

 6    Q.   Did you check Ms. Pollok's record for the call as well?

 7    A.   I did.

 8    Q.   What did you find in Ms. Pollok's record?

 9    A.   I found an entry for such a call and Ms. Pollok's records.

10    Q.   Is it significant to you that this call appeared in the

11    entry for -- for the record for Ms. Pollok's device but not for

12    Mr. Ray's device?

13    A.   It is.  It would indicate to me that with one unknown which

14    one of the sets of records, one of the sets of evidence is

15    errant or perhaps both are.  And that's an indication, because

16    of the lack of a time stamped entry for a charging data record,

17    indicating communication session, that we don't know what that

18    actual evidence should be.

19    Q.   When you find the call in one record but not the other, can

20    you tell which one is wrong?

21    A.   No, it's not possible.  There are standards that relate to

22    how CDR entries occur in the evidence and there is a provision

23    for error checking in the standards, and the carriers generally

24    follow the standards in their recordkeeping.  However, their

25    computing processes sometimes just have errors, and you don't
```

1   know whether there is a false entry in place, a ghost entry, or

2   you don't know whether there is a void because a piece of

3   equipment failed and didn't record an entry.  So there is not a

4   way of knowing either way.  Typically, what I would do --

5   sorry.  I probably shouldn't --

6   Q.  I think that's good.  Thank you, Mr. Minor.

7           We are going to go to another map.

8           MS. GLASHAUSSER:  Larissa, can you please pull up page

9   79.

10  Q.  This is a map from August 23.  We, again, have Mr. Ray's

11  device listing a call.

12          MS. GLASHAUSSER:  Larissa, could you highlight the

13  call that's listed as 7:20:36.

14  Q.  Did you reach any conclusion with respect to that call?

15  A.  Yes.  I did not locate that precise time stamp in Mr. Ray's

16  device evidence, in the actual evidence as well, at that

17  precise time.

18  Q.  Thank you.

19          So staying with this map, I'd like to turn your

20  attention to the mapping of the tower locations.  Focusing

21  still on August 23, did you look into other locations Mr. Ray's

22  device connected to around this time?

23  A.  I did.

24          MS. GLASHAUSSER:  Larissa, can you please pull up

25  Defense Exhibit P1.

1   Q.   What date do these maps depict?

2   A.   I'm sorry.  I didn't --

3   Q.   What date do these maps depict?

4   A.   August 23, 2018.

5   Q.   Is that the same date we were just looking at on the

6   government's maps?

7   A.   Yes, ma'am.

8   Q.   And does this show the same time period as the government's

9   maps?

10  A.   It does.

11  Q.   Can you describe what we see about the movement of

12  Mr. Ray's device in these maps.

13  A.   Well, once the mapping was depicting additional calls that

14  occurred in the records for Mr. Ray's device, I realized that

15  Mr. Ray's device was first up near 60th or so east of Central

16  Park and was actually moving toward Grand Central Station,

17  which is the lower dot and call-out box at 7:18:20 p.m.  Then

18  over the progression of time, Mr. Ray's device ended up in New

19  Jersey, across the river, which would be consistent with the

20  device being on the move and probably in congested traffic.

21          MS. GLASHAUSSER:  Larissa, can you please pull up

22  Government Exhibit 1410, page 79 next to Defense Exhibit P1.

23  Q.   I think you said that P1 shows that Mr. Ray's device is on

24  the move.  Is that shown in Government Exhibit 79 -- excuse

25  me -- page 79 of the government's exhibit?

1    A.  No.  It's not a complete analytical picture of what events

2    were occurring and what type of movement and timing was

3    occurring with respect to Mr. Ray's device.

4    Q.  How much time elapses between the device being up by

5    Central Park and the device being down by or connecting down by

6    Grand Central Station?

7    A.  Roughly, 11 minutes, plus -- that's approximately what we

8    are talking about.

9    Q.  Having done the analysis in Defense Exhibit P1 and

10   determining that Mr. Ray's device was on the move, did you

11   reach any conclusion about the proximity of the devices between

12   Mr. Ray's device and Ms. Drury's device?

13   A.  What I observed in reviewing a more complete record of

14   Mr. Ray's device is that it appears to be a coincidental

15   proximity to Ms. Drury's device in the course of travel down

16   from east of Central Park toward Grand Central and traversing

17   out then to the west on some path out to New Jersey.

18   Q.  Does Ms. Drury's device also appear to be on the move?

19   A.  No.  Ms. Drury's device appears to be static in the area

20   the entire time, and I would consider that scenario of

21   Mr. Ray's device on the move while Ms. Drury's device was

22   static in place.

23   Q.  So did you reach any conclusion about Government Exhibit

24   1410, page 79 in comparing these two maps?

25   A.  Well, it casts an illusion that Mr. Ray's device is in

1  proximity for at least some time to Ms. Drury's device, until

2  you get the bigger picture of movement with the additional

3  calls bracketing each side of Mr. Ray's device and understand

4  that the device was actually undergoing movement during the

5  time while Ms. Drury's device was static.

6        MS. GLASHAUSSER:  Thank you, Larissa.  You can take

7  these down.

8  Q.  I am going to turn your attention to another map,

9  Mr. Minor.

10        MS. GLASHAUSSER:  Larissa, can you please pull up page

11  53 of Government Exhibit 1410.

12  Q.  Did you reach any conclusion about this map from May 4 and

13  the locations of the towers noted on the map?

14  A.  Yes, ma'am.  What I observed was, if you look at the map,

15  there are two blue bubbles associated with Ms. Pollok's device.

16  The upper blue circle or bubble is positioned in a location

17  that does not identify the cell site to which Ms. Pollok's

18  device connected to during this particular communication event.

19  Q.  When you say it does not depict the cell site that she

20  connected to, what do you mean by that?

21  A.  Well, that particular geographic location is the wrong

22  location depicted in this map for the cell site to which

23  Ms. Pollok's device connected.  It actually was a cell site

24  that is north or above that some distance up, closer to the

25  Time Warner Center identifier up there, but off to the right of

1    it.

2         MS. GLASHAUSSER:  Larissa, could you please pull up

3    Defense Exhibit P7.

4    Q.  What date does this map depict?

5    A.  May 4, 2018.

6    Q.  Is that the same date as the date we were just looking at

7    on the government map?

8    A.  Yes, ma'am.

9    Q.  And is it the same time period?

10   A.  It is.

11   Q.  And what does this map show?

12   A.  Well, this map depicts the one errant cell site that I

13   pointed out in the previous map, and that is the correct

14   location for this site being on Columbus Circle there, actually

15   on the west side of Columbus Circle as you round the curve.

16   Q.  When you say errant cell site, is that another way of

17   saying it's the wrong cell site?

18   A.  Yes.

19        MS. GLASHAUSSER:  Larissa, could you please put

20   Government Exhibit 1410, map 53 next to Defense Exhibit P7.

21   Q.  So looking at these two maps together of Ms. Pollok's

22   device at the same call, what can you tell us about the

23   accuracy of the May 4 map in the government's exhibit?

24   A.  Well, the government exhibit is in error.  Again, it

25   indicates that the cell site at the top, to the north, if you

 1   will.  The first blue bubble at the top -- thank you -- would

 2   be nearer to the second location, and actually it was further

 3   up another block and a half up on Columbus Circle.

 4   Q.  Thank you.

 5        MS. GLASHAUSSER:  Larissa, you can take those down.

 6   Thank you.

 7   Q.  Turning to one more map, Government Exhibit 1410, map 81.

 8        MS. GLASHAUSSER:  Larissa, can you please pull that

 9   up.

10   Q.  So this map from August 27, can you tell us what time

11   period is reflected for Ms. Pollok's device on this map?

12   A.  Ms. Pollok's device is at 1:35 in the afternoon, p.m.

13   Q.  What time period is reflected for Ms. Drury's device on

14   this map?

15   A.  I'm sorry.  I could not hear that.

16   Q.  What time period is reflected for Ms. Drury's device on

17   this map?

18   A.  Ms. Drury's device indicates seven voice and text records

19   between 10:08 and 11:27 a.m.

20   Q.  So when did Ms. Drury's device last connect by that cell

21   site tower near the White Castle?

22   A.  The indication on this record is 11:27:06 a.m.

23   Q.  And when did Ms. Pollok's device first connect to that cell

24   site location by the White Castle?

25   A.  1:35:28 p.m.

1   Q.  And how much time is between Ms. Drury's last connection

2   and Ms. Pollok's first connection?

3   A.  There would be approximately two hours.

4   Q.  So, just looking at this map, did you reach any conclusions

5   about the accuracy of the map?

6   A.  This particular map passed an illusion that the two devices

7   are, proximity, location, and timing wise, near one another

8   when in fact Ms. Pollok's device didn't arrive until long

9   after, two hours after Ms. Drury's device was located, attached

10  to this cell site.

11          MS. GLASHAUSSER:  Larissa, can you please pull up

12  Defense Exhibit P2.

13  Q.  So this exhibit is a series of three pages.  I'd like you

14  to walk us through them, starting with this first page.

15  A.  Yes, ma'am.

16  Q.  On this first page what date does this depict?

17  A.  August 27, 2018.  It's the time period from 10 a.m. to

18  11:30 a.m.

19  Q.  So is the date the same as the date on the government's map

20  we were just looking at?

21  A.  It is.

22  Q.  And what about the time period, is it the same hours?

23  A.  Well, it includes approximately the time range for

24  Ms. Drury's device.

25  Q.  So it's just a portion of the hours from the government's

1    exhibit?

2    A.   That's correct.

3    Q.   In the government's map we saw a cell site near a White

4    Castle.  Is that cell site in this map?

5    A.   It is.  It's the red dot and the call-out box outlined in

6    red indicated for Ms. Drury's device.  That is the same

7    location, approximately, depicted in the map, in the

8    government's map, and I have referred to it.

9    Q.   At this time period, between 10 and 11:30, does

10   Ms. Pollok's device connect to that cell tower by the White

11   Castle?

12   A.   No, it does not.  You might observe at the bottom right

13   corner of the map there is a legend that indicates the scale

14   and you will see a 1,000-foot scale, and it would be simple

15   enough to estimate that it's over 10 of those on the scale

16   between the top blue dot for Ms. Pollok's device and the red

17   dot for Ms. Drury's.  They were likely a couple of miles or

18   more apart.

19   Q.   The devices you're talking about when you say that?

20   A.   The cell site locations.

21   Q.   The cell site location towers where they connected to.

22           MS. GLASHAUSSER:  Turning to page 2, Larissa, of this

23   same exhibit.  Thank you.

24   Q.   Is this still August 27?

25   A.   It is.

 1    Q.  So it's the same date we are looking at?

 2    A.  It's the same date.  It's a later span of time.

 3    Q.  Is it the next chunk of time after the last map?

 4    A.  Yes.  It would be sequentially the next chunk of time or

 5    span of time.

 6    Q.  What does that map show about Ms. Drury's device between

 7    11:30 and 12:15?

 8    A.  It shows Ms. Drury's device actually making a move from

 9    west to east during that period of time, and you see that from

10    the box on the left a time period between 11:30 and 12:05, and

11    then between 12:05 and 12:15 on the upper right-hand box.  That

12    would indicate some movement occurring in the device between

13    the two areas.

14    Q.  And is this the cell site by the White Castle still on this

15    map?

16    A.  No.  I believe she has exited the area and is on the move

17    to the east, from the west to the east from the White Castle.

18            MS. GLASHAUSSER:  Larissa, could you please turn to

19    page 3 of this exhibit.

20    Q.  To orient us, this is the same date still, August 27,

21    right?

22    A.  Yes, it is August 27, 2018.

23    Q.  And what is the time period here?

24    A.  The time frame or period is between 1:30 p.m. and 1:40 p.m.

25    Q.  And is the cell site by the White Castle on this map?

1    A.   Yes.  If you observe the left-hand graphic with the blue

2    dot for Ms. Pollok's device, it indicates that Ms. Pollok's

3    device is connected or attached to the cell site near the White

4    Castle as it was described.

5    Q.   Where is Ms. Drury's device connecting during this time

6    period?

7    A.   Ms. Drury's device is now well to the east across the river

8    in Manhattan.

9    Q.   So what does Defense Exhibit P2 generally show about

10   Ms. Drury's and Ms. Pollok's devices that day?

11   A.   Well, they were in completely disparate or different

12   locations at the time that Ms. Pollok's device was connected to

13   the White Castle.  The cell site near the White Castle where

14   Ms. Drury's device was was actually miles away to the east.

15   Q.   Looking back to Government Exhibit 1410, map 81 with this

16   third page, can you describe the differences from the

17   government's map to the defense map?

18   A.   Yes, ma'am.  Forensic cell site analysis has more than one

19   primary purpose, but location and timing is one of the very

20   primary aspects of forensic cell site analysis.  And the map on

21   your right, the government exhibit, creates an illusion that

22   the devices are, timing wise, location and, timing wise, near

23   one another when actually they were far apart from one another

24   at the time that Ms. Pollok's device connected to the White

25   Castle.

 1   Q.  Thank you, Mr. Minor.  I have no other questions.

 2           THE COURT:  Cross-examination.

 3   CROSS-EXAMINATION

 4   BY MS. KEENAN:

 5   Q.  Hello.

 6   A.  Good morning.

 7   Q.  If you can't hear me in there, just let me know.

 8           I want to start by looking at Defense Exhibit P1.

 9   A.  Yes, ma'am.

10   Q.  Before we do that actually, Mr. Minor, you wrote an article

11   entitled Forensic Cell Site Analysis, a Validation and Error

12   Mitigation Methodology, right?

13   A.  I did, yes, ma'am.

14   Q.  In that article you posit that it's required to take

15   several steps before you can confirm that a cell site

16   connection is accurate, right?

17   A.  Yes.

18   Q.  One of those steps --

19           MS. GLASHAUSSER:  Your Honor, I would object.  Can we

20   have a sidebar, perhaps?

21           THE COURT:  Yup.

22           (Continued on next page)

23

24

25

1              (At sidebar)

2              MS. GLASHAUSSER:  I tailored my direct examination

3    solely to the items that your Honor permitted me to do, so I

4    did not go into general cell site validation and error

5    mitigation and Mr. Minor's thoughts on those topics, which I

6    would have done if I were permitted to so.  I did not, so I

7    don't think it's appropriate for the cross-examination to

8    explore those topics.  I was prohibited.

9              MS. KEENAN:  I want to know what steps that he took to

10   validate that these maps are more correct than the other maps

11   that he was shown by way of comparison.

12             THE COURT:  That seems like that's within the scope.

13   If she opens it up, depending on where she goes, you might have

14   some redirect.

15             MS. GLASHAUSSER:  I think it's fine to explore the

16   maps.  It just sounded much broader by asking about his general

17   methodologies.

18             THE COURT:  I appreciate you bringing it to my

19   attention.  Go ahead.

20             (Continued on next page)

21

22

23

24

25

 1          (At sidebar)

 2          THE COURT:  Ms. Keenan, you may proceed.

 3  Q.  It is your view that it's necessary to take several steps

 4  before you can rely on records reflecting that a cell phone

 5  connected to a particular cell site at a given date and time,

 6  right?

 7  A.  Yes.  My methodology entails that process.

 8  Q.  The first step would be to know the carrier's error rate,

 9  right?

10  A.  That's not the first step.

11  Q.  Is that one of the steps?

12  A.  Actually, it's not.

13  Q.  OK.  You would want to validate the cell site location,

14  right?

15  A.  Yes.  That would be the first step, to validate cell site

16  location.

17  Q.  You would want to check the coverage area for topographic

18  analysis, right?

19  A.  Yes.

20  Q.  You would want to do research about subscriber aggravating

21  events, right?

22  A.  I'm sorry.  I didn't hear that completely.

23  Q.  You would want to do research about whether there were any

24  subscriber aggravating events?

25  A.  Yes.

1    Q.  You would want to review network traffic congestion

2    policies, is that right?

3    A.  That would be desirable, yes.

4    Q.  You would also want to check weather conditions, right?

5    A.  Yes.

6    Q.  And you would want to review network operation center

7    network logs?

8    A.  Yes.  Maintenance logs for planned or unplanned outages of

9    cell sites.

10   Q.  And you would want to review carrier performance metrics,

11   right?

12   A.  Yes.

13   Q.  And you would want to research the carrier's adherence to

14   the network standards 3GPP?

15   A.  I'm not able to quite make out what you said.

16   Q.  You would also want to research the cell carrier's

17   adherence to the network 3GPP standards, right?

18   A.  Yes.  Different cell phone companies adhere to standards to

19   a different degree.

20          MS. KEENAN:  If we could take a look at Defense

21   Exhibit P1.

22   Q.  The northern most connection on this map is at 7:07 and 47

23   seconds p.m.?

24   A.  Yes, ma'am.

25   Q.  Are you certain that that's the exact cell site that

1    Mr. Ray's device connected to on August 23, 2018 at 7:07:47

2    p.m.?

3    A.   I believe that is the coordinate that was provided within

4    the CDR.

5    Q.   And you believe that connection was at that exact time?

6    A.   I believe so.

7    Q.   Are you aware that during this time period Verizon

8    disclosed an issue saying that its records might reflect the

9    first cell site a phone connected to or they might reflect the

10   last cell site a phone connected to?

11   A.   I am familiar with the Verizon disclosure letter, and that

12   would indicate potential error introduced into records.

13   However, Verizon could not identify specifically what was an

14   error and what wasn't.

15   Q.   So you don't know whether this phone connected to this

16   exact cell site at 7:07:47 p.m., right?

17   A.   Well, we don't know whether it was an originating or a

18   terminating cell site for the duration of the call.

19   Q.   But is this the beginning of the call, 7:07:47 p.m.?

20   A.   I'm sorry?

21   Q.   Is this the beginning of the call, 7:07:47 p.m.?

22   A.   That is the originating time stamp.

23   Q.   So depending on whether this was the originating or the

24   terminating cell site, this phone could have been somewhere

25   else at 7:07:47 p.m., right?

1  A.  It could have connected to a different cell site.

2  Q.  It could have been somewhere else?

3  A.  It could have.

4  Q.  Did you validate whether there is actually a cell site at

5  this location?

6  A.  I believe that I did.

7  Q.  Did you check the weather on this date?

8  A.  I did a cursory check of weather and space weather,

9  climactic and space weather.  I saw nothing unusual.

10  Q.  Did you check network traffic congestion policies?

11  A.  So, network traffic congestion policies are maintained by

12  the carrier, and there was -- I was not asked to perform a full

13  analysis in this case, so, therefore, never had a chance to

14  request that the carrier, Verizon in this case, produce.  I did

15  request supplemental information be produced regarding the

16  disclosure letter, but I never received any additional

17  information.

18  Q.  You were not asked to perform a full analysis in this case?

19          MS. GLASHAUSSER:  Objection, your Honor.

20          THE COURT:  Overruled.

21          (Continued on next page)

22

23

24

25

1    BY MS. KEENAN:

2    Q.  I believe you just testified you were not asked to perform

3    a full analysis in this case?

4    A.  Well, I was -- I was asked to review the government's

5    slides, the mapping, and point out clear errors, and I did so.

6    But I did not perform a full analysis of the government's

7    records in the manner because I didn't have complete

8    information to get through that analysis.

9    Q.  So although you did not perform a full analysis, it's your

10   view that your maps are correct and the government's maps are

11   wrong.

12   A.  I believe that my maps are as accurate as the evidence is

13   accurate.  If the evidence -- if we really knew what the

14   evidence indicated, they might or might not be the same cell

15   site.

16   Q.  Okay.  It's also your view that Mr. Ray's device was near

17   this Grand Central cell site at 7:18:28 p.m. on this date,

18   right?

19   A.  Yes, ma'am.

20   Q.  And that Claudia Drury's cellphone was near that same cell

21   site near Grand Central at 8:52:50 p.m., right?

22   A.  Yes.

23   Q.  Did you check whether Ms. Drury's device was in that

24   location on other times at that date?

25   A.  I did not.

1   Q.  Did you check whether Ms. Drury's cellphone was right near

2   that location, for example, at 7:42:35 p.m.?

3   A.  Well, I generally reviewed the record but I did -- I chose

4   to depict what clearly indicates was occurring.

5   Q.  Did you choose to pick these times or did defense counsel

6   tell you to map these times?

7   A.  I was asked to put together the material in the form that

8   it's in.

9   Q.  And I think you referred to this proximity as coincidental,

10  right?

11  A.  Coincidental?  Yes.

12  Q.  Okay.  And did you see any of the other evidence in this

13  case that would help you determine whether this proximity was

14  in fact coincidental?

15  A.  I think it's evident that from the -- the timing and

16  location movement that there was a coincidental rush between

17  two devices that relate to these two disparate times.

18  Q.  Do you know whether Ms. Drury's cellphone connected to this

19  same cell site at 7:42 p.m. on this date?

20  A.  I don't recall.

21       MS. KEENAN:  I want to take a look at Government

22  Exhibit 1410, page 71.

23  Q.  You testified that you reviewed the actual evidence related

24  to this map and that it did not reflect these calls from the

25  defendant's device on these dates and times, right?

 1   A.  Oh, correct.

 2   Q.  Okay.  So let's start with the 5:59:19 call.  Do you see

 3   that parenthetical, plus or minus 15 seconds?

 4   A.  I do.

 5   Q.  Okay.  So let's look at Government Exhibit 224, line 143.

 6   Would you agree that that's 15 seconds before the time

 7   reflected in Government Exhibit 1410, 5:59:19 p.m.?

 8   A.  I -- I don't -- you'd have to show me the column headers so

 9   that it's clear on how we're -- what we're talking about.

10   Q.  Sure.

11           MS. KEENAN:  Ms. Hernandez, could you scroll up to the

12   top.

13   Q.  That's the Record Open Date/Time in column A, right?

14   A.  That's correct.

15   Q.  Let's go back to 143.

16           So this Record Open Date/Time is 15 seconds before the

17   time reflected in Government Exhibit 1410, right?

18   A.  The 17:59:04 you're referring to.

19   Q.  Yes.

20   A.  Yes, that would be --

21   Q.  Exactly as reflected on the map, right?

22   A.  Well, it is, but the Seconds of Use column indicates it's a

23   29-second call, and I'm not aware of any forensic cell site

24   analysis that's performed in this manner.

25   Q.  That's not what I asked you.  I asked you:  The map

1   reflects that the call was plus or minus 15 seconds from the

2   time reflected on the map, and it is, right?

3   A.  Quite literally, it is, if you calculate it like that.

4   Q.  So the map is not inaccurate, right?

5   A.  It's not accurate by any mapping analysis I've ever seen or

6   done.

7   Q.  That's not what I asked you.  I asked you whether the map

8   was inaccurate with respect to the records.

9   A.  If we -- if we extrapolate numbers, it appears to be --

10  Q.  If we subtract 15 seconds, it's accurate, right?

11  A.  If -- if you go through the map and perform an extraction

12  of the time, you would arrive at that time.

13  Q.  It's just subtraction, right, simple arithmetic, as

14  reflected in the map?

15  A.  Yes.  Yes.

16  Q.  Yes.  Okay.  Let's go back to Government Exhibit 1410,

17  page 71; that second call, 6:42:16 p.m.

18  A.  Yes, ma'am.

19  Q.  We can go back to Government Exhibit 224, line 144.  Would

20  you agree that that's 25 seconds before the time reflected on

21  Government Exhibit 1410, exactly as stated in the map?

22  A.  If I roughly subtract that, I think it would be.

23  Q.  If you subtract 25 seconds, that's exactly right, isn't it?

24  A.  It looks like it would be that time.

25  Q.  It would be or it is?

 1   A.  It is that time, if I went through the process of

 2   calculating that.

 3   Q.  Okay.  Let's go back to Government Exhibit 1410, page 96.

 4   I'm sorry.  Page 97.

 5        You also said that these calls aren't reflected in the

 6   records, right?

 7   A.  Correct, yes, ma'am.

 8   Q.  Let's start with 8:03:24 p.m., plus or minus two minutes.

 9        MS. KEENAN:  We'll go to Government Exhibit 224, line

10   1955.

11   Q.  Would you agree that 8:01:24 p.m. is exactly two minutes

12   before 8:03:24 p.m. as reflected in the map?

13   A.  Yes, approximately, yes.

14   Q.  Approximately or exactly?

15   A.  I believe the entry is plus or minus two minutes.

16   Q.  And this is exactly --

17   A.  The choice.  It's very close to that, yes.

18   Q.  It's exactly that, right?  It's exactly two minutes before

19   the map said it was.

20   A.  Yes.

21   Q.  Did you do this exercise before you determined that the

22   government exhibits were inaccurate?

23   A.  No.  I've never seen a plus or minus indicator on any sort

24   of mapping before like this.

25   Q.  And having never seen it, you weren't able to do the

 1  subtraction?

 2  A.  I simply -- it's very important that the evidence depict

 3  precise times that communication session events occur, and I

 4  simply reviewed and saw that there was some other information

 5  there and not an accurate time stamp.

 6  Q.  So you did not do this exercise before you determined that

 7  the government exhibits were inaccurate.

 8  A.  No, ma'am.

 9          MS. GLASHAUSSER:  Asked and answered.

10          THE COURT:  Overruled.

11          MS. KEENAN:  Can we turn to Defense Exhibit P2.

12  Q.  I want to look at this call at 10:42:13 p.m. from

13  Ms. Pollok's device.  Did you validate whether a cell site

14  actually exists at that location?

15  A.  Yes, ma'am.

16  Q.  And did you check the weather on this date?

17  A.  I did a general check of climatic and space weather

18  conditions and saw no -- no issue.

19  Q.  On this date?

20  A.  Yes.

21  Q.  Did you check the traffic conditions?

22  A.  It -- it's not possible to check that metric without the

23  assistance of the cellphone company itself.

24  Q.  And although you weren't able to perform your full

25  validation process, it's your view that this map is accurate

 1  and the government's map is not?

 2  A.  Well, I was not asked to perform a complete analysis of the

 3  steps, and of course I certainly didn't have a chance to

 4  request additional production.

 5  Q.  You were not asked to perform a complete analysis of the

 6  cell site --

 7          MS. GLASHAUSSER:  Objection, your Honor.

 8  Q.  -- activity on this date?

 9          THE COURT:  Overruled.

10          MS. GLASHAUSSER:  Your Honor, may we have a sidebar

11  with respect to these questions.

12          THE COURT:  You can redirect on it.

13  A.  I was not.

14  Q.  Is this the only time that Isabella Pollok's device

15  connected to the cell site with E node B816420 on this date?

16  A.  I don't recall, actually.

17  Q.  If we could look at Government Exhibit 202, page 3389.

18  A.  I'm sorry?

19  Q.  Ms. Hernandez is just going to pull it up.  It takes a

20  minute because the exhibit is 17,000 pages.

21  A.  Sure.

22          THE COURT:  I hope you're not going to take us through

23  each one of them.

24          MS. KEENAN:  I was planning on it.

25          THE COURT:  That objection is sustained.

1    Q.  Line 16603 at the top there?

2    A.  Yes, ma'am.

3    Q.  That call is at 11:24:12 a.m., right, if you do the UTC

4    math?

5    A.  Yes.

6    Q.  And there's that same E node B816420, right?

7    A.  I see it, yes.

8    Q.  So Ms. Pollok's device also connected to that cell site on

9    that date about an hour after you have her there, at

10   11:24 a.m., right?

11   A.  Yes.

12   Q.  Ms. Drury's device also connected to that cell site on

13   August 27, 2018, right?

14   A.  Yes, it did.

15   Q.  And she connected to it at 11:35 a.m., about 10 minutes

16   later, right?

17   A.  Yes.

18   Q.  But your map cuts off at 11:30 a.m., right?

19   A.  I apologize.  I couldn't --

20   Q.  Defense Exhibit P2 cuts off at 11:30 a.m., right?

21   A.  I can't understand what you're saying.

22           MS. KEENAN:  Ms. Hernandez, could you pull up Defense

23   Exhibit P2.

24   Q.  You have Ms. Pollok's device at E node B ID 816420 at

25   10:42 a.m.

1    A.  Yes, ma'am.

2    Q.  But the records, the actual evidence, reflects that she

3    also connected to that device at 11:24 a.m., right?  That's

4    what we just looked at.

5    A.  Yes.

6    Q.  And Ms. Drury's device connects to that same E node B at

7    11:35 a.m., right?

8    A.  I saw that, yes.

9    Q.  Within 11 minutes.

10   A.  Yes.

11   Q.  But your map cuts off at 11:30 a.m., right?

12   A.  Yes.

13   Q.  So you did not capture the fact that Ms. Drury was in that

14   same location at 11:35 a.m., right?

15   A.  That's correct.

16   Q.  Okay.  But the use of that same E node B would suggest that

17   Ms. Drury and Ms. Pollok were both near that little league

18   field within 10 minutes of each other, right?

19   A.  It does in that particular event, yes.

20   Q.  I didn't hear you.

21   A.  It does in that event, yes.

22          MS. KEENAN:  Can we pull up Defense Exhibit P7.

23   Q.  You have Ms. Pollok's device connecting to this cell site

24   at 10:25:35 a.m., right?

25   A.  Yes, ma'am.

1   Q.  There are actually two latitude and longitude coordinates

2   in the actual evidence for this cellphone connection, right?

3   A.  Yes, there is an originating and a terminating in this

4   event.

5   Q.  What have you mapped here, the originating, right?

6   A.  Yes.

7   Q.  You did not map the terminating, right?

8   A.  No, I didn't have an issue with the terminating.

9   Q.  So is it possible that the terminating cell site is just a

10  few blocks south of where you've mapped this connection?

11  A.  I did not disagree with the government's exhibit indicating

12  where that lower blue bubble was located.

13         MS. KEENAN:  So could we pull up Government

14  Exhibit 1410, page 53, side by side.

15  Q.  So it's your view that Ms. Pollok's device started up a

16  little closer to Central Park South as your map depicts it,

17  right?

18  A.  Yes, it was -- up on the map on the right depicts Columbus

19  Circle up at the southwestern corner of Central Park, and it

20  was up midway in the circle along the west side of --

21  Q.  And you agree that Ms. Pollok's device moved a little bit

22  south and connected to a cell site as depicted in the

23  government's map, right?

24  A.  Yes, I believe that cell site is correct, where the black

25  arrow from Ms. Pollok's device is pointing.

 1   Q.  And did you check whether she was about two blocks away

 2   from Ms. Drury's device at that time?

 3   A.  I -- I observed that, yes.

 4   Q.  And she was?

 5   A.  Yes.

 6   Q.  Government Exhibit 1410 is almost a hundred pages long,

 7   Mr. Minor, right?

 8   A.  I'm sorry.  I'm having difficulty --

 9   Q.  Government Exhibit 1410 is almost a hundred pages long,

10   right?

11   A.  Yes.

12   Q.  Did you check the pages that you didn't do three comparison

13   exhibits for?

14          MS. GLASHAUSSER:  Your Honor, objection.  Beyond the

15   scope.

16          THE COURT:  Sustained.  The objection is sustained.

17   Q.  Mr. Minor, you were paid by the defense to prepare these

18   three cell site maps, right?

19   A.  Yes, ma'am.

20   Q.  And you were paid for your work consulting on this case for

21   the defense, right?

22   A.  Yes, ma'am.

23   Q.  How much were you paid?

24   A.  You know, I don't know a total figure.

25   Q.  How much do you charge per hour?

1  A.  I charge $450 per hour.

2  Q.  How much work have you done on this case?

3  A.  I -- I've been involved in consulting on this case for a

4  while so I don't -- I really don't know.  I don't -- I don't do

5  my own bookkeeping.  I don't really know the number of hours,

6  but considerable number of hours; probably in excess of 40 or

7  50 hours.

8  Q.  So about $20,000?

9  A.  I'm sure.

10  Q.  More?

11  A.  Possibly.

12  Q.  $30,000?

13  A.  I don't -- I don't honestly know, ma'am.

14  Q.  Could it be $40,000?

15       MS. GLASHAUSSER:  Asked and answered, your Honor.

16       THE COURT:  Overruled.

17  Q.  $40,000?

18  A.  I don't -- I wouldn't be able to tell you an accurate

19  number of hours that I spent or money dollar figures.

20  Q.  To make these three maps?

21       MS. GLASHAUSSER:  Objection, your Honor.

22       THE COURT:  Sustained.  Sustained.  The objection is

23  sustained.

24       MS. KEENAN:  No further questions.

25       THE COURT:  Redirect.

1    REDIRECT EXAMINATION

2    BY MS. GLASHAUSSER:

3    Q.  Mr. Minor, you were asked by the government -- let me start

4    again.

5           I believe you said in response to the government that

6    your maps are as accurate as the evidence provided; do you

7    remember that?

8    A.  Yes.

9    Q.  Was the evidence you were provided the government exhibits

10   in this case?

11   A.  I'm sorry.  Can you repeat that.

12   Q.  The evidence that you were provided, were those the

13   government exhibits in this case?

14   A.  They -- they were.

15   Q.  And that's what you relied on here.

16   A.  Yes.

17   Q.  You talked about a VoLTE disclosure letter from Verizon.

18   Can you tell us more about that.

19   A.  Yes.  The Verizon -- what you term VoLTE would be voice

20   over LTE, LTE being 4G, fourth generation, recordkeeping.  The

21   Verizon disclosure letter indicated that a misconfiguration of

22   some sort had occurred beginning in 2017 and went on for some

23   years, I believe into 2021, as I recall, indicating that

24   charging data records, the entries in the CDR CSLI evidence,

25   might in many instances be wrong, it might contain terminating

1    location, the end of the call location versus the beginning of

2    the call, or originating location.  But no other information

3    really other than some basic statistical estimates, perhaps,

4    that it could be up to half the calls could be wrong, at some

5    point in time.  But no known way of knowing which numbers

6    were -- it was applicable to.

7    Q.   Sorry.  You said so half the calls could be wrong during

8    the time period.  Did that error apply to the calls you

9    reviewed in this case?  Did the time period reflect the same

10   time period as the calls in this case?

11   A.   It did.  It reflected up to -- was estimated perhaps up to

12   half could be off, yes.

13   Q.   When you say that Verizon said there was a

14   misconfiguration, what does that mean?  What does the word

15   "misconfiguration" mean?

16   A.   Well, the way this system works, the -- the call session,

17   whatever communication your cellphone establishes through an

18   antenna connection, actually traverses through a number of

19   pieces of equipment, and in the process, the event of that

20   communication session is recorded and is transferred to a

21   database ultimately, and there is some error checking that goes

22   on, but the process of it recording through the system

23   apparently was configured so that part of the time—an unknown

24   percentage of the time, but maybe up to 50 percent of the

25   time—the wrong cell site was recorded as the beginning of the

1    call.

2    Q.  So the wrong cell site was recorded for approximately half

3    the calls from Verizon.  Was it Mr. Ray's records that were the

4    Verizon records?

5    A.  Yes, ma'am.  That was the only evidence records that was

6    affected.

7    Q.  You were also asked about the government's maps using the

8    plus or minus figure in front of the call times for Mr. Ray's

9    device.

10           MS. GLASHAUSSER:  And actually, can we pull up one of

11   those examples.  Larissa, could you go to Government

12   Exhibit 1410, page 97.

13   Q.  So for example, on this map, there's a plus or minus figure

14   of -- for one of the calls of 2 minutes 45 seconds.

15   A.  Yes, ma'am.

16   Q.  Is using this sort of plus or minus figure the standard in

17   the field of cell site analysis?

18   A.  I have never seen any type of analysis performed.  I

19   certainly does -- do not add plus or minus figures.  It's very

20   important to depict what the actual evidence indicates because

21   that's a precise time to the second, typically, in CDR

22   evidence.

23   Q.  And why is it important to use the times from the records

24   themselves?

25   A.  Well, the map is only a depiction.  It's to better

1  understand location and timing, and getting the time -- the

2  metadata time stamp accurately depicted is the only way to

3  represent this evidence in an accurate manner.

4  Q.  So you were asked about all sorts of validation techniques

5  that you could use.  Are those all things that try to make

6  these records more accurate?

7  A.  They do.  The validation and error methodology actually has

8  several more steps.  It has a number of steps.  And the purpose

9  of the methodology is to gather additional information from the

10 phone company as well as from atmospheric science, for example,

11 and aggregate and evaluate, in the context of each entry, each

12 part of the evidence, to try to get a more accurate estimate of

13 both the timing and location.  The coverage area could shift,

14 depending upon whether adjacent cell sites suffered outages

15 that were planned, or not planned, and traffic loading or

16 maintenance operations would make a difference—all information

17 that could be produced by the carrier to help us understand

18 with a higher confidence what the level of accuracy of the

19 evidence is.

20 Q.  So there are a lot of things that can make these cell site

21 locations inaccurate, right?

22 A.  Yes, these are very complicated networks and there are a

23 lot of nuances to the process.  It's much more than simply

24 plotting GPS coordinates when a complete analysis is performed.

25 Q.  So given that there's so many things that can make these

1   cell site location records inaccurate, is that why it's

2   important to at least use the times listed in the records and

3   make sure those are accurate when mapping?

4   A.  Yes, ma'am, it is.  It's critically important that the

5   depiction of the evidence be precisely what the evidence

6   indicates and not some other estimation process, because it's

7   the only way we have to make a comparison absent doing some

8   sort of estimate, you know, calculus in your mind or carefully

9   calculating what an analyst has done.  That's the problem.

10  Q.  When the government asked you about your validation

11  techniques, is that something that came from a paper that you

12  published?

13  A.  Yes, ma'am.  It's a process that developed over the early

14  years of analytical work, and I began to realize that there was

15  a need to involve more of a science approach and try to

16  increase the accuracy of the process and, yes, it was -- that

17  was part of one of the peer-reviewed research papers and

18  ultimately a path of methodology.

19  Q.  Do you have an opinion about whether the government expert

20  performed valid methodology and error mitigation in this case?

21  A.  I read portions of the transcript and I understand that

22  cell -- cell location validation was performed.  I think -- I

23  think he missed on at least one, but I don't know to what

24  degree he actually followed through.  I don't have enough

25  knowledge from what I saw.  It doesn't appear to be the case.

1   Q.  You were also asked about Defense Exhibit P2, and the

2   government pointed you to Ms. Pollok's data usage for that day.

3   Do you remember that?

4   A.  Yes.

5   Q.  Is data usage cell site location information that you used

6   to make these maps?

7   A.  No.

8   Q.  Why is that?

9   A.  I was comparing voice records to voice records, and the

10  data records themselves can -- can produce a completely

11  different range away from a cell site than voice records can.

12  Voice requires a certain quality of signal that enables a full

13  duplex or a two-way conversation to occur in a phone call where

14  data can result in a much fainter signal with a cellphone much

15  further away from a cell site, and in fact, a text message via

16  data can be a very faint signal, you know, it could be at the

17  outer limit.

18          MS. GLASHAUSSER:  So Larissa, could you just pull up

19  Defense Exhibit P2 quickly.

20  Q.  So when the government asked you about Ms. Pollok's data

21  records for this map, those aren't included here, but all of

22  her phone calls are, right?

23  A.  Right.

24          MS. GLASHAUSSER:  Okay.  Thank you, Larissa.

25  Q.  Now the government asked you a number of times if you had

1  done a full analysis in this case, right?

2  A.  Yes, ma'am.

3  Q.  Did you review a court order before you were testifying

4  here today?

5  A.  The judge's order regarding my testimony?

6  Q.  Yes.

7  A.  Yes, ma'am, I did.

8  Q.  And did you understand that court order did not allow you

9  to discuss a full analysis of this case?

10  A.  I did.

11  Q.  And that you were limited to discussing the particular

12  exhibits that we showed to the jury.

13  A.  Yes, ma'am.

14          MS. GLASHAUSSER:  Thank you.  No further questions.

15          THE COURT:  Anything further?

16          MS. KEENAN:  No, your Honor.

17          THE COURT:  Okay.  You're excused, sir.  Thank you.

18          THE WITNESS:  Thank you, sir.

19          (Witness excused)

20          THE COURT:  All right.  Defense will call its next

21  witness.

22          MR. KELLY:  Thank you, your Honor.  The defense calls

23  Glenn Ripa.

24          THE COURT:  Okay.  Bring Mr. Ripa in.

25          Members of the jury, after you hear this next witness

1    testify, I will have some instructions for you with respect to

2    the limited purpose for which this testimony is being received.

3           Mr. Ripa, please step forward into the witness box.

4           THE WITNESS:  Thank you, your Honor.

5           THE COURT:  Please take off your mask, remain standing

6    while my deputy clerk administers the oath.

7           THE DEPUTY CLERK:  Please raise your right hand.

8           (Witness sworn)

9           THE DEPUTY CLERK:  Thank you.  Can you please state

10   your full name for the record and please spell out your first

11   and last name.

12          THE WITNESS:  Yes.  My name is Glenn Ripa.  G-L-E-N-N,

13   R-I-P-A.

14          THE DEPUTY CLERK:  Thank you.

15          THE COURT:  You may proceed, Mr. Kelly.

16          You may be seated, sir.  Please try to keep your mouth

17   close to the microphone, speak clearly for the benefit of the

18   members of the jury, and the court reporter.

19          THE WITNESS:  I will, your Honor.

20          THE COURT:  Go ahead, Mr. Kelly.

21          MR. KELLY:  Thank you, your Honor.

22    GLENN RIPA,

23        called as a witness by the Defendant,

24        having been duly sworn, testified as follows:

25   DIRECT EXAMINATION

1    BY MR. KELLY:

2    Q.   Mr. Ripa, what do you do for a living?

3    A.   I'm an attorney.  I'm a sole practitioner.

4    Q.   And how long have you been an attorney?

5    A.   I've been an attorney since 1985.

6    Q.   And from where did you graduate law school?

7    A.   I graduated from Fordham University Law.

8    Q.   Did you work before you went to law school?

9    A.   Yes, I did.

10   Q.   Where did you work?

11   A.   I was a -- I worked for the Internal Revenue Service.  I

12   started out as a revenue officer, which is a collection officer

13   for the IRS.  I became an -- an appeals officer with the

14   Appellate Division of IRS, and then I went to law school while

15   I was with the IRS.  And when I graduated from law school, I

16   went to the Brooklyn District Attorney's Office.

17   Q.   Did there come a time where you left the Brooklyn District

18   Attorney's Office?

19   A.   Yes, I did.  I left the Brooklyn District Attorney's Office

20   in 1988.

21   Q.   And what did you do next?

22   A.   I -- I became a -- an attorney in my own private practice

23   as a sole practitioner.

24   Q.   And what types of law do you practice?

25   A.   I do white collar criminal defense, I do civil and criminal

1   litigation, and I do tax representation.

2   Q.  Do you belong to any professional associations?

3   A.  Yes, I do.  I'm a member of the American Bar Association,

4   I'm a member of the New York County Lawyers Association, I'm a

5   member of the Federal Law Enforcement Officers Association, and

6   I'm a member of Former Special Agents of the IRS.

7   Q.  Mr. Ripa, are you familiar with someone named Lawrence Ray?

8   A.  Yes, I am.

9   Q.  Do you also know him as Larry?

10  A.  Yes, I do.

11  Q.  How do you know Mr. Ray?

12  A.  He was a client of mine.

13  Q.  In connection with what did you first represent Mr. Ray?

14  A.  Housing court matter.

15  Q.  And approximately when was that housing court matter?

16  A.  2014.

17  Q.  In connection with Mr. Ray's housing court matter, did

18  someone named Claudia Drury testify?

19  A.  Yes, she did.

20  Q.  And in that testimony, did Ms. Drury state that she

21  poisoned Mr. Ray?

22  A.  Yes, she did.

23  Q.  Mr. Ripa, did there come a time when you learned how

24  Ms. Drury made money?

25  A.  Yes.

1  Q.  And what was your understanding of how Ms. Drury made

2  money?

3  A.  She was a prostitute.

4  Q.  Mr. Ripa, at some point after you learned that fact, did

5  you provide information to Mr. Ray about the taxability of

6  receiving money from Ms. Drury?

7  A.  Yes, I did.

8  Q.  And what information did you provide Mr. Ray about the

9  taxability of receiving money from Ms. Drury?

10  A.  I represented to Mr. Ray that if he was getting restitution

11  from her for the damages she caused with respect to the

12  poisoning, that that kind of money would not be taxable.

13  Q.  And how did you communicate that information to Mr. Ray?

14  A.  I did it orally.

15  Q.  And to the best of your recollection, sitting here today,

16  when was that conversation?

17  A.  It was probably around 2014, 2015.

18  Q.  Mr. Ripa, did you do any other legal work on behalf of

19  Mr. Ray; yes or no?

20  A.  I think it was most -- just basically the housing case.

21  There was a lot of aspects to it and appeals, but it was

22  basically the housing case.  I -- I did --

23  Q.  Let me interrupt you.

24  A.  Okay.

25  Q.  Did Mr. Ray retain you to contact law enforcement regarding

```
 1   his alleged poisoning?

 2   A.  Yes, he did.

 3   Q.  And did Mr. Ray retain you to request that law enforcement

 4   investigate that poisoning?

 5   A.  Yes, he did.

 6   Q.  And did you in fact contact law enforcement?

 7   A.  Yes, I did.

 8   Q.  And which law enforcement agency did you contact?

 9   A.  I contacted the U.S. Attorney's Office for the Southern

10   District of New York.

11   Q.  And Mr. Ray had asked you to contact that office?

12   A.  Yes, he did.

13          MR. KELLY:  No further questions, your Honor.

14          THE COURT:  Okay.  Cross-examination.

15   CROSS EXAMINATION

16   BY MS. KEENAN:

17   Q.  Mr. Ripa, you just testified that you were at some point

18   retained by the defendant to contact law enforcement about his

19   alleged poisoning, right?

20   A.  Yes, that's correct.

21   Q.  And you said you contacted the U.S. Attorney's Office,

22   right?

23   A.  Yes, that is correct.

24   Q.  And the person you contacted was Assistant U.S. Attorney

25   Perry Carbone, right?
```

 1    A.  That is correct.

 2    Q.  And you previously testified under oath that you got no

 3    response to that contact, right?

 4    A.  Yes, I did.

 5    Q.  But you did get response to that contact, right?  In fact,

 6    Mr. Carbone called you, right?

 7    A.  I -- it's -- it's vague in my mind, but I understand that

 8    there -- there was some information that he did contact me, and

 9    I know he declined to proceed with this matter.

10    Q.  You said you were retained, but you have no retainer

11    agreement with the defendant from any period of time, right?

12    A.  I checked my records before I came here today, and I did

13    have a retainer agreement initially with him in 2014.

14    Q.  You had no engagement letter with the defendant, right?

15    A.  I had a retainer agreement.  I don't know --

16    Q.  But no engagement letter, right?

17    A.  I don't know the difference between an engagement letter

18    and a retainer agreement.

19    Q.  You also kept no billing records of your work for the

20    defendant, right?

21    A.  I don't have a copy of any of the billing records at this

22    time.

23    Q.  That wasn't what I asked you.  Did you keep any billing

24    records?

25    A.  Probably at the time I did, but this is going back eight

1  years, and I do -- no longer have any records with respect to

2  that.

3  Q.  So you did not keep the billing records.

4  A.  I -- I do not have billing records at this point, no.

5  Q.  The defendant paid you in cash for your work, right?

6  A.  That is correct.

7  Q.  In fact, you saw him with cash all the time, right?

8  A.  He did have cash with him on a regular basis, yes, that's

9  correct.

10  Q.  Have you provided that retainer letter to defense counsel?

11  A.  No, I did not.

12  Q.  The defendant still owes you money for the services you

13  rendered him, right?

14  A.  I believe that's probably true.  I'd have to go back and

15  look at my records, but that might be true.

16  Q.  Generally it's the practice of lawyers to take notes of

17  meetings with their clients where they provide legal advice,

18  right?

19        MR. KELLY:  Objection.

20        THE COURT:  Overruled.

21  Q.  If you're providing a client with legal advice, it's best

22  practice to take notes of that, right?

23  A.  I think every lawyer handles it his own way.

24  Q.  But generally it's best practice to take notes when you're

25  giving a client legal advice, right?

```
1    A.  I don't necessarily agree.

2    Q.  And that's because you don't take notes, right?

3    A.  A lot of times I don't.

4    Q.  In the course of your relationship with the defendant, you

5    exchanged hundreds of emails with him, right?

6    A.  That is correct.

7    Q.  Maybe thousands of emails?

8    A.  I don't know about thousands, but probably hundreds.

9    Q.  And you turned over a big box of paper records related to

10   your representation of the defendant, right?

11   A.  I -- I don't know if it was a box, but I did provide

12   documents, yes.

13   Q.  In all of these records, is there a single note about the

14   conversation where you told the defendant he could take

15   prostitution proceeds from Ms. Drury?

16          MR. KELLY:  Objection.

17   A.  I don't --

18          THE COURT:  Basis?

19          MR. KELLY:  The scope of the question, your Honor, and

20   your ruling.

21          THE COURT:  Overruled, but you can inquire on

22   redirect.

23   A.  Okay.

24   Q.  And all --

25   A.  I said -- I advised my client that he could take money from
```

1  Claudia Drury for the damage she caused him with respect to the

2  poisoning.  I never said that you can take it from her

3  prostitution business, but that was the way she made her

4  living.

5  Q.  You never told the defendant it was okay to accept

6  prostitution proceeds.

7  A.  We never talked about it's okay to accept prostitution

8  proceeds.  What I told my client was that he -- it was lawful

9  for him to get restitution from Claudia Drury.  I also was

10 aware of the fact that Claudia Drury was in the business of

11 prostitution.  But I never said it's okay to take prostitution

12 money from Claudia Drury.

13 Q.  But to be clear, there's no notes of any of these

14 conversations, right?

15 A.  No, there is not.

16 Q.  There's no record that you relayed this information to the

17 defendant, right?

18 A.  No, there isn't.

19 Q.  Your memory of this conversation and when it took place is

20 pretty hazy, right?

21 A.  No.  I think I'm pretty clear on what I represented to him

22 at the time.  I don't think it's hazy at all.

23 Q.  When did this conversation take place?

24 A.  It probably took place 2014, 2015.

25 Q.  You previously testified in this court, Mr. Ripa, right?

1    A.  Yes, I did.

2    Q.  And you previously testified under oath, right?

3    A.  Yes.

4    Q.  And when you previously testified about when this

5    conversation took place, you were asked the question whether

6    this conversation was sometime after the spring of 2015, and

7    you gave the answer, "If the trial was in spring of 2015, it

8    would have been."  You were asked the question, "Could it have

9    been 2016," and you said, "Could have been."  You were asked

10   the question, "Could it have been 2017," and you said, "I

11   believe it was after the incident."  You gave that testimony

12   just three days ago, right?

13   A.  Yes.

14   Q.  But today, sitting here, you think that conversation took

15   place in 2014?

16   A.  I'm not really sure exactly when it took place, but it

17   would have been -- it would have took place after I was aware

18   of the fact that -- that she had poisoned him.

19   Q.  So it could have been 2015.

20   A.  Could have been, yes.

21   Q.  Could have been 2016.

22   A.  Yes, it could have been.

23   Q.  Could have been 2017.

24   A.  Yes, it could have been.

25   Q.  You don't know when it was.

1  A.  I have -- I believe it was around the time that I found out

2  about the poisoning, but I had conversations with Mr. Ray over

3  an extended period of time.  So the subject might have came up

4  on other occasions in other years, also.

5  Q.  You don't know when you first had that conversation.

6  A.  I believe it would have been after she testified that she

7  had poisoned him.

8  Q.  In 2015.

9  A.  2015.

10 Q.  But it could --

11 A.  Initially, yes.

12 Q.  But it could have been years later.

13 A.  Yes.  Well, it certainly could have been years later

14 because there was an ongoing relationship with respect to Larry

15 Ray, so the conversation might have came up in -- in later time

16 also.

17 Q.  You don't remember when you first learned that Claudia

18 Drury was working as a prostitute, right?

19 A.  I would say it probably was around the time of her

20 testimony.

21 Q.  And you don't remember whether the defendant told you at

22 the time of this conversation that he already was accepting

23 money from Ms. Drury, right?

24 A.  That -- that he told me he was already accepting money from

25 Ms. Drury when?

```
 1   Q.  At the time of this conversation.

 2   A.  No.  I was unaware of that.

 3   Q.  You don't remember if you called poisoning a tort, right?

 4   A.  I certainly wouldn't have used that word with Larry Ray.

 5   Q.  And you don't even remember if you gave the defendant tax

 6   advice, right?

 7   A.  No.  I -- I specifically remember that I would have told

 8   him that somebody paying him money for restitution would not be

 9   taxable.  I do recall that.

10   Q.  You've spoken with the defense lawyers many, many times

11   during this particular proceeding, right?

12   A.  I'm sorry?

13   Q.  You've spoken with the Federal Defenders many, many times

14   about their particular representation of the defendant, right?

15   A.  Yes, I did.

16   Q.  And you've spoken with them over the course of many months,

17   right?

18   A.  Probably, yes.

19   Q.  On February 9, 2022, the Federal Defenders drafted a

20   document about the advice you gave the defendant about

21   accepting prostitution proceeds, right?

22   A.  Yes.

23   Q.  You signed that document, right?

24   A.  Yes, I did.

25   Q.  That document doesn't mention tax advice, does it?
```

 1    A.  I'd have to look at the document again.

 2            MS. KEENAN:  Ms. Hernandez, could you pull up 26.2-11.

 3            THE COURT:  That's just for the parties and for the

 4    witness, not for members of the public or the members of the

 5    jury.

 6    Q.  Just read that to yourself, Mr. Ripa.

 7            THE COURT:  Tell us when you're done reading it and

 8    then you'll take it down.

 9            THE WITNESS:  Okay.  Thank you, your Honor.

10            Okay.  I've finished reading it.

11            MS. KEENAN:  Okay.  Ms. Hernandez, you can take that

12    down.

13    BY MS. KEENAN:

14    Q.  That document doesn't mention tax advice you gave the

15    defendant, does it?

16    A.  No, it does not.

17    Q.  In fact, in all your months of conversations with the

18    Federal Defenders about the advice you gave the defendant, the

19    first time you raised the subject of tax advice was last week,

20    right?

21    A.  No.  I believe I -- I believe I did mention it to the

22    defense attorney before that.

23    Q.  Before March 30, 2022?

24    A.  Before -- yes, I -- I do believe, yes.

25    Q.  Do you have any notes about that?

1   A.  No, I do not.

2   Q.  The defendant never told you he was collecting millions of

3   dollars from Claudia Drury, right?

4   A.  Absolutely not.

5   Q.  In fact, you assumed it was just a few hundreds of dollars,

6   right?

7   A.  That's true.

8   Q.  And when you had this conversation with the defendant about

9   accepting money from Claudia Drury, you did not discuss the

10  appropriate measure of damages for poisoning, right?

11  A.  No, I did not.

12  Q.  It's not part of your practice to assist people in

13  collecting damages for personal injury, is it?

14  A.  No.  I do not do any personal injury and I would not even

15  know what the appropriate amount was.

16  Q.  And you don't generally offer advice about the tax

17  consequences of damages payments, right?

18  A.  Well, no.  I would probably talk to most of my clients

19  about tax consequences 'cause that's, you know, my specialty,

20  so I --

21  Q.  Although you don't practice anything related to personal

22  injury, you do offer tax guidance about personal injury

23  payments?

24  A.  No, no.  What I'm saying is, when I'm representing a

25  client, often I would talk -- I would give them tax advice

1  because that's what I do, but I don't do any personal injury

2  types of cases.

3  Q.  So the question I'm asking you is whether you generally

4  offer your clients advice about the tax consequences of

5  personal injury damages payments.

6  A.  I would say that's not my usual practice because I don't

7  have many clients that have personal injury cases.

8  Q.  So you don't generally do that.

9  A.  I don't generally do it because the subject never comes up,

10  but I would normally give tax advice to clients with respect to

11  their financial transactions.

12  Q.  You don't generally do that.

13          THE COURT:  Sustained.

14  Q.  You don't ordinarily provide tax advice about how to

15  prepare a tax return, right?

16  A.  No.  I would give advice on how to prepare a tax return,

17  but I wouldn't -- I don't practice preparing tax returns for

18  clients; that is correct.

19  Q.  Outside of these so-called damages payments, you didn't

20  provide the defendant other tax guidance, right?

21  A.  No, no, I did not.

22  Q.  You never represented him on any other tax matters, right?

23  A.  No, I don't believe I did, no.

24  Q.  In 2016, you did not discuss the defendant's taxable income

25  with him, right?

1  A.  No.  I never talked to him about his taxable income; that

2  is correct.

3  Q.  In 2017, you did not talk to him about his taxable income.

4  A.  No, no.  I had no idea what his taxable income was for any

5  of these years.

6  Q.  Not for the year 2018?  You did not discuss his taxable

7  income?

8  A.  No, I did not.

9  Q.  Did you discuss his taxable income for the year 2019?

10 A.  No.

11 Q.  Were you actually retained to provide him tax advice about

12 these so-called damages?

13 A.  The -- the retainer agreement would not have talked about

14 that.  It was when I initially -- when he initially retained me

15 and none of it would have talked about tax advice, 'cause he

16 didn't come to me for tax advice.

17 Q.  So --

18 A.  So I don't have a written retainer agreement saying that

19 I'm providing him tax advice.

20 Q.  So your engagement with the defendant was not covering tax

21 guidance.

22 A.  The written retainer would not, but it's certainly

23 something I would provide to my clients regardless of the

24 retainer agreement language.

25 Q.  Generally would the matter of the amount of the damages

1  that someone was receiving be relevant to the question of

2  taxes?

3  A.  There might be some component with respect to the amount of

4  money that was being received.

5  Q.  When you gave the defendant this tax guidance, did you ask

6  any questions about the amount of damages --

7  A.  No, I did not.

8  Q.  -- he was receiving?  Did he provide you any information

9  about his costs related to these so-called damages?

10  A.  No, he did not.

11  Q.  Did he provide you any records of his expenditures?

12  A.  No, he did not.

13  Q.  Did he provide you any medical bills?

14  A.  No, he did not.

15  Q.  You didn't estimate the value of any potential claim

16  related to the so-called poisoning, right?

17  A.  Absolutely not.

18  Q.  You didn't come up with a figure for pain and suffering?

19  A.  Absolutely not.

20  Q.  The defendant didn't tell you the amount of money he

21  believed Claudia Drury owed him, did he?

22  A.  No, he did not.

23  Q.  You would agree all of that information would be relevant

24  to the taxability, right?

25  A.  Yes, I do believe that's so.

1 Q. You didn't analyze whether any of the money that he

2 intended to collect from Claudia Drury would be punitive

3 damages, did you?

4 A. I have no idea about that.

5 Q. The defendant never showed you a written agreement that he

6 entered into with Ms. Drury to collect damages from her, did

7 he?

8 A. No, he didn't.

9 Q. He never told you the terms of any oral agreement that he

10 entered into with Ms. Drury to collect damages from her, did

11 he?

12 A. No, he did not.

13 Q. Did he ask you whether he could collect money from her

14 indefinitely?

15 A. No, he did not.

16 Q. Did he ask you if he could threaten her to get the money?

17 A. Absolutely not.

18 Q. Did he ask you if he could beat her up to get the money?

19 A. Absolutely not.

20 Q. Did he ask you if he could force her into sex work to get

21 the money?

22 A. Absolutely not.

23    MR. KELLY:  Objection, your Honor.

24    THE COURT:  Basis?

25    MR. KELLY:  The scope of what I was permitted to

1    address.

2              MS. SASSOON:  Can we have a sidebar?

3              THE COURT:  Yes, we can have a sidebar.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (At the sidebar)

2              MR. KELLY:  So first, Ms. Keenan inquired into whether

3    he ever advised Mr. Ray that it was lawful to accept proceeds.

4    I was specifically told not to go into that, and now if I go

5    into it, I fear it's going to spiral into a whole issue where

6    there's going to be multiple sidebars on each question, about

7    what I'd be allowed to inquire into.  So that was specifically

8    prohibited for me on this.  We'll address that first, I guess.

9              THE COURT:  I think as to that, Mr. Kelly has a point.

10   I'm prepared to strike this testimony with respect to whether

11   there was advice as to whether it was lawful to collect

12   prostitution proceeds.  The subject matter of this witness's

13   testimony is the advice with respect to the taxability of the

14   proceeds, prostitution proceeds.

15             MS. SASSOON:  Your Honor --

16             THE COURT:  Go ahead.

17             MS. SASSOON:  -- even though there's no advice of

18   counsel defense, they're relying on this conversation to show

19   good-faith belief, and what the defendant did or did not share

20   with Mr. Ripa is probative of whether his belief was a

21   good-faith belief.

22             THE COURT:  I hear what you're saying, but that

23   actually didn't respond to Mr. Kelly's point with respect to

24   Ms. Keenan's question that I'm going to look back at.  It was

25   framed in a way that it was not about tax advice but was about

1    advice with respect to receiving prostitution proceeds.

2         MR. KELLY:  Right.  And we specifically advised

3    Mr. Ripa, consistent with the Court's order, that he should not

4    go into that at all, so I think the answer he gave, mindful of

5    the Court's order, which I made him read, was no, because he

6    knew he was not allowed to stray into that area, and so I think

7    the record now is actually misleading because he was instructed

8    not to wade into that area.

9         MS. SASSOON:  Are there notes of this meeting?  We

10    weren't provided any.

11         THE COURT:  Excuse me.  You're not talking to

12    Mr. Kelly.

13         MS. SASSOON:  I'm sorry.

14         THE COURT:  Ms. Keenan, why shouldn't I strike that

15    question and the answer with respect to advice with respect to

16    receiving the proceeds of prostitution?

17         MS. KEENAN:  So again, we were just trying to probe

18    whether or not this conversation was in good faith, and part of

19    this conversation would have been, can I collect these

20    prostitution proceeds lawfully.

21         THE COURT:  I'm going to strike the testimony, that

22    bit of testimony.

23         Now let's move on to the question with respect to this

24    pending question, which is -- remind me what the pending

25    question is.

1              MS. SASSOON:  What he told the lawyer.

2              MR. KELLY:  Right.  Again, I asked him about the

3    taxability of the proceeds.  These are all questions that go to

4    the good -- the advice of counsel issue, which is, did you

5    fully disclose all the facts, did you, you know, provide the

6    full record in front of a lawyer.  Those questions were

7    relevant at the hearing because they went to the advice of

8    counsel issue.  They're far afield from the narrow question of

9    the taxability that I was allowed to ask about.

10             THE COURT:  Well, no.  With respect to questions about

11   the tax advice, the witness at the hearing testified that he

12   had no information about the nature of the injury, the

13   circumstances of the alleged injury.  The whole set of

14   questions that Ms. Keenan has asked up till now is all

15   probative to ask questions about whether there was an agreement

16   and the like.  But with respect to this whole stream of

17   questions, it seems like it's a way to get what you're getting

18   to now of just reiterating what seems to be your summation, and

19   it does seem to me to go beyond the scope of the direct

20   examination and, on a 403 basis, not to be particularly

21   probative, whether you can go through the whole history, did

22   you see this tape, did you see that tape.  We don't need it.

23             MS. SASSOON:  We think it's directly probative of

24   whether this was a conversation conducted in good faith.  We

25   understand that they're not getting the advice of counsel

1    instruction, but we should not then be prejudiced to present

2    the jury with a misleading impression of the circumstances of

3    seeking out this tax opinion from a lawyer by presenting a

4    completely misleading, curated, and abbreviated version of how

5    he obtained these so-called damages.  I think it's directly

6    relevant to the question of whether there's a good-faith belief

7    that these are damages if the defendant is seeking a tax

8    opinion without actually sharing the source of getting these

9    so-called damages.

10           THE COURT:  What are your remaining questions on this

11   subject, the pending question and the other questions you've

12   got?

13           MS. KEENAN:  Whether he knew the circumstances under

14   which Claudia Drury began to engage in prostitution and whether

15   he knew whether those circumstances were abusive and coercive;

16   that Claudia Drury had been watching her friends being beaten

17   by the defendant for years before she entered into

18   prostitution; and the defendant did not relay that information

19   to his lawyer before getting a tax opinion.

20           THE COURT:  I need to think about that for a moment.

21           What would your redirect be on that?

22           MR. KELLY:  I mean, there's a way to ask that question

23   without spending 20 minutes going through every allegation in

24   this case, which I think has already been elicited.  He had

25   limited information about their relationship, he had limited

1   information about why she was giving him money.  That's already

2   been elicited.  To go through every allegation in the case,

3   when they're all going to hear it in 15 minutes in summations,

4   seems to be --

5        THE COURT:  I agree with Mr. Kelly on this.  I think

6   you can ask one or two questions about, you don't know anything

7   about the circumstances under which Ms. Drury agreed to provide

8   this money to Mr. Ray besides that he told you that this was

9   restitution.  He didn't tell you about --

10        MS. SASSOON:  Your Honor, we think it would be

11   appropriate to ask, if you knew these things, would that have

12   altered your tax advice.

13        THE COURT:  I don't know that it goes to the tax

14   advice.  I mean, you can ask a question about, you know, would

15   it be relevant to tax advice whether she was being forced into

16   prostitution by the defendant or not.  You've asked the

17   questions about threats, and you're going to ask the follow-up

18   question that says, I've asked you questions about whether you

19   knew that he threatened her, he used physical force.  Wouldn't

20   that have been relevant to your tax advice?  Just a couple more

21   questions and you can bring it to a close.

22        (Continued on next page)

23

24

25

```
 1                (In open court)
 2                THE COURT:  Members of the jury, we will take a break
 3    in about five minutes.
 4    Q.  Mr. Ripa, you don't know anything about the circumstances
 5    under which Ms. Drury began working as a prostitute, right?
 6    A.  No, I do not.
 7    Q.  And that's because the defendant didn't tell you about
 8    those circumstances, right?
 9    A.  Yes.  Also, Claudia Drury never talked to me about it
10    either.
11    Q.  And you don't know anything about the circumstances under
12    which the defendant collected money from Ms. Drury, right?
13    A.  Absolutely not.
14    Q.  And you didn't advise the defendant how much money he could
15    collect from Ms. Drury, right?
16    A.  Absolutely not.
17    Q.  That information would have been relevant to your tax
18    advice, right?
19    A.  Absolutely.
20    Q.  When you met with the defendant and Ms. Drury, it was your
21    impression that they had a cordial relationship, right?
22                MR. KELLY:  Objection.
23                THE COURT:  Sustained.
24    Q.  Giving the defendant tax advice, did you tell him that he
25    should not spend time with people who are poisoning him?
```

 1                MR. KELLY:  Objection.

 2                THE COURT:  Sustained.

 3                MR. KELLY:  Move to strike.

 4                THE COURT:  Members of the jury, I am going to give

 5     you the instruction I have given several times before which is,

 6     questions are not evidence in this case.

 7                MS. KEENAN:  Can we have another sidebar, your Honor?

 8                THE COURT:  I am going to give the members of the jury

 9     a short break.  We will break for about 10 minutes or so while

10     I meet with the lawyers.

11                (Jury not present)

12                THE COURT:  Mr. Ripa, you may step down.  Go outside

13     the room.  You are still testifying.  Just step outside.

14                THE WITNESS:  I will wait outside.  Thank you, your

15     Honor.

16                THE COURT:  Mr. Kelly.

17                MR. KELLY:  Your Honor, this is now the second witness

18     in a row where the government has inquired misleadingly on

19     cross into subjects the defense was explicitly instructed by

20     the Court that they couldn't inquire into on direct.

21                So it's creating a misleading impression for the jury

22     that there are all these issues that these witnesses haven't

23     disclosed on their direct testimony that are contrary to their

24     testimony on direct that undermine their credibility, that we

25     are hiding the ball from the jury, when we have scrupulously

1    adhered to the Court's rulings.

2           I didn't elicit one objection on direct.  And now the

3    government is inquiring into these subjects that I did not ask

4    the witness about, that I handed him a copy of the Court's

5    order five minutes before today and told him what he could not

6    testify to.  And now it's making it seem like I avoided all

7    this testimony.  I think it is misleading and it should be

8    stopped.

9           THE COURT:  I will hear from the government with

10   respect to what more they intend to do.

11          With respect, Mr. Kelly, to your objection, the line

12   of examination has gone into what it was that the defendant did

13   not say to Mr. Ripa.  We had a hearing on Friday and there was

14   no testimony that Mr. Ripa was provided any information with

15   respect to that tax issue.  Had there been a line of

16   examination that you wanted to go into with respect to the tax

17   advice, as opposed to the underlying issue with respect to the

18   veracity of whether Mr. Ray was in fact poisoned, that was

19   something that you could have raised with me.

20          The main point is that there is no evidence that Mr.

21   Ripa did anything other than make a comment about taxability,

22   which I have ruled is relevant.

23          MR. KELLY:  But I haven't objected to the questions

24   about what he wasn't told where they were relevant.  When I

25   objected was when it started turning into a pre-summation.

```
1              THE COURT:  Let's where I sustained your objections.

2              MR. KELLY:  I didn't object to the line of questions

3   of, he didn't tell you this, he didn't tell you that when it

4   was relevant to the tax advice.  I only objected when it turned

5   into a mini summation.

6              What I'm objecting is now is the inquiry into all

7   these other tangential subjects which I was told I could not

8   inquire into on direct, so I didn't.

9              Again, this is consistent with what happened with

10  Mr. Minor too, which was he was precluded from testifying about

11  the full analysis he did, and then the government misleadingly

12  implied to the jury that he did $40,000 worth of work on three

13  maps when the Court said he was not allowed to testify beyond

14  the scope of the three maps where were allowed to cross on.

15  This is twice in the same day in front of the jury that the

16  government has done the same misleading --

17             THE COURT:  If there is a motion with respect to the

18  prior witness, then you can make that separately.  That was not

19  my impression with respect to the prior witness.

20             But the question is, where does the government want to

21  go?  What is the next line of questions?

22             MS. SASSOON:  May I respond briefly on Mr. Minor?

23             THE COURT:  Sure.

24             MS. SASSOON:  There was a good-faith basis for those

25  questions.  It's appropriate for the government to probe that
```

1    there is an hundred page document and at the end of the day all

2    he came up with were three slides showing what they said were

3    inconsistencies in the maps.

4         THE COURT:  There may have been a good-faith basis for

5    that particular question, but I actually sustained the

6    objection to that question.

7         MS. SASSOON:  The Court had a limited order about the

8    subject matter, but the defense could easily have created more

9    slides to poke holes in the government's maps, and that was an

10   appropriate subject for cross.

11        With respect to Mr. Ripa, the government feels like

12   it's operating with one hand tied behind its back in the sense

13   that they are putting on this evidence to say that the

14   defendant was acting in good faith.  The government is going to

15   argue that, no, this was just yet another manipulation by the

16   defendant of presenting a misleading picture of events in order

17   to cover his tracks with the patina of legal advice and legal

18   approval.

19        And just because this is the last witness doesn't mean

20   that the government should not be permitted to advance themes

21   that are going to show up in closing.  That's what all of the

22   cross-examinations of the defense have done.  If we want to

23   make points that are corroborative of our closing and that

24   support this theme of manipulating the lawyer to obstruct

25   justice and to try to escape responsibility for his tax

1    liability, we think that that's an appropriate line of cross,

2    even if it involves showing the witness a few exhibits and

3    saying you never saw this.  You never saw this before he said

4    that he could take the income and not pay tax on it.

5             THE COURT:  After that, what's your next line of

6    inquiry?

7             MS. SASSOON:  We would like to show two exhibits that

8    confirm that these are two exhibits, one from 2014, one from

9    2015, which would be before even the earliest time that Mr.

10   Ripa supposedly gave this advice and confirm that he was not

11   told about this and he was not shown this, and that if it had a

12   bearing on how the defendant got the money that it would have

13   affected the tax opinion.

14            THE COURT:  I am not going to permit you to do that.

15   This witness is testifying for a very limited purpose.

16            Do you have any cross-examination with respect to the

17   retention to go to the U.S. Attorney's Office?

18            MS. SASSOON:  One moment, your Honor.

19            We think that the questions about observing a cordial

20   relationship with the defendant is relevant to that because he

21   is being retained to report these people to the U.S. Attorney's

22   Office, and, yet, he is observing the defendant spending time

23   with these people living with him, and, yet, they are supposed

24   poisoners that he's reporting to the U.S. Attorney's Office.

25            THE COURT:  I am not going to permit that question.

1              Any other questions with respect to going to the U.S.

2    Attorney's Office?

3              MS. SASSOON:  Nothing beyond that, your Honor.

4              THE COURT:  I take it you will be able to conclude

5    your cross-examination.

6              MS. SASSOON:  Yes.  May we have a moment to think

7    about whether there is some final question?

8              THE COURT:  Yes.  Ms. Glashausser is anxious to stand

9    up.

10             Let me ask, Mr. Kelly, what do you expect in terms of

11   redirect?

12             MR. KELLY:  Two minutes.  If the government sticks to

13   what they just represented, two minutes.

14             THE COURT:  Ms. Glashausser, I am going to call on

15   you, but while the government is conferring I am not going --

16             MS. SASSOON:  One thing we would like to raise, as far

17   as we could tell, from the 26.2 material, the notes that the

18   defense lawyers have taken do not indicate anything at all

19   related to tax advice until March 30, 2022.  We would like a

20   stipulation indicating that at no time prior to March 30, 2022

21   did he mention to the Federal Defenders anything about tax

22   advice.  We want to raise this now, before the witness leaves

23   the stand, in the event that defense counsel thinks that we

24   have not perfected that impeachment.

25             MR. KELLY:  They asked the question.  He gave his

1    answer.  There is nothing else for us to do.

2           THE COURT:  No.  His answer, I think, was, I told them

3    before March 30, 2022.

4           MR. KELLY:  And the notes don't reflect that.  They

5    can do proper cross-examination to elicit that fact.  We have

6    produced the notes.  If they don't reflect that in the notes,

7    as he was crossed on on the written statement, that it didn't

8    say tax advice, they elicited that testimony already.

9           THE COURT:  What's sauce for the goose is sauce for

10   the gander, right.  You were permitted to elicit prior

11   inconsistent statements, and we could call somebody from the

12   Federal Defenders, the government could, on its rebuttal case

13   to give the testimony that at no point prior to March 30, 2022

14   did Mr. Ripa say anything about tax advice, if that's correct.

15   Otherwise, I think they have established the predicate for a

16   prior inconsistent statement.  He left the impression with the

17   jury that he did say something prior to March 30, 2022.  You

18   could look at the testimony.

19          MR. KELLY:  I think this is impeachment by omission.

20   There is a process to go through with that which I think they

21   have somewhat done, and the written statement, the written

22   signed statement, is the most contemporaneous statement of him

23   prior to when that was disclosed, and I think they elicited

24   that fact.

25          THE COURT:  But he testified he met many times with

1    the defense, and then he was asked point blank the question,

2    prior to March 30, 2022, you never raised with the defense the

3    tax information, and he said, I think I did.

4           MR. KELLY:  Can I confer for one minute.  Thank you.

5           Your Honor, two points.  The stipulation, the omission

6    by Mr. Pagan to Agent Maguire that was stipulated to, that

7    wasn't purely because it was an impeachment by omission.  It

8    was also a sanction for the government's failure to turn over

9    3500 material.  So I don't think it's sauce for the goose,

10   sauce for the gander in equal parts here.

11          The second thing I would say is, I don't think we can

12   be forced to a stipulation that goes beyond the scope of what

13   the witnesses would or would not testify to.

14          If the government wants to call Ms. Finkel from our

15   office, who witnessed the signed statement, they can do that,

16   and they can say that he did not mention tax advice when he

17   signed that signed statement.

18          THE COURT:  It's not just going to be Ms. Finkel.  I

19   would permit them to call every single witness from every

20   person from the Federal Defenders with whom this witness met to

21   elicit the fact that prior to March 30, 2022, Mr. Ripa never

22   mentioned anything about tax advice.

23          MR. KELLY:  I think that creates a conflict then.  If

24   they are calling represented lawyers at this table to the

25   witness stand, I think that creates an ethical conflict for us.

1              MS. SASSOON:  May I respond?

2              THE COURT:  Yes.

3              MS. SASSOON:  This is why the government has another

4    witness at every single witness prep, so that we don't have to

5    get called up as a witness.  But that doesn't obviate the

6    requirement here that if he contradicted what happened in these

7    prior meetings that we have a right to establish that, either

8    by calling witnesses from every one of these meetings or a

9    stipulation between the parties, and we would be happy to

10   proceed that way.

11             THE COURT:  I also don't think, under the ethical

12   rules, that it would be a material matter that would require

13   the recusal of the Federal Defenders, particularly at this

14   stage.  I am going to permit that in the government's rebuttal

15   case.  You can figure out whether you are willing to do a

16   stipulation instead.

17             MR. KELLY:  What I'm looking for, your Honor, is there

18   testimony on this point from the hearing that can be agreed to.

19   You testified under oath that X.

20             MS. SASSOON:  At the hearing he said the same

21   inconsistent thing.

22             THE COURT:  Ms. Glashausser, you had something else.

23             MS. GLASHAUSSER:  Yes.  This seems like even a smaller

24   matter now than what we are speaking about.

25             Just with respect to Mr. Minor, the government said

1    that the defense could have created more slides for Mr. Minor

2    to present on, but that's not true.  Those are the slides that

3    were created for the cross-examination of Mr. Petersohn.  Mr.

4    Petersohn, that cross was not allowed to proceed, so I wrote a

5    letter explaining what my cross-examination of Mr. Petersohn

6    would have been, and then your Honor issued an order saying

7    that I could have Mr. Minor called to testify only to those

8    same slides.  So we were never given the opportunity to create

9    a fuller picture for Mr. Minor to testify about.

10            THE COURT:  OK.  Why don't we get the jury.

11            Mr. Kelly, let me ask you the question, while my

12   deputy is getting the jury ready, who from the defense met with

13   Mr. Ripa over time.

14            MR. KELLY:  There were phone conversations with Ms.

15   Lenox reflected in the 26.2.  There is a phone conversation

16   with Ms. Glashausser.  There is the signed statement that was

17   witnessed by nonattorney Ms. Finkel in our office.

18            THE COURT:  Excuse me.

19            Ms. Lenox, do you want to get the witness ready?  Have

20   him come in while we are just going through this information.

21            MR. KELLY:  And then on the 30th there was a

22   conversation witnessed by a nonlawyer in our office.  And then

23   from this morning, no, I do not have notes of me handing the

24   witness your order and telling him to read it and adhere to it.

25            THE COURT:  The question really is prior to March 30.

1    I guess it's Ms. Lenox and Ms. Glashausser.

2            MR. KELLY:  Ms. Cross-Goldenberg was present at the

3    two meetings, but we have a nonlawyer witness for those, the

4    30th meeting.

5            THE COURT:  Do we have the witness ready to come in?

6            MR. KELLY:  Can the government, if I can impose on

7    them to write out the language they would want for a

8    stipulation so we can consider it while his cross is

9    continuing.

10           THE COURT:  Ms. Sassoon, please do that.

11           I intend to instruct the jury after this testimony is

12   over along the lines of, the sentence that is in Mr. Kelly's

13   letter from April 2.

14           MR. KELLY:  And also that they should disregard the

15   testimony about --

16           THE COURT:  Yes.

17           (Jury present)

18           THE COURT:  Ms. Keenan, you may proceed.

19   BY MS. KEENAN:

20   Q.  Mr. Ripa, you called the prosecutor on this case last week,

21   right?

22   A.  Yes, I did.

23   Q.  And prior to your testimony here today, it was your

24   understanding that the damages on which you were giving

25   guidance were a couple hundred dollars a month, right?

 1    A.  I really didn't do any calculation with respect to what the

 2    damages were, and that really is not my expertise.

 3    Q.  You had no idea that the tax guidance you were giving

 4    involved millions of dollars, right?

 5    A.  Absolutely not.

 6            MS. KEENAN:  No further questions, your Honor.

 7            THE COURT:  Mr. Kelly.

 8    REDIRECT EXAMINATION

 9    BY MR. KELLY:

10    Q.  Good morning, Mr. Ripa.

11    A.  Good morning.

12    Q.  I just want to reiterate, you spoke with the prosecutors

13    before your testimony today, right?

14    A.  Yes, I did.

15    Q.  You testified on cross that you had the conversation with

16    Mr. Ray about the taxability of this money several times,

17    right?

18    A.  I probably -- it was probably more than once, but I don't

19    know about seven times.

20    Q.  More than once?

21    A.  Yeah.  It probably was more than once.

22    Q.  You testified you don't know exactly when you first had

23    this conversation, right?

24    A.  No.  But I would assume it was around the time that I found

25    out about the nature that Claudia Drury was poisoning him.

1    Q.  Sitting here today, what is your best recollection of when

2    you first had that conversation?

3    A.  I would say it was around the time that she testified about

4    the poisoning.

5    Q.  And that was in 2015?

6    A.  Yes, I believe that is correct.

7            MR. KELLY:  No further questions, your Honor, but I

8    think the parties should have a brief sidebar before we dismiss

9    the witness.  OK.

10            (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At sidebar)

2          MR. KELLY:  I don't think we are prepared to stipulate

3    to this, so the government can call who they want to call.

4          MS. SASSOON:  I will, just for the record, say that

5    this proposed stipulation is:  Mr. Ripa first informed lawyers

6    for the defendant, Lawrence Ray on March 30, 2022, that he

7    provided the defendant tax advice.  Mr. Ripa previously spoke

8    with lawyers for the defendant, Lawrence Ray, on, and then it

9    lists the dates of the other meeting.

10          THE COURT:  We will have a government case after the

11   defense case.

12          Any recross-examination?

13          MS. KEENAN:  No, your Honor.

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

```
 1                    (In open court)

 2             MR. KELLY:  No further questions, your Honor.

 3             THE COURT:  Ms. Keenan, any further questions?

 4             MS. KEENAN:  No, your Honor.

 5             THE COURT:  Mr. Ripa, you are excused.  Thank you very

 6    much.

 7             THE WITNESS:  Thank you, your Honor.

 8             (Witness excused)

 9             THE COURT:  Members of the jury, you have just heard

10    testimony regarding information or conversation that Mr. Ripa

11    said that he had with the defendant about the taxability of

12    restitution payments.

13             I instruct you that that testimony should be

14    considered by you only in connection with the tax evasion

15    counts in this case.  I will explain to you in more detail in

16    my final jury charge what the elements of the tax evasion

17    charge are.  I further instruct you that you should disregard

18    the testimony of the witness regarding the lawfulness of the

19    receipt of prostitution proceeds themselves.

20             Anything further in the defense case?

21             MR. KELLY:  No, your Honor.

22             THE COURT:  Does the defense rest?

23             MR. KELLY:  The defense rests.

24             THE COURT:  Let me meet with the parties at sidebar.

25             (Continued on next page)
```

1          (At sidebar)

2          THE COURT:  Which of the lawyers are you going to

3   call?

4          MS. SASSOON:  There were a lot of dates.  All of these

5   dates.  We are putting together a chart right now of who was at

6   each of these meetings.  We should have that information pretty

7   soon.

8          MS. GLASHAUSSER:  Your Honor, can we do take a step

9   back and do our Rule 29 motion before the end of our case?

10         THE COURT:  Do you want to make it right now?

11         MS. GLASHAUSSER:  We would like to renew our Rule 29

12   motion.  The evidence was insufficient with respect to each

13   count and all of the elements therein.  We had highlighted one

14   area of insufficiency previously.  There is a second area of

15   insufficiency related to the tax counts, which Mr. Kelly would

16   like.

17         MS. SASSOON:  Should we excuse the jury?

18         THE COURT:  How long will it take?

19         MR. KELLY:  Thirty seconds.

20         As I have flagged in my recent letters to the Court,

21   it's our view that the government has the burden on the tax

22   evasion counts of proving that the income was taxable.  We

23   think that requires them to prove that exceptions do not apply.

24   We do not think they have done that for the payments Ms. Drury

25   made to Mr. Ray as restitution for damages for physical injury.

1   So we think because they failed to introduce evidence that the

2   exception does not apply that the tax evasion counts should be

3   dismissed under Rule 29.

4           THE COURT:  I'll reserve on that.  I don't think it's

5   a very serious motion, but I'll reserve on it.

6           MS. SASSOON:  We would like a short recess so we can

7   get our ducks in a row for the rebuttal.

8           MS. GLASHAUSSER:  Can we respond to what seems to be

9   going on here, your Honor.

10          I don't see how it's not a massive conflict of

11  interest for the government to call Mr. Ray's defense lawyers

12  in this case to testify against him.  That's such a classic

13  conflict.  We represent Mr. Ray.  Our duties are to Mr. Ray.

14  We cannot testify against him and continue to represent him.

15          THE COURT:  That motion is denied.

16          MS. SASSOON:  We, again, remain amenable to a

17  stipulation.

18          THE COURT:  Is there any reason why we can't, during

19  the break, do two things at once?

20          Number 1, discuss the theory of the defense and do the

21  final charge conference, and also give the government a couple

22  of minutes to get the ducks in a row with respect to the

23  witnesses.

24          From the defense perspective, your evidence is all in,

25  so I think that you can do the theory of the defense.

1              MS. GLASHAUSSER:  Sure.  That's fine, your Honor.

2              MS. SASSOON:  Can we take a short bathroom break?

3              THE COURT:  We will take a short bathroom break, and

4    then we will do both of those things.

5              You will all have to figure out on your side who is

6    doing what.

7              (Continued on next page)

1              (In open court)

2              THE COURT:  Members of the jury, as you probably have

3    observed, the evidence is coming close to being closed in this

4    case.  I do need a couple of minutes to talk to the lawyers.

5    Rather than having you wait in the jury box, I am going to

6    excuse you, let you go into the jury room, and we will see you

7    back in a little bit.

8              (Jury not present)

9              THE COURT:  We will take five minutes for a restroom

10   break, and then I'll see the parties here back at 11:40.  At

11   11:40, we will discuss the jury charge and any issues with

12   respect to the government rebuttal case.

13             In connection with the government rebuttal case, the

14   defense should make efforts to figure out if there is a single

15   witness or a couple of witnesses who were present for the

16   conversations with Mr. Ripa who would be able to testify with

17   respect to the fact that the tax conversation was not mentioned

18   to the defense prior to March 30.

19             I'll see you back here in five minutes.

20             (Recess)

21             THE COURT:  Any update with respect to the government

22   rebuttal case?

23             MS. SASSOON:  Yes.  We are close to reaching an

24   agreement on a stipulation, but we would just need then a few

25   minutes to type it and create an exhibit that we can then

1    offer.

2           THE COURT:  Is there any reason why you can't

3    handwrite it out and sign it, and then the parties can agree

4    that when the exhibits are prepared for the jury, a typewritten

5    exhibit would be substituted?

6           MS. SASSOON:  That's fine for the government.

7           THE COURT:  From the defense.

8           MR. KELLY:  That's fine.

9           I was trying to phrase the proposed stipulation

10   language on what the witness was asked, like to complete the

11   impeachment.

12          We don't have live, either side, so I was wondering if

13   the Court could ask the court reporter to pull up the

14   question -- Ms. Keenan might know the phrasing that they could

15   specifically look for, but something about, you previously met

16   with or you previously spoke with --

17          THE COURT:  I can do that.

18          I wonder whether, from the court reporter's

19   perspective, and I'll inquire of the court reporter, it would

20   be easier for the reporter to do that if I stepped out and then

21   the two of you met with the court reporter.

22          We will do it while I'm out here.

23          Ms. Keenan, do you have the question?

24          MS. KEENAN:  The question was sort of on the fly, but

25   I think the pertinent date would be March 30, 2022.

```
 1                (Discussion off the record).

 2                THE COURT:  Do we have a stipulation?

 3                MS. SASSOON:  Yes.

 4                THE COURT:  I don't need to know the terms of it.

 5                Is that all we will have in the government rebuttal

 6      case?

 7                MS. KEENAN:  Yes, your Honor.

 8                THE COURT:  Ms. Lenox asked a question, while we were

 9      on break, along the lines of the schedule for this afternoon.

10                After the jury comes back, I am going to excuse them

11      for an early lunch.  We will see how quickly they can come

12      back, and then we will proceed to Ms. Bracewell's summation.

13      We will see how it goes with respect to Ms. Bracewell's

14      summation and with respect to the jury.  If there is time until

15      4:00, or if the jury can stay later than 4, I'd like to start

16      the defense summation.

17                (Continued on next page)

18

19

20

21

22

23

24

25
```

1        MS. LENOX:  Your Honor, I would strongly oppose

2   starting the defense summation and then having to finish

3   tomorrow morning.

4        THE COURT:  Why?

5        MS. LENOX:  I think it cuts into the defense summation

6   and makes it less powerful for the jury.  I think that the

7   break in time is a break that no one would want to have when

8   making an argument summing up a month's worth of testimony and

9   evidence.

10       THE COURT:  We'll see how it goes.  Okay?

11       Let's go to the charge.

12       First, with respect to the theory of the defense, does

13  somebody have a copy of the theory of the defense charge that

14  was sent to me at 6:23 this morning or something like that?

15       MS. SASSOON:  I do.

16       THE COURT:  Do you want to pass that up.

17       Actually—I'm sorry—I do have it.  You don't need to

18  pass it up.  So I have the email from early this morning.  I

19  also provided a potential revision of the theory of the

20  defense.  Let me hear first from the government and then I'll

21  hear next from the defense.

22       Ms. Sassoon.

23       MS. SASSOON:  Yes, your Honor.

24       The defense is entitled to a charge that states a

25  legally correct legal theory.  We object to summarizing factual

1    arguments and characterizations of the facts being made by the

2    defense.  We think there's a difference between the language

3    your Honor added at the end about their legal theory related to

4    willfulness on the facts and having several sentences

5    summarizing their version of the factual evidence.  If your

6    Honor were to include that, we would ask that every sentence

7    begin with, "Mr. Ray asserts," "Mr. Ray asserts," so that it's

8    very clear that the Court is not adopting his version of events

9    or seeming to favor his version of the events.

10          THE COURT:  Okay.  Let me ask you both with respect to

11    the law and with respect to your issue regarding the balance of

12    the instruction.

13          With respect to the law, I have revised the theory of

14    the defense to make clear my view that I've written about that

15    this is a viable theory of defense only with respect to the tax

16    evasion charges, which is what's contained in the last couple

17    of sentences in the version that I circulated to the parties.

18    The version that I had from the defense was not clear that this

19    applied only to tax evasion and not to any of the other counts.

20    Does the government agree with that view of the law?

21          MS. SASSOON:  Yes.  I was responding to the revisions,

22    but with respect to the original submission, it's legally

23    incorrect to say that Mr. Ray did not act with criminal intent

24    just on the basis that he thought he was poisoned for all the

25    reasons that we have briefed several times in this case.

1              THE COURT:  Okay.  All right.  Let me look at the

2     instruction again.

3              Okay.  Let me hear from the defense, both with respect

4     to Ms. Sassoon's argument and also with respect to my revision

5     of the theory of the defense charge.  Ms. Glashausser.

6              MS. GLASHAUSSER:  Yes, your Honor.  We have no

7     objection to your Honor's revision, nor do we have any

8     objection to adding language at the start of each sentence

9     either, "It is the theory of the defense that," or, "Mr. Ray

10    asserts," as the government suggested.

11             THE COURT:  Okay.

12             MS. GLASHAUSSER:  So we do not have an objection to

13    that.  And if that satisfies the issue, I won't continue.

14             THE COURT:  I think that that does satisfy the issue.

15    Ms. Sassoon is right that as a technical matter, I'm not

16    required to give this additional language, but there's enough

17    in the charge with respect to the theory of the indictment that

18    in the exercise of my discretion and with the addition of

19    language that "Mr. Ray asserts," I think it's appropriate to

20    give this revised charge.  So that's what I'm going to do.  And

21    I'm going to put it at page 89, right before the charge on

22    violent crime in aid of racketeering.

23             With that, are there, from the government's

24    perspective, any objections to the charge that I circulated

25    last night?

1           MS. SASSOON:  No, your Honor.

2           THE COURT:  I should say yesterday.  And from the

3    defense perspective, we're going to strike the errant use of

4    the word "robbery," but anything else from the defense

5    perspective?

6           MS. GLASHAUSSER:  No, other than the ones we raised

7    previously and your Honor rejected.

8           THE COURT:  And those are preserved.

9           MS. GLASHAUSSER:  Thank you, your Honor.

10          THE COURT:  Okay.  So let me bring in the jury.  Give

11   me a second.

12          So we're able to get them lunch pretty quickly, so I

13   think we can get them lunch in 15 minutes, and we could start

14   summations around 1:15.

15          I am going to give the jury an instruction with

16   respect to Mr. Ripa's testimony that the testimony that he

17   received information that Claudia Drury admitted that she

18   poisoned the defendant was received as background to Mr. Ripa's

19   testimony that he told the defendant with respect to what he

20   told the defendant regarding taxation and was not received as

21   evidence that Ms. Drury in fact poisoned the defendant.  I

22   think that that is consistent with my ruling earlier and

23   appropriate.

24          So let's bring the jury.

25          MS. SASSOON:  Your Honor, can I just make a record

1    given that the last we spoke about the prior inconsistent

2    statement, there's some uncertainty.  I just wanted to put on

3    the record that over the break, the parties agreed to a

4    stipulation in lieu of testimony about the prior inconsistent

5    statement, and the language in the proposal was principally

6    drafted by the defense, and both parties have indicated that

7    they are comfortable with the stipulation.

8              THE COURT:  Any disagreement with what Ms. Sassoon

9    just put on the record?

10             MS. LENOX:  No, your Honor.

11             THE COURT:  Okay.  And from the record perspective, I

12   did make some comments about the lawyer witness rule and that

13   those comments were based on the understanding that the

14   testimony related to an uncontested issue.

15             All right.  Let's bring the jury in.

16             MS. GLASHAUSSER:  I'm sorry, your Honor.  We would

17   disagree with that.  We think that the lawyer-advocate witness

18   rule very much applied.  We are not waiving our objection that

19   we made at sidebar with respect to Ethical Rule 3.7.  We think

20   having that -- being forced to choose between testifying

21   against our client or signing a stipulation was inappropriate,

22   and so while we have now, as the lesser of two evils, agreed to

23   a stipulation, this is not something that we are entering into,

24   you know, willingly.  We had two choices, and we've opted to go

25   with this one.

```
 1              THE COURT:  Do you disagree that the matter is
 2    uncontested?  In other words, you're not stipulating to
 3    something that's untrue, are you, Ms. Glashausser?
 4              MS. GLASHAUSSER:  No, your Honor.
 5              THE COURT:  Okay.
 6              MS. GLASHAUSSER:  We're objecting to the --
 7              THE COURT:  I understand your legal argument.  I'm
 8    just asking the predicate whether I should understand what
 9    you're saying to be that you're stipulating to something that
10    is untrue.
11              MS. GLASHAUSSER:  No.  Certainly not.
12              THE COURT:  Okay.
13              (Continued on next page)
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                  (Jury present)

 2                  THE COURT:  Be seated.

 3                  Welcome back, members of the jury.  I have one

 4    instruction for you, and then I understand that we have one

 5    thing from the government's case.

 6                  Before the break, you heard testimony from Mr. Ripa

 7    that Mr. Ripa received information that Claudia Drury had

 8    admitted to poisoning the defendant.  That testimony was

 9    received as background to Mr. Ripa's testimony regarding

10    information he provided to the defendant regarding taxation.

11    It was not received as evidence that Ms. Drury in fact poisoned

12    the defendant.

13                  Okay.  Anything from the government in rebuttal?

14                  MS. SASSOON:  Yes.  The government offers Government

15    Exhibit 5007, which is a stipulation between the parties.

16                  THE COURT:  Okay.  That's received.  You may read it.

17                  (Government's Exhibit 5007 received in evidence)

18                  MS. SASSOON:  The parties stipulate and agree that

19    Mr. Ripa previously spoke to representatives of the defense on

20    a number of occasions about this case.  Notes from the defense

21    do not reflect Mr. Ripa discussing with representatives of the

22    defense, prior to March 30, 2022, tax advice provided to the

23    defendant.

24                  THE COURT:  Anything further from the government on

25    rebuttal?
```

1              MS. SASSOON:  No, your Honor.

2              THE COURT:  Okay.  All right.  Members of the jury,

3       that concludes the presentation of evidence in this case.  I'm

4       going to excuse you for an early lunch.  After lunch, we'll

5       begin with the summations of the parties in this case.  We'll

6       hear first from the lawyers for the government.  It's now a

7       little bit after 12.  I think it'll be out by around 12:15.  So

8       why don't we all reconvene here by no later than 1:15 and we'll

9       begin with the summations from the government.

10             While you are enjoying your lunch, enjoy the lunch,

11      don't talk about the case, and we'll see you back in a little

12      bit.

13             THE DEPUTY CLERK:  All rise.

14             (Continued on next page)

1                    (Jury not present)

2            THE COURT:  Okay.  Be seated.

3            So Ms. Lenox, we'll see where things stand, but you

4    should be prepared to start as soon as the government finishes

5    its summation.  And I'll see you all back here by around 1:00

6    or so.

7                    (Luncheon recess)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        AFTERNOON SESSION

2                            1:10 p.m.

3           THE COURT:  Ms. Bracewell, are you ready to proceed?

4           MS. BRACEWELL:  Yes, your Honor.

5           THE COURT:  Okay.  We'll get the jurors.

6           And I take it, Ms. Bracewell, because I don't see

7     another podium, you're delivering it from that podium?

8           MS. BRACEWELL:  Yes.

9           THE COURT:  Okay.

10          MS. LENOX:  Your Honor, just so I know, is the jury

11    going to stay longer today or --

12          THE COURT:  I don't think so.  So we'll see how long

13    the summation goes and we'll take a break.  What I plan to do

14    is after Ms. Bracewell is done, I'll have you all come up to

15    sidebar, we'll see how much time is left, and we'll discuss

16    whether it makes sense --

17          MS. LENOX:  Understood.

18          THE COURT:  -- to start.

19          (Continued on next page)

20

21

22

23

24

25

1              (Jury present)

2              THE COURT:  Be seated.

3              Members of the jury, you will now hear summations from

4      the parties.  The government will go first, then the defense,

5      and then the government will have a chance to make a rebuttal

6      summation.  After you hear the summations, I will then charge

7      you as to the law to apply in this case.

8              Ms. Bracewell, you may proceed.

9              MS. BRACEWELL:  Thank you, your Honor.

10             I want to begin with the portion of a recording,

11     Government Exhibit 4176.  The full recording is over an hour

12     long.  All night on this night, the defendant, Lawrence Ray,

13     dominates Santos Rosario.  The defendant is there that night

14     with his lieutenant, Isabella Pollok, with his trusted

15     associate, his daughter Talia Ray, in the apartment where they

16     operated.  The defendant puts on a display of violence, in

17     front of his other victims, Felicia Rosario, Claudia Drury, to

18     make sure they understood the consequences of noncompliance.

19             The defendant forced Santos to admit to doing

20     something made up, an online post, and demands Santos fix it.

21             This is the recording.

22             (Audio played)

23             MS. BRACEWELL:  You heard it in Santos's voice.  The

24     fear, the panic in response to the defendant's blows, raining

25     down again and again.  You heard the defendant's voice—angry,

1     abusive.  The defendant was instilling fear, creating a climate

2     of fear so that Santos would give in to his demands.  This is

3     one example out of many of the defendant's campaign of terror,

4     abuse, and manipulation.  When his victims were completely

5     subdued, when they were under his control, he committed crimes

6     to get them to pay—extortion, forced labor, sex trafficking,

7     obstruction of justice, financial crimes.  The defendant did

8     all of this for control, for his own greed, and to increase his

9     power, to cement his position in the organized group that he

10    led.

11          Ladies and gentlemen, over the past four weeks, you

12    have heard how the defendant's criminal organization began, how

13    it operated, and its purposes.  You've heard how it existed so

14    that the defendant could direct criminal activity to his

15    benefit.  You heard how it began when the defendant moved in to

16    his daughter's college housing in 2010, and then gained the

17    trust of her friends.  You've heard how he used that trust to

18    assume power, to make accusations against students, to induce

19    their confessions, to make these students believe that they had

20    poisoned him and they faced jail time or terrible violence

21    unless they paid.  What began in a college housing ended with

22    victims exploited through sex trafficking, forced labor,

23    extortion, while the defendant and his lieutenant, Isabella,

24    and his daughter Talia got rich.

25          This summation is the government's opportunity to go

1    back and explain all the evidence that came in, sometimes in

2    bits and pieces, and out of order, to explain how it shows

3    beyond a reasonable doubt that the defendant, Lawrence Ray, is

4    guilty of each and every one of the 15 charges in this case.

5            First, I'm going to talk about the categories of

6    crimes that you'll consider.

7            Second, we'll talk about how the evidence fits

8    together and shows that the defendant is guilty of these

9    crimes.

10           One thing I want to flag now—throughout this

11   afternoon, I'm going to reference exhibits, portions of the

12   transcript.  Make a note.  You can review any of this later.

13   It's available to you in your deliberations.

14           So briefly, I'm going to start by discussing the

15   categories of crimes the defendant is charged with committing.

16   Later today, or more likely tomorrow, Judge Liman will instruct

17   you on the law.  His instructions govern.  My references to the

18   law today are just to guide this presentation.

19           We'll start with the racketeering conspiracy.  That's

20   about the group the defendant organized, the way he gathered a

21   band of followers, developed a structure and a hierarchy, and

22   used that group to commit crimes.  That's charged in Count One.

23   We'll talk in detail about one standalone count—the defendant's

24   assault against Claudia Drury in the Gregory Hotel on

25   October 15th and 16th of 2018.  That's charged in Count

1    Fifteen.  We'll talk about how it was committed in furtherance

2    of the racketeering conspiracy I just mentioned.

3         And then there are also other categories of offenses

4    that we'll walk through.  Extortion, sex trafficking, forced

5    labor, obstruction of justice, and financial crimes.  Some of

6    these crimes are charged separately, as standalone criminal

7    conduct, and some charged as part of the racketeering

8    enterprise.  Overall, we will talk about five categories of

9    crimes.

10        So I'm going to start with racketeering.  This

11   category encompasses both the violent assault against Claudia

12   Drury and the conspiracy I just mentioned.  The law recognizes

13   that when people commit crimes as part of an organized group,

14   what the law calls an enterprise, they are more powerful and

15   more dangerous.  And that is exactly what you saw here.

16        As I expect Judge Liman will tell you, under the law,

17   an enterprise refers to a group of people who have come

18   together for a common purpose, with some kind of organization

19   amongst themselves, with personnel who function as a continuing

20   unit, for a common purpose of engaging in a course of conduct,

21   a group of people like the defendant and the few anointed into

22   his inner circle, a group that shared a common purpose of

23   abusing and controlling the victims in this case over a period

24   of years, a group that evolved from extortion and forced labor

25   into even more lucrative sex trafficking and committed

1    financial crimes to hide their criminal proceeds.

2            We're going to start with the assault on Claudia Drury

3    in the Gregory Hotel on October 15th and 16th, 2018.  We're

4    starting here because this one event embodies so much of the

5    charged conduct.  We are starting here because in this long

6    night of abuse, you see what the defendant wanted, what his

7    enterprise was all about—violent control, greed, threats,

8    protecting his profits, with victims who were entirely under

9    his thumb and too terrified to run away or report him.

10           How do you know the defendant is guilty beyond a

11   reasonable doubt of this assault?  You know from the testimony

12   of the victim Claudia, from the account that Felicia heard

13   directly from the defendant, from the text messages between

14   Claudia and Isabella both before and after the assault, from

15   cell site location data, even paper receipts; finally, most

16   damningly, from a recording of the assault recovered from a

17   device in the defendant's home.

18           Let's start with Claudia's testimony.  Remember what

19   Claudia told you.  You saw her on the stand reliving that night

20   and the physical abuse she suffered over hours.  The defendant

21   and Isabella stormed into Claudia's room at the Gregory Hotel.

22   They were mad that Claudia was getting close to a client Stuart

23   Piltch, that she was slipping from their control.  Over a

24   period of hours, the defendant held a plastic bag over her head

25   repeatedly.  The bag stuck to Claudia's mouth and nose whenever

1    she tried to breathe.  She was naked, tied up, choked with a

2    leash.  The defendant poured water over her while she was

3    blasted with cold air from a window unit AC.  He cut her hair

4    with a pair of souvenir scissors.  In the midst of this

5    shocking abuse, while Claudia was tied to a chair, the

6    defendant and Isabella ate carryout from a nearby diner.

7         On this night, the defendant and Isabella told Claudia

8    why they were there—to bring her back into line so she would

9    "focus on work."

10        (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MS. BRACEWELL:  Think about the word the defendant

2     used for Claudia's forced prostitution, work.  Claudia was

3     working for the Ray family, the defendant's enterprise, and

4     this assault was another way of asserting the group's control

5     ensuring their power and their profits.

6          You know what happened because of what the defendant

7     told Felicia in his own words about the assault, and it matches

8     up exactly.  The defendant and Isabella came home bragging

9     about how they had stripped Claudia, strapped her to her chair,

10    choked her with a plastic bag until she couldn't breathe.  They

11    were, in Felicia's words, gleeful.  The defendant showed

12    Felicia with snipping gestures how he terrorized Claudia with

13    the scissors by her face.  Claudia was crying.  It was a

14    success.  They, in Felicia's quote, really got her this time.

15         What Claudia and Felicia told you is confirmed by

16    every kind of evidence you've seen in this case.  The

17    underlying records are detailed on these summary slides.  I

18    urge to you review them and all the exhibits they cite:  Text

19    messages from Claudia to Isabella about being at the Gregory,

20    cell site data showing Isabella went there that night, records

21    recovered from the defendant's home, like the receipt from the

22    Skylight Diner for burgers and onion rings, exactly what

23    Claudia told you the defendant and Isabella ate on that night.

24    Think about that, ladies and gentlemen, she remembers what she

25    ate on a night four years ago.  Do you remember what you ate on

1    any night last week?  Claudia remembered because this night of

2    abuse is seared on her memory.

3         You saw text messages from the next day that show you

4    the assault worked, that Claudia had more cash ready for

5    pickup, a pickup then confirmed in Isabella's ledgers, and the

6    pickup confirms what the defendant's purpose was with the

7    assault, to ensure the profits and the power of the enterprise,

8    to ensure that their sex trafficking scheme continued, and that

9    the defendant's position at the top of this group, with command

10   over Claudia, was secured.

11        And you saw still more.  If you go back to Mr.

12   Petersohn's maps, you will see that included a phone ended up

13   in Piscataway the next day.  Claudia told you that the

14   defendant and Isabella took her phone that night, and that's

15   confirmed by her text message to Isabella the next morning from

16   a new phone, by her e-mail to a client, Randy Levinson, about

17   losing her phone.

18        And, on top of all of that, you know what happened

19   because of the devastating recording the defendant and Isabella

20   made that we listened to.  It was saved in a folder on the

21   defendant's computer entitled October 16, 2018, the date of the

22   assault, an audio file with metadata for 12:59 a.m., hours into

23   the all-night assault.

24        If you want, if you can, listen again.  Use the

25   headphones.  You can hear the plastic bags being crinkled.

Listen to it again right at 20 minutes and 15 seconds.  You can
hear a choking sound.  It brings to life what Claudia
experienced, naked and helpless, in that hotel room.

The recording ends with, pass me the bags.  The
defendant asks his lieutenant, Isabella, to hand him an
instrument of torture so he could choke Claudia until she
nearly blacked out.  You heard what happened.

This night-long assault is charged alone in Count
Fifteen, but it is relevant proof of almost every other crime
charged in this case.  This incident also proves that the
defendant used violent force to extort money from Claudia.
That's extortion.  That the defendant conspired with Isabella
to do so, that's extortion conspiracy.  That the defendant used
force to get money from Claudia's commercial sex acts, that's
sex trafficking.  That the defendant conspired with Isabella to
do that, that's a sex trafficking conspiracy.  That the
defendant used interstate facilities, that can just mean the
phone they used to find Claudia as part of his sex trafficking
and that's Count Nine.  That the defendant took this cash and
concealed it through transactions into other people's accounts,
that's money laundering.  That the defendant profited off of
sex trafficking and extortion and never paid a cent of taxes,
as he knew he was required to do, that's tax evasion.  That the
defendant was the leader of an organized group that engaged in
a constant pattern of criminal activity of which this night is

1    just a snapshot, that is Count One, racketeering conspiracy.

2         Ladies and gentlemen, this single night of crime tells

3    you almost all you need to know.  But, as we will cover and as

4    you have seen, there is so much more.  I started here too with

5    this assault because it captures exactly what the defendant

6    wanted, what his whole criminal enterprise was all about,

7    control.

8         Think of the defendant closing and loosening the

9    plastic bag over Claudia's head as she feared for her life.

10   Think about the defendant stripping this young woman down

11   before tying her up.  This was about preserving the control he

12   had over the victims ensuring that Claudia understood even more

13   that she couldn't escape the feeling that, no matter what, her

14   money and her life belonged to the defendant.  He wanted her to

15   believe that she existed for his benefit.  It was about

16   silence.

17        Ask yourselves, why did he record this assault?  Why

18   did he keep this recording?  The fact of the recording and the

19   fact that he kept it are damning proof of his entire campaign.

20   This is yet another tool of intimidation, convincing his

21   victims of their own wrongdoing, threatening to expose it,

22   relying on their fear to insulate himself and his inner circle

23   from detection and prosecution.  It was about money.

24        The defendant and Isabella were picking up more than

25   $8,000 in cash on October 15.  A date later, on October 16, the

1    text messages show Claudia was ready to hand over 4,000 more, a

2    cash flow of millions of dollars over years.  It is what they

3    lived on.  It is what they would do anything to preserve.

4         Within a day of this vicious assault the defendant,

5    Isabella spent hundreds of dollars in cash on a shopping spree.

6    The receipts were recovered from the defendant's home.

7         Finally, it was about protecting his organization.

8    Think of how the defendant and Isabella went home and bragged

9    about how they had succeeded in bringing Claudia to heal.  This

10   was an organization that instilled fear and profited off of it.

11   This was an organization that succeeded for years with the

12   defendant at the top.

13        With this assault in the first category of crimes is

14   Count One of the indictment, the racketeering conspiracy That I

15   previewed a moment ago.

16        Before we go any further, let me set out the elements,

17   the components of the racketeering conspiracy.  As I expect

18   Judge Liman will instruct, there are three elements to this

19   charge:  First, that there was an agreement among two or more

20   persons to participate in an enterprise that would affect

21   interstate commerce through a pattern of racketeering activity.

22   The enterprise here is the Ray family, and we will talk in a

23   moment about how the defendant and his inner circle were an

24   enterprise under the law.

25        With respect to an effect on interstate commerce, this

1   can be a minimal effect.  Here, this is simple.  To pick just a

2   handful of examples, the defendant's sex trafficking victim,

3   Claudia, worked in multiple sales.  His extortion victim,

4   Santos Rosario, robbed his mother of the proceeds of

5   international wires to hand the money to the defendant.

6   Isabella and the defendant regularly crossed state lines to

7   collect Claudia's sex trafficking proceeds.  This, or any of

8   these, is enough.

9        The second element, that the defendant knowingly and

10  willfully became a member of that agreement.  Third, that the

11  defendant or another member of the conspiracy agreed to commit

12  two racketeering acts.

13       You've heard and will hear about a lot of crimes, and

14  I want to make one thing clear up front.  As Judge Liman will

15  instruct you, to find the defendant guilty on Count One, you

16  only have to find two separate racketeering acts.  It could be

17  of the same type or different types.  It doesn't matter.  Two

18  acts of money laundering or two separate extortionate payments

19  from Claudia Drury or one of each, that's all the law requires.

20       How do you know that this enterprise existed?  We have

21  been calling it the Ray family, and you heard Felicia testify

22  about how that language came from the defendant.  You saw the

23  e-mail from Felicia referring to the Ray family echoing the

24  defendant's language.

25       You heard from the victims of the enterprise, and you

1    saw communications among its members:  The defendant, Isabella,

2    and Talia.  You saw their e-mail exchanges.  You saw

3    photographs of them.  You saw recordings in which they are

4    audible or visible acting together.  You saw financial records

5    showing the flow of funds between them.

6          Ladies and gentlemen, you have evidence spanning

7    almost a decade showing how the surprise operated, how its

8    members interacted, how it profited from its criminal

9    activities, and how it began.

10          You have heard how Talia introduced the defendant to

11    her friends.  She helped in the interrogations and confessions.

12    She participated in the extortion and the forced labor.  She

13    profited substantially off of her friends.

14          You have heard how Isabella became the defendant's

15    lieutenant, recorded the interrogations, retrieved the

16    confessions, and humiliating collateral when needed, carried

17    out the day-to-day business of sex trafficking, and, most of

18    all, you have heard how the defendant was at the top of the

19    group.  He managed the others, instilled and perpetuated the

20    fear that ensured the victims remained under his control and

21    enjoyed the criminal proceeds that followed of.

22          What we are going to turn now is the pattern of

23    racketeering, the various categories of crime the Ray family

24    committed:  Extortion, forced labor, sex trafficking, financial

25    crimes.

 1              So this second category is extortion offenses.  As I

 2     expect Judge Liman will instruct in more detail, extortion

 3     involves using or threatening force, violence, or fear to

 4     obtain a victim's property.  It's when the victim hands over

 5     the property because they are afraid not to.

 6              Ladies and gentlemen, you don't need to guess at

 7     whether the victims were afraid when the defendant demanded

 8     their money.  Anyone who came within the ambit of the Ray

 9     family knew what he was capable of.  You saw again and again

10     what he was capable of.  One example you heard a moment ago,

11     the recording, 4176, where the defendant beat Santos with a

12     hammer.

13              Here is another example, Government Exhibit 1881.

14              (Video played)

15              MS. BRACEWELL:  You can see the defendant hitting Dan

16     with the hammer.  You can see Dan flinch as the hammer comes at

17     him, in the living room of the apartment, a display for others

18     about what the defendant is willing, is capable of doing.

19              The defendant used these displays of violence

20     performed in front of his other victims, the defendant

21     demonstrating that he could and would use violence as far as he

22     needed it, with hammers, pliers, threats of taking it even

23     further.  Swinging the hammer towards the floor and suggesting

24     Santos' head could be there.  Opening the window and urging

25     Santos and Felicia to jump.

1          Ladies and gentlemen, these are death threats.  He

2     used the threatening displays of violence both to create fear

3     and maintain control over his victims and so that the victims

4     would yield to his demands, because they were too scared not

5     to.

6          And amid this same abusive climate, the defendant

7     created and stockpiled confessions that compounded this fear,

8     where the victims confessed to all sorts of criminal conduct

9     and intentional harm at the defendant's direction in recordings

10    he maintained forever.  And he told his victims that they face

11    ruin, possible lifetime incarceration where they would be

12    violated or slashed or worse.  The defendant made his threats

13    vivid.  To be sure, his victims would be too terrified to say

14    no to his demands.

15          You heard their fear here too.

16          (Video played)

17          MS. BRACEWELL:  Felicia is begging the defendant not

18    to turn her into the police.  She is terrified of what will

19    happen next.  He couldn't care less.  The defendant created a

20    climate of fear and demanded money or promised violent

21    consequences.

22          The defendant may have labeled these as reparations,

23    repairs, damages, but that was nothing but a con.  The

24    defendant demanded and relentlessly pursued his extortion

25    victims:  Santos, Claudia, Felicia, Yalitza, Dan.  The money

1    wasn't an accident.  It wasn't a gift.  It certainly wasn't

2    misplaced generosity from storytelling kids.  You heard it from

3    the victims and you heard it in the defendant's own words.

4              (Audio played)

5              MS. BRACEWELL:  In the defendant's own words, just pay

6    me.  Think of what Santos told you.  At a certain point the

7    defendant was making demands for money, in his words, all the

8    time.  And the debts only grew.  There was never a subtraction,

9    never anything Santos could do to decrease the total on the

10   list.  $100,000 handed over.  No effect.  This is a college

11   student who was so scared that he borrowed money from his

12   parents who had to rely on loans from friends, a college that

13   robbed his parents at the small shop that they had in the

14   Bronx.

15             And think of the defendant.  What does it show you

16   that he took $100,000 from a college student, then a college

17   dropout, who was borrowing and robbing from his parents.  For

18   Santos it shows his fear, his desperation; for the defendant,

19   his utter entitlement.

20             Claudia told you about the same pattern of behavior,

21   constant conversations about her wrongdoing, constant

22   confessions on ceasing pressure to get money.  She told you in

23   2014 she had no money to give.  Eventually, Claudia ran out of

24   options.  She hoped she would be able to get a good job and a

25   career to pay the defendant, but, in her words, that wasn't

1    anywhere fast enough for Larry.

2         Instead, he steered Claudia into prostitution.

3    Claudia became a prostitute because she was under immense

4    pressure to get money amid a climate of fear that the defendant

5    and Talia and Isabella created.  Claudia continued in

6    prostitution because, as we will discuss in a moment, that

7    pressure, that fear, that violence only escalated.

8         Now, defense counsel has suggested again and again

9    that the defendant believed his victims' confessions, that he

10   was somehow a victim of the confessions he induced with

11   violence, with threats, sometimes wielding weapons.

12        Ladies and gentlemen, this claim about what Larry

13   believed does not withstand the slightest scrutiny.  You know

14   because every single one of his actions was designed to keep

15   these victims close, to keep control over them.

16        Why on earth would you stick around and share meals

17   with your supposed poisoners?  You know it because the

18   defendant never for an instant showed any actual fear.  In

19   recording after recording after recording, the only people who

20   are terrified are his victims.  You know it from the way he

21   monetized his accusations immediately and then repeatedly.

22   Think of how before Felicia even moved to New York City, she

23   was being held responsible for $1 million in damages, and here

24   too, in weeks, the total damages only grew.

25        You know it because you could not live in an apartment

1   with all of these items on Santos' list and actually think they

2   were all broken.  You know it because the defendant studied

3   mind control.  He had articles about mind control, just like

4   the experiment he waged on these students.  This was nothing

5   but a long con.

6           But this is also a distraction.  It does not matter

7   whether the defendant believed that his victims harmed him.  It

8   does not matter because no one is entitled to use force to

9   threaten force, to demonstrate force, to get money, even if

10  they were entitled to it.  You cannot use pliers on someone's

11  tongue, a hammer against their body, choke them with a plastic

12  bag.  That's not how debts are collected.

13          The only relevant thing about what Larry believed is

14  that the rules didn't apply to him.  The whole point of the

15  defendant's organization was that the defendant took and took

16  whatever he wanted and however he wanted it.  The law does not

17  require you to be a mind reader.  You can look at his actions.

18          I want you to think about Felicia's testimony about

19  what happened when the money from Claudia dried up in mid 2019.

20  The defendant told Felicia that he reeled Santos back in

21  because they weren't getting money from Claudia.  He was

22  explicit.  Claudia was gone, so he was refocusing his efforts

23  on Santos.  That tells you everything.  The defendant wasn't a

24  believer.  The defendant was an opportunistic accuser reviving

25  accusations when convenient, when his money source dried up.

1    It had nothing to do with actual injury.  It had everything to

2    do with greed.

3            With respect to this extortion, the defendant did not

4    act alone.  Extortion conspiracy is charged separately in Count

5    Two and on that charge you have to consider whether the

6    defendant agreed with another person to engage in extortion.

7            In frightening his victims, in threatening

8    consequences and recording, collecting, amassing these

9    confessions, and reminding the victims of their ongoing debts,

10   the defendant relied upon Talia and Isabella to carry out this

11   extortion scheme.

12           Think of the testimony from Claudia.  She told you

13   about a particular conversation she heard in Pinehurst.  Talia

14   and Santos were on the phone with a phone being passed

15   occasionally to the defendant.  Santos was talking to them

16   about how to get his parents to give him money to make repairs.

17   When Santos succeeded in getting the money, Claudia heard the

18   defendant say:  Good job.  See.  Doesn't that feel better?  You

19   know, making repairs is the right thing to do.

20           The conversation Claudia overheard is confirmed in the

21   financials.  Between the end of April 2013 and mid January of

22   2014, in about a six-month period, Talia received $43,777 from

23   her former college classmate, Santos.  Ladies and gentlemen,

24   just reflect upon this.  How incredibly damning is this proof

25   of Talia's complicity?  Who on earth accepts over $40,000 from

 1   a college classmate who is being accused by their father?  The

 2   same kind of person who tells their friend he could go to jail

 3   for life as a violent criminal because of what he has done.

 4   This is Government Exhibit 4175.

 5            (Audio played)

 6            MS. BRACEWELL:  That's Government Exhibit 4175.

 7            Listen to it again as you deliberate.  You can listen

 8   to Talia laugh as if there is something humorous about Santos'

 9   terror.

10            Talia and Isabella used the confessions to damage

11   their victims most effectively.  Look at Talia's e-mail.  She

12   is reviewing a confession from Yalitza, providing notes,

13   providing feedback.  Look at the written feedback halfway down

14   the page, Yalitza hesitating.  She is trying to maximize their

15   usefulness for the Ray family.

16            Isabella was the defendant's right hand, ready to

17   record whenever the defendant deployed her.

18            (Audio played)

19            MS. BRACEWELL:  When the defendant was ready to make

20   an audio recording, when the confession from Santos satisfied

21   him, he turned to Isabella to get it made.  Hours later on that

22   same night, when the defendant was still in the midst of

23   terrifying Santos, he turned to Isabella to gather a

24   humiliating confession, to post it online.

25            (Audio played)

1          MS. BRACEWELL:  As Santos testified, Isabella was

2     ready to resurface confessions whenever needed.  She kept track

3     of the collateral that she participated in making.  Most, if

4     not all, were on Isabella's computer, santos testified.  And as

5     you just heard, she had them ready to use so that the Ray

6     family could dominate its victims.

7          Finally, before we move to the next category of

8     conduct, I want to note for you briefly that you will also

9     consider state law extortion.  This is not a standalone count

10    but part of Count One, the criminal activities that the

11    defendant committed for his enterprise.

12         As Judge Liman will explain, the relevant New York

13    statute is violated when the defendant obtains property by

14    instilling in his victims a fear of future physical injury.

15    Ladies and gentlemen, you know the defendant did this.  You

16    know he created a culture of fear, used displays of extreme

17    physical violence, and then demanded money again and again.

18         The third category of criminal conduct is crimes

19    related to forced labor.  I expect that Judge Liman will

20    instruct you that forced labor has to do with obtaining labor

21    or services through prohibited means.  That's defined as things

22    like force, physical restraint, serious harm or threats of it,

23    abuse of the law or legal process, a scheme to cause a victim

24    to believe that not performing would result in serious harm to

25    the victim or any other person.

1             In 2013, the defendant brought these students, these

2    young people, to Pinehurst, North Carolina.  They ended up in a

3    grueling summer of physical labor to benefit the Ray family.

4    Instead of working summer jobs or internships, they labored on

5    the defendant's stepfather's rural property all day, every day,

6    often until late at night.  The defendant determined when the

7    victims slept, when they ate.  He directed the plan, the work,

8    the hours.  He made them into an unpaid, untrained, demolition

9    and construction crew.

10            How did he do it?

11            (Video played)

12            MS. BRACEWELL:  Those are just some of the images and

13   videos of Pinehurst and the labor that the victims engaged in

14   constantly.

15            So how did the defendant get his victims to do this

16   manual labor?  Force, physical force.  You heard from Yalitza

17   about how the defendant shoved her to the ground because, in

18   his words, she was sabotaging the whole task he had made her

19   do.

20            You heard about Claudia, from Claudia about how the

21   defendant shoved her to the ground as well because she was

22   digging, doing the project he made her do, when he shoved her

23   to the ground accusing her of harmful thoughts.  And you saw

24   the defendant's abuse of Felicia throughout the time in

25   Pinehurst, abuse other people remember that is recorded in

1    multiple videos.

2              Serious harm, another prohibited means which can

3    include threat of harm to another person.  Think of how Yalitza

4    was made to watch the defendant's abuse of Felicia, watch him

5    wrestle her to the ground and pin her there for what had to

6    feel like ages.  As Yalitza told you, this was not the only

7    occasion that the defendant abused Felicia.  And, as you know

8    from the videos, far from it.

9              Abuse or threats of legal process.  Felicia told you

10   about being taken to the police station to be signed and

11   booked, to be held in jail in North Carolina maybe forever.

12   Claudia remembered those threats, remembered how the defendant

13   and Felicia left one night for Felicia to get turned in, and it

14   was another tactic that the defendant repeated.  Remember how

15   Yalitza was driven to the police station too, expecting to be

16   turned in for damages and poisoning.  They were all terrified

17   that the defendant would report them, take them to the police.

18             Threats of harm to another.  A scheme to cause the

19   victim to believe that not performing would result in serious

20   harm to the victim or any other person.  The defendant did this

21   too.  Claudia told you how the defendant said Gordon Ray, his

22   stepfather, would die if the work wasn't completed, that if the

23   Gordon saw the state of the work in Pinehurst he would have a

24   heart attack because they were destroying the last remaining

25   thing that was good in his life.  The defendant told Felicia

1    something similar too, that she was hurting Gordon by not

2    helping.  She was terrified.

3          And Gordon wasn't the only person that the defendant

4    leveraged with his victims.  Remember how the defendant told

5    Yalitza he needed her in Pinehurst or Felicia would fall apart.

6    That was the scheme that led Yalitza to come down for a

7    temporary visit despite her planned job at a bakery in New

8    York.

9          To be guilty, the defendant had to use just one of

10   these prohibited means.  He used them all in combination and to

11   maximum effect.  And the law does not require you to decide

12   that the defendant obtained the labor of all of the victims,

13   although the evidence shows he clearly did.  Any one of the

14   victims is enough

15         I want to be clear that the victims weren't locked in

16   a room.  They weren't physically restrained.  No one is

17   claiming that's how this forced labor happened.  But make no

18   take, the defendant used means that were just as effective.  In

19   Pinehurst the victims' isolation was complete.  They were city

20   kids in a different state, in a rural area far from home.

21   Felicia told you about how she spent five days outside, eating

22   figs from a tree and going to the bathroom outside.  Claudia

23   told you how she lost 40 pounds slaving away in summer heat.

24   What does this testimony show you?  That in North Carolina the

25   defendant's power was absolute

 1          Furthermore, the defendant relied upon the

 2   deprivations that he inflicted.  Think of Yalitza's testimony

 3   about her time at Pinehurst.  Her misery became so acute that

 4   she trekked through the night to reach a Wal-Mart.  The only

 5   goal she could form was to get Life cereal, to eat it out of a

 6   Tupperware, and then try to commit suicide.

 7          What does that tell you and what does that show you?

 8   She was exhausted from working every day from watching the

 9   abuse of others, including her older sister, only months after

10   being in a coma for a prior suicide attempt.  Her physical,

11   mental, emotional capacities were completely depleted.  The

12   forced labor, the grueling summer of constant work itself

13   strengthened the defendant's grasp on these vulnerable young

14   people.  However, because of their isolation, the deprivation,

15   the violence, the threats of legal abuse, the harm against

16   other victims, the victims felt trapped again, and again they

17   told you they did not feel like they could leave

18          Counts Seven and Eight are also related to Pinehurst,

19   and I'll explain them briefly.  Count Seven deals with forced

20   labor trafficking, whether the defendant recruited,

21   transported, provided, obtained victims, among other things, to

22   perform the forced labor or intended to do one of the things.

23          The defendant recruited his victims from New York City

24   to North Carolina.  Let's look again at Yalitza.  He told her

25   she'd come down for a temporary stay.  She planned to go back

to her work at a bakery.  He told her she needed to help her

sister.  He manipulated her closest family ties to suck her

into his orbit, to suck her in the Ray family forced summer

activities.

She ended up staying for months, and she told you,

when she finally left Pinehurst, it wasn't because she didn't

fear the consequences.  It was because she planned to die and

she knew the consequences wouldn't matter.  This young woman

was subjected to such extreme brutality that she didn't want to

live anymore.  Think about that.

Count Eight, forced labor conspiracy requires that the

defendant knowingly joined a conspiracy to obtain forced labor

from victims.  The defendant conspired with Talia Ray in

Pinehurst.  She was there working inside, shielded from the

manual labor, except for an occasional cameo appearance to sit

atop of a machine.  She participated in the abuse and she

profited from it.

Look at Talia's accusations to Claudia from the summer

of 2013.  Thanks for writing this.  It's the right thing to

give us the info so we can now do damage control.  This is

being sent in August of 2013, while Talia is sitting inside

studying for the LSAT, while her friends labored in the North

Carolina summer heat.

And Talia already knew exactly how those claims of

damages played out.  Remember, as we already discussed, Talia

received payments from Santos all summer long, while Santos was

working most of the summer as a waiter in a cafe near the Upper

East Side apartment, more than $40,000.  Just like her father

in Pinehurst, Talia treated her former roommates like they

existed for her profit

Now, Counts Six, Seven, and Eight are the standalone

forced labor counts related to that terrible summer in

Pinehurst.  With respect to the predicate acts of the

racketeering conspiracy, you can also consider another category

of forced labor.  That is, how the defendant forced Felicia to

provide sexual services to strangers out of the New York

apartment, out of Pinehurst, North Carolina, and out of

Piscataway, New Jersey.

This is Government Exhibit 1405.  These recordings

were not displayed during trial.  They are in evidence.  You

can view them if you feel you need to during deliberations.

They are described in detail in the summary chart that Agent

Maguire described.  The recordings were recovered from the

defendant's residence from the defendant's devices.

These videos show exactly what Felicia told you they

would.  Time and again, the defendant required her to go into

the street to engage in sex acts with strangers, to record

those acts, to provide those recordings to him.  Remember how

she told you that the defendant said she was useless, not even

competent to record a sex video.  He sent Isabella along to

 1   secure footage of her performances.  Remember how she looked

 2   when she told you about this.  Her shame and humiliation were

 3   visible, even now, years later.

 4         The sexual services that Felicia was forced to engage

 5   in at the defendant's pleasure and at his direction for a

 6   period of years are another kind of forced labor.  The means

 7   that the defendant used against Felicia were varied and yet

 8   constant:  Physical abuse, humiliation, name calling, physical

 9   restraint like duct-taping her, threats of the police, of jail.

10   She did what the defendant demanded, what he required her to do

11   if she wanted to avoid horrible physical abuse or other

12   terrible consequences.  That's forced labor too.

13         The fourth category of criminal conduct is crimes

14   related to sex trafficking.  With Claudia the defendant did

15   more than seizing what she had, what she could get from parents

16   or family.  Rather than accepting the limited resources of a

17   recent college graduate, he steered her into prostitution.  He

18   stoked her fear, her desperation, and her terror.

19         I expect Judge Liman will instruct you that sex

20   trafficking has three elements.  The first element can be

21   satisfied in two ways.  Either the defendant knowingly, among

22   other activity, recruited, enticed, provided, obtained the

23   victim, or knowingly benefited financially from participating

24   in a venture that did those activities.  Either way fits the

25   facts here.  You know the defendant recruited Claudia into

1    prostitution, he presented the idea, packaged it as appealing,

2    pressed it as a way to make the money she needed for

3    quote/unquote repairs.  But he also benefited financially many

4    times over from the prostitution he forced Claudia into.

5           The second element is that the defendant knew or

6    recklessly disregarded that force, threats of force, or

7    coercion would be used with respect to Claudia.  We will return

8    to this in one moment.

9           The third element is that the defendant knew that

10   Claudia would be engaged in a commercial sex act.  These are

11   Claudia's prostitution photographs found in the defendant's

12   iCloud.  You heard Felicia testifying about how the defendant

13   and Isabella workshopped Claudia's prostitution advertisements

14   while they were still in the Upper East Side apartment.  How

15   Claudia made money from commercial sex acts was not at a secret

16   at all.  You know it from the pickups, the client lists they

17   received, their visits to hotels.

18          The question for you is whether the defendant knew or

19   recklessly disregarded that force, threats of force, or

20   coercion would be used with respect to Claudia.  Of course he

21   knew because he was the one using the force, the one

22   threatening force, the one creating a coercive climate that

23   took over everything else in Claudia's life.

24          How did Claudia end up in prostitution?  It was

25   because of isolation, sexual degradation, threats, and

1   violence.  It was not because of Sleaze Week at Sarah Lawrence.

2   It was because the defendant isolated her totally so that she

3   had no one else in the world.

4        Think of how the defendant unmoored her from her

5   parents from normal life, think of how he labeled her as the

6   sabotager, the damager of the roommates who had previously been

7   her friends.  In her words, he actually told me they only spoke

8   to me because he told them to multiple times.  She felt

9   ostracized, as he intended.

10       Claudia's complete isolation was a project that the

11  defendant kept up persistently for a period of years.  Whenever

12  she was close to a client, the defendant was violent or

13  threatening toward either Claudia or the client.

14       You heard about at the Time Hotel how the defendant

15  and Isabella trashed the clothes that Claudia's client had

16  purchased for her.  You heard about how Santos left a message

17  on a client's voice mail, as instructed by the defendant.

18       Claudia's life had shrunk down.  She was living in

19  hotels, carrying belongings between them, meeting prostitution

20  clients seven days a week, out of touch with her parents.  And

21  when she had anything approaching a human connection, even with

22  a prostitution client, the defendant destroyed it

23       It happened because the defendant groomed Claudia into

24  forced prostitution.  He moved the line of deviance and

25  normalized ever-escalating sexual activities.  Sex with a

1    married tool salesman, sex clubs, sex with a cabdriver as

2    payment, BDSN.  These were escalating degradations.  It

3    happened because of the fear of the consequences that the

4    defendant and Isabella promised that they would terrorize

5    Claudia with.

6            Jail, where she would be raped, slashed, maybe have

7    her mouth used as toilet paper.  It is a visceral, disgusting

8    image.  It is as vile as it was intended to be.  It was because

9    the defendant used force and coercion when needed, when Claudia

10   seemed to be slipping away.

11           Before she ever began working as a prostitute, Claudia

12   was present and watched as the defendant brutally assaulted

13   Santos with a hammer.  That's 41:76 that we listened to first

14   thing this morning.  The violence only continued.  He threw her

15   belongings all over the floor as he interrogated her at Time

16   Hotel.  He flogged her with BDSN props in her apartment.  He

17   came to the Shoreham Hotel and hit her until she learned to

18   stop flinching.  He threatened her with further violence, with

19   abduction, with having her face cut open.

20           When the defendant and Isabella stormed into Claudia's

21   room in the Gregory Hotel in the middle of October of 2018,

22   when they told her to behave and focus on work, the violence

23   had been going on for years.  The assault was a capstone of a

24   campaign of terror and violence that was well underway.

25           And you know what followed from that assault.  Look at

1    Claudia's e-mail from October 16, 2018, right after the Gregory

2    Hotel assault.  Hours after she had been suffocated, she

3    barters her future to Randy Levinson for $5,000, 303 dates of

4    sex for money, $5,000, all so she could satisfy the insatiable

5    greed of the defendant and Isabella.

6          Ladies and gentlemen, this desperation, this unceasing

7    pace of prostitution, of future prostitution, was not because

8    Claudia liked it.  This shows her terror

9          And look at the ledgers from 2018 from the months

10   before this assault.  There had been an explosion of income.

11   In August of 2018, $168,000 in pickups.  In September of 2018,

12   $92,000 in pickups.  The defendant knew Claudia was slipping

13   away from his control, and he knew Claudia was profitable for

14   the Ray family.

15         You saw the evidence that showed how the defendant and

16   Isabella lived lavishly off this exploitation.  Remember what

17   Agent Maguire did not see among the receipts:  Medical

18   treatment, physical therapy.

19         Instead, she saw the meticulous record of their luxury

20   expenditures:  Luxury clothing; items for the defendant and for

21   Isabella; gifts for the defendant's stepfather, Gordon;

22   five-star hotels and expensive dinners; tens of thousands of

23   dollars in wire transfers to Talia.

24         And, on the other side, in these horrible

25   circumstances, Claudia once bought air buds for herself, and

1    she felt so guilty keeping a few hundred dollars for herself

2    that she threw them away.

3           It shows you what the defendant did to Claudia, how

4    unworthy she felt.  It tells you how the defendant viewed

5    himself at the top of this organization, the Ray family

6    entitled to any and all of the money from the people beneath

7    him.

8           Think of what else you didn't see.  Never anywhere,

9    any ledger showing Claudia worked off a cent.  Millions of

10   dollars and no offset for these supposed damages.

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MS. BRACEWELL:  That's because the entire idea of

2     damages was a con to allow for continuing control and

3     continuing payments, nothing else.  Just another reason you

4     know the defendant did not believe this story of damages that

5     he created.

6          Sex trafficking conspiracy is charged in Count Five.

7     And this means that the defendant agreed with another person to

8     engage in sex trafficking.  Here, the defendant worked hand in

9     hand with Isabella.  She was his deputy, his accountant, the

10    manager of the day-to-day business of Claudia's sex

11    trafficking.

12         You've seen the ledgers Isabella kept, documenting the

13    pickups that she made, highlighted yellow in this multipage

14    document.  You've seen the communications from Isabella's phone

15    with Claudia saved under the name Brian.  Pause on that.  Why

16    on earth would you save your college roommate under a fake

17    name?  Because the communications are incriminating and you're

18    trying to hide the evidence.

19         And in between collecting thousands of dollars,

20    Isabella periodically reminded Claudia of her confession, of

21    the leverage hanging over her head.  Look at these messages.

22    Look at the date.  These happened on Christmas Day.  Claudia

23    provides a message about the money ready for pickup, 17,000.

24    Isabella responds, "Did you always get the mercury that you

25    poisoned us with from the same place?"  Their ruthlessness, the

1    defendant and Isabella, was relentless.  They worked hand in

2    hand to control Claudia and to keep themselves in designer

3    clothing.

4            The last offense in the sex trafficking category is

5    Count Nine, the Travel Act, which makes it a crime to use

6    interstate facilities to promote unlawful activities, including

7    sex trafficking, under federal law, and the promotion of

8    prostitution under state law.  Judge Liman will walk you

9    through the elements of this statute just like all the others.

10   The language is complicated, but the concept is simple.  Using

11   an interstate facility can be making a phone call from one

12   state to another; crossing state lines from Piscataway, New

13   Jersey, to midtown Manhattan in an Uber.  The unlawful

14   activities are what we've already spoken about—the sex

15   trafficking, the constant exploitation of Claudia.

16           We've talked about how the defendant monetized his

17   control, how he deployed his power to commit crimes against the

18   victims, but he also kept himself at arm's length from the

19   criminal proceeds.  The evidence shows that by design, the

20   defendant avoided a paper trail.  He used cash, he used other

21   people's accounts, online domains, to hide his enormous

22   proceeds.  Ladies and gentlemen, if the defendant really

23   thought that he was owed this money or entitled to this money,

24   he wouldn't have gone to lengths to hide it.  Why would the

25   defendant work so hard to avoid a paper trail linking him to

1    his other crimes, extortion and sex trafficking, unless he knew

2    how incriminating, how wrong, his conduct was.

3          His acts of concealment and evasion are charged as

4    money laundering and tax evasion, and these financial crimes

5    are the fifth and final category of conduct we're going to

6    discuss today.

7          The defendant earned millions of dollars from Claudia;

8    millions of dollars that he wasn't entitled to, that he took

9    through force and fear; millions of dollars that he kept in

10   cash or in other people's accounts, at arm's length from

11   himself.  Remember what Felicia told you about the notecards

12   that the defendant required her to keep, documenting all

13   expenditures, how she wrote initially "LR Cash" in the upper

14   left-hand corner because as she well knew, it was the

15   defendant's cash, just like Claudia knew she was giving the

16   pickups to Lawrence Ray.  Remember how Felicia told you that

17   both the defendant and Isabella yelled at her because she was

18   putting the defendant at risk by writing notecards that

19   referenced his ownership of the money.

20         You heard about what the defendant and Isabella did

21   with the money.  They kept it in cash.  They moved money into

22   the accounts in Felicia's name, in Isabella's name, to keep it

23   out of Lawrence Ray's name.  But they had to do something with

24   this dirty cash.  And so when they weren't spending it on

25   designer shopping sprees, they used it to build a massive

1    portfolio of almost 8,000 GoDaddy domain registrations.  Ten

2    separate bank accounts held by Felicia, Santos, Claudia,

3    Isabella, and Talia were used to funnel money to the

4    defendant's GoDaddy accounts.  This is in Government

5    Exhibit 1404, at page 15.  Take your time with it.  This was

6    where the defendant held his profits.  He told you in his own

7    words, in a recorded jail call, that that portfolio was worth

8    more than $34 million.

9         The defendant and Isabella knew that these were

10   criminal proceeds.  Of course they did.  They went to hotel

11   rooms in the middle of the night, received wire transfers from

12   prostitution clients, talked to Claudia about how many

13   appointments she had, weighed in on the photos she had in her

14   online advertisements.  They took money from college-age

15   students that they had physically abused.  The gulf between

16   what the defendant controlled and what the defendant attached

17   his name to tells you what you need to know.  That's

18   concealment, and that is evidence of money laundering.

19        As you heard from the IRS revenue agent and as Judge

20   Liman will instruct you, the IRS doesn't distinguish between

21   lawful and unlawful income.  And for good reason.  You don't

22   want criminals raking in millions of dollars to get

23   preferential tax treatment over wage earners or day laborers.

24   Between 2016 and 2019, the defendant did not pay a cent of

25   taxes.  You know that Lawrence Ray filed taxes before.  He

1    wasn't confused about whether the tax laws applied to him.

2    Clearly they did.  Clearly he knew that.  And all the

3    activities that he took to launder the proceeds, to put up

4    impediments to tracing the money back to him, they tell you two

5    things—the money was fully in his control, and he was conscious

6    of avoiding responsibility and tax liability for it.  The

7    defendant's actions—parking money in GoDaddy, filtering money

8    through Felicia Rosario and Isabella Pollok's bank

9    accounts—these are steps he took to keep his name away from the

10   bottom line.  They don't make it any less his income.

11        In each and every year between 2016 and 2019, Isabella

12   picked up this account, this income all around midtown

13   Manhattan where Claudia Drury was a constant hotel resident,

14   and she, or Felicia, deposited it in bank accounts, including

15   in Manhattan.  This is 2016.  This is 2017.  2018.  2019.

16   Every year, cash deposits made in Manhattan.

17        You also heard this morning from the attorney that the

18   defendant supposedly consulted with whom he supposedly got tax

19   advice about the taxability of personal injury damages.  The

20   defendant spoke to an attorney, gave a misleading picture of

21   his activity, and misrepresented what he was doing and how he

22   was doing it.  You know what he didn't say?  He did not say:  I

23   am sex trafficking Claudia Drury to the tune of millions of

24   dollars; is that okay?  He didn't say that because the answer

25   to that is obvious.

1          Ladies and gentlemen, what could be stronger

2    consciousness of guilt than this manufactured consultation.

3    The defendant knew he wasn't personally damaged.  He knew he

4    didn't have any kind of agreement with Claudia beyond the

5    violence and threats and force he used against her.  He knew

6    that the cash payments that he and Isabella seized from hotel

7    rooms in the middle of the night had nothing to do with the

8    kind of lawful settlement proceeds vaguely alluded to in his

9    discussion with his attorney.  This wasn't attorney advice;

10   this was a contingency plan developed in the midst of ten years

11   of criminal conduct.  That testimony today was the culmination

12   of the defendant's plan to camouflage and conceal his criminal

13   conduct, and you got to see it live.  Nothing shows you that

14   the defendant was aware of his income tax obligations more than

15   his efforts at the time to plan a superficial defense for their

16   evasion.  Don't fall for it.

17        Finally, you heard about how the defendant was irate

18   after Claudia dared to run away to stop paying him money.  You

19   saw what that generated when they lost control of Claudia, what

20   the defendant and Isabella did after that—public humiliation,

21   tactics to embarrass her.

22        At the defendant's house, the government found pages

23   of drafts of this email, 15 in total, with Isabella's

24   handwriting on the various versions revising to help land on

25   the right tone between guilt and threats, all of this aimed at

1    Claudia, pointedly, to ensure that she remained silent and

2    compliant.  They also found pages of notes of things that

3    Claudia wouldn't want on the website, things that would

4    humiliate her or silence her, the leverage they had that they

5    were preparing to deploy.

6          You heard again from Felicia about the magazine

7    article, how the defendant became irate about the betrayal of

8    the victims who he assumed featured in it.  The defendant's

9    reaction to that article, to the specter of law enforcement and

10    detection, was retaliation, reviving old emails, old

11    confessions, all the leverage he'd accumulated over a decade.

12          And you see it in these emails that resurfaced old

13    materials; Felicia gathering YouTube videos of Claudia, sending

14    them to Isabella, to the defendant.

15          You see the defendant sending to Isabella bullet

16    points from Claudia on her supposed misdeeds.  And what you see

17    here is that Talia and Isabella worked with the defendant to

18    silence Claudia.

19          This is Talia commenting on Isabella's emailed threat

20    from the fall of 2019.  Only one comment, Talia said to

21    Isabella.  Ratchet up the language.  "Only comment is, maybe

22    say, 'you're more than evil . . .'"  All of them—the defendant,

23    Isabella, Talia—had to understand that they had to silence

24    Claudia, they had to bring her to heel again.  She could expose

25    years of crimes.

1          After the defendant's arrest for this case, the

2     defendant doubled down on marshaling the embarrassing videos

3     and recordings of Claudia, of Dan, of Yalitza, of the people

4     the defendant blamed for the article, of tallying their suicide

5     attempts, of tracking down particular emails that referenced

6     humiliating details.  The defendant was looking for ways to

7     discredit them.  It was similar to the project he'd been

8     working on for years, ensuring his victims' silence, their

9     compliance.  Only now he was faced with an actual criminal case

10    against him.

11         This was the exact contingency he'd planned for, the

12    use of all that leverage he had stockpiled.  And he didn't stop

13    there.  He involved his father, Lawrence Grecco—his biological

14    father—in the project of ensuring the loyalty of Felicia

15    Rosario.  Grecco passed the message, "You signed on for

16    forever."  And when it seemed like Felicia was trying to

17    separate from the Ray family, trying to get a new address,

18    trying to break free, that's when the message escalated.  You

19    heard the language that Grecco used.  It wasn't subtle.  He

20    wasn't afraid of going to jail if it would help his son.  It

21    was a threat, as it was meant to be.

22         Ladies and gentlemen, you may be asking yourselves

23    how, how did this happen?  How did this group of bright,

24    talented, young people fall under the defendant's control?  How

25    did he succeed at indoctrinating, exploiting, and victimizing

1    Santos, Claudia, Felicia, Yalitza, Dan, Iban?  Dr. Hughes told

2    you at the beginning of this trial about techniques that

3    perpetrators use to establish and maintain coercive control.

4    To be clear, she never interviewed this defendant or these

5    victims, and she based her testimony on her 25 years of

6    experience.  We started the trial with Dr. Hughes, and almost a

7    month has passed, but this testimony can be made available to

8    you if it's helpful.  And we're going to recap some of those

9    tactics now.  They track what the defendant did.

10          Day after day for a period of years, with Talia and

11   Isabella's help, the defendant implemented and sustained

12   tactics of abuse and manipulation.  These methods were a way of

13   diminishing his victims slowly, surely, until his control was

14   complete and his exploitation could be unleashed.  All of these

15   tactics, on their own, are powerful proof of the racketeering

16   enterprise.  All of this explains how the defendant committed

17   the crimes we've walked through, how he used the enterprise to

18   do it.

19          So let's start with some of those tactics.

20          Establishing trust.  These victims thought the

21   defendant could help them.  They were vulnerable because of

22   their age, because they were away from their homes and

23   families, because the defendant's daughter, Talia, their

24   college roommate, their friend, introduced him, because of

25   their mental health struggles.

1           Their mental health struggles have come up throughout

2    trial.  That's the point.  That's part of why this worked.  It

3    is no wonder that the defendant earned their trust.  And then

4    the defendant cultivated that trust.  Hours spent with each of

5    his victims.  He made them feel special.  This was not

6    accidental.  This was grooming.  Because no one signed up for

7    exploitation or abuse.  That comes later.

8           (Video played)

9           MS. BRACEWELL:  He promised them connection.

10          (Video continued)

11          MS. BRACEWELL:  But even here, in what's supposed to

12   be a cozy Christmas scene in the apartment, you can see the

13   defendant's abuse starting.  The criticism, the singling out of

14   Santos.  "Leave it to Santos," he said.  The trust was just a

15   tactic.

16          And after he had their trust, the defendant

17   systematically seized control, and he used violence to do it.

18   He relied on the primitive reflexive reaction that we have to

19   violence—fear.  His victims learned to obey or suffer the

20   consequences of physical pain.

21          These are just some of the electronic evidence,

22   recordings and photos that show, that memorialize the types of

23   physical pain the defendant inflicted on his victims.  He

24   didn't need to use violence every day or against everybody in

25   the group.  A display of violence, like holding a sharp object

1    at Iban's throat for the rest to see, hitting Dan Levin with

2    hammers in the living room, holding his tongue with pliers,

3    establishing what he was willing to do was enough.  It was more

4    than enough.  Everybody learned the lesson.  Fear is effective.

5            The defendant also used sexual abuse to control his

6    victims.  He moved what Dr. Hughes called the line of deviance.

7    He slowly desensitized them to ever cruder kinds of sexual

8    behavior.  The victims told you about sexual conversations.

9    The defendant had Felicia watching pornography.  Claudia

10    engaged in sex with Dan in front of the defendant.  The

11    defendant directed Santos to receive a blowjob from Isabella by

12    the shed.  Claudia and Felicia were told to take nude

13    photographs, later directed to have sex with strangers.  The

14    defendant promoted BDSM.  He talked about the benefits of gang

15    banging.  Remember Claudia and Felicia's testimony.  Think of

16    how the defendant normalized this ever more extreme behavior,

17    twisting it into something good for the victims.  "This is the

18    time to experiment."  "It would be good for you to lose your

19    inhibition."  "I'm going to help you become empowered,

20    liberated."  Of course the defendant's message had nothing to

21    do with education and everything to do with his own

22    gratification and the control that he gained from slowly

23    degrading these young people and watching the shame that set

24    in.

25            (Video played)

1          MS. BRACEWELL:  You can see and you can hear what

2    sexual abuse did to these victims.  It is written all over

3    Felicia's face.  That is humiliation.  That is self-loathing.

4    That is sha.

5          Me.  And then the defendant isolated his victims from

6    their parents, from the jobs, from the schools, from anything

7    that lent their life structure and normalcy.  He even isolated

8    them from each other.  You learned from Dr. Hughes about the

9    effect of isolation, dependence on the defendant, insulation

10   from other voices.  Think of what Maritza Rosario told you

11   about her three kids.  She went seven years without speaking to

12   them.  Listen.

13         (Audio played)

14         MS. BRACEWELL:  This is Government Exhibit 3139.  This

15   is the defendant talking to Claudia.  And throughout this

16   recording, he reminds her at several points, she is alone.  Her

17   parents are part of the problem.  And again and again, she is

18   alone.  This was only months before the defendant pushed

19   Claudia into sex trafficking.

20         And think of how the defendant isolated his victims

21   from each other.  Even siblings turned against siblings.  Watch

22   here as Felicia is held captive by the brother that she adored.

23         (Video played)

24         MS. BRACEWELL:  You saw Santos's face at the end of

25   that abuse.  It was so swollen as to be nearly unrecognizable.

1    Felicia is being held captive by her brother, and the defendant

2    is directing this incident from outside the frame.  The

3    defendant sustains this project of isolating his victims over

4    years.  He subverted other relationships so that his victims

5    had nowhere to turn but him.

6         The defendant imparted an ideology to his victims.

7    Claudia described some of these lessons—what it means to be

8    honest with yourself, what it means to be an honest person;

9    philosophical ramifications of honesty or dishonesty; how do

10   you know what a lie is.  Conversations the defendant directed

11   that lasted for hours in which, after preaching for hours about

12   honesty, he had the final word on what was true.  The victims

13   came to believe that the defendant's word was the only truth,

14   more real than their own memories, their own realities.

15        You can see too how the defendant's language became

16   the victim's language.  His words appear again and again and

17   again.  "Criminal."  "Destructive."  "Sabotage."

18   "Unforgivable."

19        The gaslighting followed.  Dr. Hughes explains

20   gaslighting as a strategy designed to make victims deny their

21   own perceptions and reality.  The defendant's entire process

22   was an exercise in gaslighting.

23        (Audio played)

24        MS. BRACEWELL:  That's Government Exhibit 1711.  It

25   goes on for many more minutes.  Santos is crying audibly,

1    convinced that the defendant knows something he doesn't know,

2    that he has somehow harmed or poisoned the food in a way he

3    can't grasp.

4            Ladies and gentlemen, the outcome of this gaslighting

5    was before you in many different types of evidence—the emails,

6    the recording, journal entries, lists, confessions, documents

7    that you heard from victim after victim are not true,

8    containing statements that they made because they were

9    convinced at that time that the defendant knew more than they

10   did; gaslighting in which the defendant told his victims they

11   were poisoners and criminals; gaslighting that told his victims

12   they were utterly powerless and totally in his control, even

13   their very reality.

14           It was coupled with emotional abuse.  And Dr. Hughes

15   told you what emotional abuse looks like—hurtful comments,

16   offensive put-downs, criticism, mean things.  You heard vile

17   and abusive language in recording after recording.  You heard

18   from each of the victims about how the defendant used cruelty.

19   With frightening, clinical precision, the defendant zeroed in

20   on his victims' vulnerabilities.  The defendant called Santos a

21   hemorrhoid, an idiot, a wuss, a cockroach.  That's all

22   Government Exhibit 1711 that we just listened to a snippet of.

23           The defendant told Felicia that she was a whore or a

24   bitch.  He made her wear her doctor's cap, parade around the

25   apartment and mocked her.

1          Claudia told you about how the defendant called her
2    names like Oompa Loompa, called her fat, deformed.  Remember
3    how she choked up when describing how the defendant told her
4    that her eating disorder was not that bad.

5          The defendant humiliated Dan Levin by putting him in a
6    dress, making him put his mouth on a dildo, insisting that Dan
7    had questions about his sexuality.  You heard in Claudia's
8    testimony about how Talia and Isabella laughed about Dan
9    Levin's humiliation.  Because that was part of the enterprise
10   too.  The impact of emotional abuse, the shame, the
11   humiliation, was stronger when it came from the Ray family as a
12   group.  Claudia said, "they sort of just found it funny and
13   like bemused, basically."

14         We've talked about deprivation from Pinehurst.  But
15   you can think in your own lives about how one poor night's
16   sleep can leave you short-tempered, short-fused.  Now compound
17   that by days and days, by needless physical exertion, by
18   hunger, by late nights and early mornings.  That is what the
19   defendant did, and it certainly wasn't limited to Pinehurst.

20         The defendant structured his victims' lives into a
21   grueling hum of activity for a reason.  The late nights, the
22   activities where everyone was expected to participate until the
23   early hours, the day-to-day construction projects that never
24   progressed, that never ended, interrogations where
25   participation was mandatory, all of this destroyed his victims'

1    ability to understand what was happening to them, to brainstorm

2    an escape plan, to understand the ramifications of the

3    confessions they were making.  It enhanced the defendant's

4    control.

5            All of this was accompanied by economic abuse.  By the

6    time this defendant's campaign of control was underway, these

7    college-age students were isolated from other sources of

8    financial support.  They had no tangible resources, no savings

9    set aside.  They were convinced they were indebted to the

10   defendant, and dependent on him.

11           And that was coupled with surveillance.  Ladies and

12   gentlemen, this is a camera feed at Felicia's Los Angeles

13   apartment.  When she was struggling with paranoid thoughts in

14   September of 2012, what did the defendant do?  He stoked the

15   paranoia.  He prodded her further into it.  He made

16   accusations.  He told her that people out to get him may be out

17   to get her.  He told her to buy a surveillance system, then he

18   watched her from his desktop computer.

19           The defendant's surveillance tactics manifested in

20   other ways too—micromanaging his victims' activities, keeping

21   them in the apartment, limiting access to keys, taking the

22   doorknobs off of the doors in the apartment so there was no

23   privacy.  You heard from Dr. Hughes what happens from this kind

24   of surveillance.  "It gives your victims the impression that

25   you're all-powerful, you're all-knowing."  This is from

1    Dr. Hughes's testimony right at page 500.  This was the

2    defendant's ideology.

3         Think of how Yalitza explained, on page 2081 of her

4    transcript, she understood from her brother, from the group,

5    that the defendant knew her intentions and knew her thoughts at

6    any given time.  When he accused her, she assumed that he knew

7    better, that maybe she just didn't remember.  The defendant

8    convinced his victims that he knew everything.  No wonder they

9    felt powerless.

10        And finally, the defendant used collateral.  Everyone

11   is familiar with the concept of blackmail—comply or suffer

12   humiliation.  What is less intuitive is how the defendant

13   obtained these confessions, written, recorded.  But after all

14   the tactics we've discussed, you can understand how writing a

15   confession might seem easier after the kinds of abuse that

16   these victims experienced.  No one is saying that confessing to

17   misdeeds is easy, but it is undoubtedly easier to pick up a pen

18   rather than be hit with a hammer.  Interrogations that the

19   defendant conducted were full of risk.  They might descend into

20   violence or threats or humiliation, but they could end if the

21   victim got the confession right.  All they had to do was say

22   what the defendant wanted them to say.  And they already

23   believed that the defendant's grasp of truth was better than

24   their own.  They'd been trained to believe in his honesty, his

25   truthfulness.  They'd been indoctrinated into believing their

1    own criminality.

2         Look at how Santos describes it: a combination of

3    indoctrination, gaslighting, on top of threats of violence and

4    humiliation that we've discussed.  "In the beginning, I was

5    convinced that if Larry said it wasn't true, it couldn't be

6    true, because he's such an honest man.  And he's been my

7    friend, so I must be confused, and I must be misremembering or

8    I must not want to remember what I did; and then over time that

9    shifted to where if I didn't agree, the conversation would

10   escalate to verbal and physical abuse."  All these tactics were

11   deployed, effectively, to get these confessions.

12        And after they were, after the defendant got the

13   confessions, they became a threat in and of themselves.

14   Because that's how collateral works.  The victims told you, and

15   in fact it's all over the recordings—the threat of release, the

16   threat of consequences.

17        (Audio played)

18        MS. BRACEWELL:  You can hear the defendant's voice.

19   That's one example.  There's many more.  The victims

20   understood, as the defendant intended, that the videos could

21   ruin them.  They had to handle the money, follow the

22   defendant's orders, or else face the consequences he made so

23   clear.  After seeing and hearing these recordings, you know why

24   the victims were scared the defendant could send them to jail,

25   why they were so terrified of jail.

 1              So this is the pattern of behavior the defendant

 2     subjected the victims to day after day after day for years.

 3     And once the victims were alone and confused, and once the

 4     defendant had abused and terrorized them, he monetized his

 5     control.  And the Ray family made victimizing others a

 6     profitable business.  The methods of the enterprise, the

 7     grooming, the isolation, the violence, the defendant carried

 8     out this activity so he could turn his victims into piggy

 9     banks.

10              I want to talk for just a moment about the victims.

11     They lived through years of abuse and exploitation.  Of course

12     they are damaged.  Of course they are traumatized.  That is

13     what the defendant did to them.  That is what the defendant

14     intended to do to them.  You cannot live through abuse like

15     that and emerge unscathed.  But you know what they're saying is

16     true because of all the ways the evidence is consistent, all

17     the ways their testimony is consistent with each other.  The

18     victims say the same thing as other witnesses, the family

19     members who saw them, and the people who knew what they were

20     like before the defendant took over their lives.  You heard

21     them describe the same common patterns.  You know they were

22     credible because they described the defendant's conduct using

23     the same words to describe the same tactics.  And finally, you

24     know what the victims say is true because all of it appears and

25     is corroborated by the trove of material the defendant himself

1    amassed.  We have reviewed much of it, and you'll have it all

2    in your deliberations—recordings, journals.  The leverage the

3    defendant collected to commit his crime allows you a composite

4    picture of what he did.

5            All of this evidence of all of this horror is now

6    before you.  You heard the testimony of the victims who the

7    defendant manipulated and terrorized, the young students who

8    this man found.  You heard how he controlled them.  You heard

9    how he forced them to pay him and his crime family for fear of

10   the consequences.  You heard how he brutalized them with a

11   hammer, with pliers, with punches, with a plastic bag, with

12   vicious abuse, with forced labor.  You saw and heard testimony

13   from the witness stand, their fear.  You heard how he took

14   their money again and again and how he played games to distance

15   himself from it.  You know he didn't pay taxes despite his

16   unbelievably wealthy lifestyle.  You heard the recordings he

17   kept.  You know that he kept recordings.  You have seen the

18   financial records, the emails, the texts, the ledgers, the

19   journals.

20           Ladies and gentlemen, this evidence is overwhelming.

21   This man, Lawrence Ray, reigned over his crime family and his

22   enterprise so that he could profit and gain power.  He did so

23   with fear and violence and manipulation and lies and schemes,

24   and he did so for years.  He told his victims, these young

25   adults, that his acts of cruelty against them were attempts to

1    hold them accountable for his made-up accusations against them.

2    But now the evidence is before you.  It is time to hold him

3    accountable.  It is time to hold him accountable for his litany

4    of crimes—for racketeering, assault, extortion, sex

5    trafficking, forced labor, money laundering, and tax evasion.

6    We are asking you to bring Lawrence Ray to justice.

7               THE COURT:  Thank you, Ms. Bracewell.

8               I'll now meet with counsel at sidebar.  This might be

9    a convenient time for members of the jury to take a little bit

10   of a stretch break.

11              (At the sidebar)

12              THE COURT:  How long is your summation?

13              MS. LENOX:  About two hours.

14              THE COURT:  Okay.  I think the right thing to do is to

15   break for the day.  The jury has heard a lot, and if we took a

16   15-minute break, that would give only half an hour for

17   Ms. Lenox.  So I think we break today, we start promptly at

18   9:00, and then, Ms. Lenox, we'll go straight into your

19   summation.  We'll take a break before the rebuttal summation.

20   And then I should have enough time to complete the charge,

21   though it's very --

22              MS. SASSOON:  Your Honor, we oppose that.  If

23   Ms. Lenox speaks for a little over half an hour today, then it

24   will be evenly divided from about two and a half hours each

25   day.  Breaking early might have been appropriate when we were

 1   on track, but we're behind schedule, and we don't think there's

 2   a basis to keep it open overnight.

 3        MS. LENOX:  We disagree.  I mean, the jury just heard

 4   a two-hour summation.  It's going to be 3:30 in the afternoon

 5   by the time I start.  They'll only the benefit of hearing half

 6   an hour's worth of a two-hour closing.  It's unnecessary to

 7   move forward today given that, in addition to the defense's

 8   closing, there's also going to be rebuttal and we're going to

 9   have to conclude.  So for half an hour, I don't think it's

10   appropriate to have the jury have to sit through more of this

11   at this late hour in the afternoon when we're just going to

12   have to conclude it in the morning.

13        THE COURT:  Give me one moment.

14        I'm going to have them take a bathroom break.  You'll

15   start the summation, do about 20 minutes or so, and then we'll

16   continue on.  It's going to be a tight day tomorrow for me to

17   get it to the jury otherwise.  That will be easier.

18        (In open court)

19        THE COURT:  Members of the jury, I'm going to give you

20   ten minutes for a bathroom break.  We'll be back promptly at

21   3:30 and then we'll start with the defense summation.  Defense

22   will not finish their summation today, obviously, but I'd like

23   to keep you all on track today.  So be back at 3:30.

24        THE DEPUTY CLERK:  All rise.

25        (Recess)

```
 1              THE COURT:  Let's bring the jury.

 2              Ms. Lenox, when you come to a convenient breaking

 3    point, it can be a little bit before 4, it can be a couple of

 4    minutes after 4., just tell me that now would be a convenient

 5    time to break.  I don't want and will not cut you off.  But you

 6    will just tell me when a convenient time is.

 7              MS. LENOX:  Thank you, your Honor.

 8              THE COURT:  While waiting for the jury, it will be

 9    helpful tonight to have the revised indictment.

10              (Jury present)

11              THE COURT:  Ms. Lenox, you may proceed.

12              MS. LENOX:  Thank you, your Honor.

13              This is a case about storytellers.  When Larry Ray met

14    his daughter's friends in the fall of 2010, he regaled them

15    with stories of his life.  They were full of mystery, intrigue,

16    and excitement.  Larry had been best friends with Bernie Kerik,

17    the former New York City Police Commissioner.  He was his best

18    man at his wedding.  They were close until, as Larry says, he

19    brought Kerik down and they suffered a falling out.

20              Larry also had relationships with people in the armed

21    forces.  He would talk with people like three-star marine

22    general Chuck Pitman.  Larry said he was the target of a vast

23    government conspiracy and people like Bernie Kerik and heavy

24    hitter Frank DiTomasso were out to get him.

25              It was a more detailed extended version of the stories
```

1    that Talia Ray, the weird girl who didn't really fit in, had

2    been telling.  Some people thought Larry was crazy, but others

3    believed, and they started to tell their own stories and their

4    stories grew and evolved, and with time Larry believed.

5           The world that Larry and the others cultivated over

6    the course of a decade may not be one that you or I could ever

7    understand, but for Larry and the others involved, through the

8    looking glass this world was real.

9           Around 2011, Larry lived in the Upper East Side in

10   Manhattan in a messy, cluttered, disorganized one-bedroom

11   apartment, and from time to time things would break.  Santos

12   Rosario started to confess to damaging Larry's property and, in

13   2013, others began to confess as well.  One by one they started

14   to confess that they had poisoned Larry and his daughter,

15   Talia.

16          It began with Claudia, who claimed that both she and

17   Santos worked together to poison Larry.  This storytelling, it

18   was natural for Talia.  As she testified, she had been

19   embellishing stories to make herself more exciting long before

20   she had ever met Larry.

21          Claudia adopted the villains in Larry's stories and

22   made them her own to make Larry believe, and Santos testified

23   that he did the same.  He patterned his stories on Claudia's to

24   make them more believable to Larry.  Claudia and the Rosario

25   siblings each testified that over time they truly believed the

1    stories that they were telling and sharing with each other.

2          Larry didn't make all of this up.  The stories came

3    from the individuals themselves.  Their stories may have been

4    rooted in Larry's, but Larry didn't implant these narratives in

5    their minds.

6          Yalitza told you that one day she just had a thought

7    about drugs and suddenly she found herself telling a story

8    about her parents being drug dealers.  She said that she would

9    use any idea that came to her mind to create a story that Larry

10   would believe.

11         These are wild stories.  They are nearly unbelievable

12   tall tales.  But they grew to believe them, and they crafted

13   these stories intentionally to make Larry believe.  The more

14   people told Larry that they had poisoned him, the more he

15   believed it.  The more he asked about it, the more they talked

16   about it.  The line between friend and enemy blurred and the

17   stories continued.  No one could tell truth from fiction, not

18   even Larry.

19         Now, the obvious question is, why would Larry continue

20   to spend time cultivating relationships with people who had

21   admitted to poisoning him?  Because Larry believed that the

22   poisoning originated elsewhere.  Claudia told you Larry would

23   ask for details.  He didn't actually believe that Claudia had

24   started poisoning him on her own.  He believed that it was his

25   enemies, Bernard Kerik, Frank DiTomasso that were actually

1    directing the poisoning.  So he would ask her, who is making

2    her do this.  And he would ask her, what are you poisoning me

3    with?  Keep your friends close and your enemies closer.

4            Larry didn't collect confessions to extort people.  He

5    wanted to know the truth of what was happening because his

6    ultimate goal was to go to law enforcement and ask them to

7    investigate the poisoning.

8            And then, in September of 2015, Frank DiTomasso

9    attacked Larry in a hotel while Larry was sitting at a table

10   with Claudia and Santos.  Suddenly, the villains in Larry's

11   stories became real.  You saw a video of the attack.  You heard

12   Claudia and Santos testify about it.  Frank DiTomasso struck

13   Larry in the head and the face multiple times.  Larry didn't

14   strike back.  For years Claudia and Santos had been confessing

15   to harming Larry at the behest of Frank DiTomasso and Bernie

16   Kerik.  These were stories.  They were fiction.  But they all

17   believed.  And now there was evidence.  Frank DiTomasso, one of

18   Larry's sworn enemies, one of the orchestrators of the

19   poisoning, had attacked Larry in public.  This was real.

20           You heard Santos say he e-mailed the prosecutor who

21   was bringing criminal charges against DiTomasso for the attack

22   on Larry.  Santos told him about the poisoning.  And Claudia

23   testified that she did too.  And they told Larry this.  They

24   said that they had talked to a prosecutor about poisoning him,

25   and he believed.

1            In 2016, Larry sent an e-mail to Preet Bharara, the

2    top federal prosecutor in Manhattan.  He told Mr. Bharara about

3    the conspiracy against him, about the poisoning, and he asked

4    him to investigate.  And you heard Glenn Ripa testify today

5    that Larry retained him in part so Glenn could bring the

6    poisoning to the attention of law enforcement and that Glenn

7    reached out to law enforcement, to Perry Carbone, to

8    investigate.

9            By the time Larry moved to Piscataway, he had become

10   so paranoid that he would have discussions outside.  He would

11   do this, Felicia explained, because he thought his house was

12   bugged.  Everyone was out to get him, Larry believed.  And at

13   the time Felicia, Santos, Yalitza, Isabella, and Claudia, they

14   believed too.

15           In the government's opening statement, and also in

16   their closing argument, they referred to the so-called Ray

17   family.  This, they claim, is a criminal enterprise.  But the

18   Ray family isn't so-called.  It's a real family.  The Ray

19   family is Larry; his daughter, Talia; his stepfather, Gordon;

20   his biological father, Lawrence Grecco; and sometimes,

21   according to Felicia, Isabella.  And this family, Mr. Ray's

22   immediate family members, it falls far short of a criminal

23   enterprise.  Let's take a look at each person individually.

24           We will start with Gordon Ray, an elderly grandfather

25   who Felicia Rosario described as a sweet man who was always so

1    kind to me.  Gordon was never at Larry's apartment during the

2    group discussions, and there is no evidence that Gordon was

3    even aware that Larry was asking people for damages, for money

4    for the harm that they had caused.

5         The fact that Gordon owned the Pinehurst property

6    where witnesses spent time, it's not criminal and certainly it

7    doesn't make him a conspirator about a forced labor charge.

8    There is no evidence that Gordon agreed with Larry or anyone

9    else to force individuals to do manual labor on his property.

10   There is not even evidence that Gordon was ever at the property

11   at the same time as the others.  In fact, Claudia testified

12   that while she was there in the summer of 2013, Gordon wasn't.

13   It's also not criminal that Gordon received money from his

14   stepson over the years.  There is no evidence that Gordon knew

15   the source of the money that he was receiving from Larry and

16   others.  And his receipt of wire transfers tells you nothing

17   more than that Gordon accepted money from his family, his

18   actual family.

19        The government wants you to believe that during her

20   freshman year of college, when a group of friends decided to

21   live together, Talia Ray began plotting some vast criminal

22   enterprise that spanned a decade.  This is preposterous.

23   Claudia testified, and she told you that Talia wasn't even part

24   of the friend group that moved in together in the fall of 2020.

25   Talia was included because of her relationship with Santos.

 1   Talia was an outsider and people thought she was weird.  Talia

 2   barely even knew or interacted with the group before they all

 3   moved in together.

 4          And an e-mail that Talia sent to one of her professors

 5   praising her father for helping her friends, it doesn't

 6   undermine the notion that Talia was just lucky to be included

 7   in the group.

 8          The government's evidence of Talia's membership in

 9   this so-called enterprise establishes precisely two things.

10   One, she loved and trusted her father, adopting his belief that

11   they had been poisoned, and, two, she was a mean girl.

12          Talia's bratty note to her friend tells you everything

13   that you need to know about her intent.  It was mean and it was

14   obnoxious, but it certainly wasn't criminal.  The same can be

15   said of the vicious e-mails and texts between Isabella and

16   Talia about Claudia.

17          The evidence merely shows that Talia believed.  She

18   believed her dad's stories and her friends' stories.  She

19   believed her dad was trying to help her friends.  And she

20   believed that she had been poisoned.

21          Claudia told her as much one night after they had gone

22   out for a drink together.  Talia came home and she started

23   throwing up after just one drink, seemingly for no reason, and

24   Claudia told her it was because she had poisoned her.

25          Talia believed she was entitled to repayment for

1    damages caused, but there is no evidence that Talia agreed to

2    extort her friends.  There is no evidence that Talia actually

3    asked anyone for money.  And there is no evidence that Talia

4    even knew that Claudia Drury was escorting.  Claudia testified

5    that she never spoke with Talia about her prostitution and

6    never sent money directly to Talia.  In all of the voluminous

7    evidence, and there is voluminous evidence in this case, there

8    is not a shred of indication that Talia was aware of the

9    prostitution.  There is no evidence that Talia knowingly

10   participated or agreed to commit any crimes.

11           Apart from receiving money from her father, with no

12   indication that she actually knew the source of that money,

13   there is no evidence that Talia agreed with anyone to

14   participate in a criminal enterprise.

15           This wasn't some complex moneymaking scheme.  It's one

16   man who believed that he was the target of a conspiracy,

17   believed the people who consistently confessed to poisoning

18   him, believed that he was entitled to repayment for harm that

19   they had caused.

20           Sending money to your stepdad and your daughter, it's

21   not criminal.  It's actually quite common.

22           Lawrence Grecco is Mr. Ray's 84-year-old father.  You

23   heard no testimony about Mr. Grecco's involvement in the

24   so-called enterprise.  In fact, you heard no testimony or

25   evidence at all about Mr. Grecco's connection to this case

1    before Larry's arrest.

2         What you did hear was Mr. Grecco's voice on three

3    calls with his son in mid 2020.  You heard Larry, isolated in

4    jail during COVID, pleading with his father to help him collect

5    information to discredit the people who were going to testify

6    at trial against him.  He wanted his father to help him defend

7    his case.  He wasn't asking his father to dig up new dirt on

8    people.  Larry wasn't trying to tamper with witnesses or

9    obstruct justice.  He was asking his family, his father, for

10   help defending him in this case.  It's not criminal.

11        Felicia came in and testified that Mr. Grecco, Larry's

12   elderly father, threatened her.  Now, this threat, it's

13   recorded and it is recorded because Felicia Rosario recorded

14   it.  I would urge you to take a listen to that recording during

15   your deliberations because that audio recording of Mr. Grecco

16   and Felicia tells you everything that you need to know about

17   this alleged threat.  Simply, it wasn't one.

18        If you listen to that recording, you will hear Larry's

19   overprotective dad telling Felicia that no one would hurt his

20   son.  He said this while Felicia was driving him home during a

21   conversation that included laughter, after which Felicia

22   dropped him off and said:  Love you, Poppy.

23        But it doesn't stop there.  Felicia claimed that she

24   felt threatened by this interaction with Poppy.  She was

25   scared.  Yet two months later she returned to his home

1    voluntarily to visit.  It doesn't make sense.  If you're truly

2    scared, if someone threatened you, you don't go back to their

3    home to visit them.  But Felicia did because Mr. Grecco's

4    words, they weren't a threat.

5         Your Honor, this is a convenient place to break.

6         THE COURT:  Members of the jury, we are going to break

7    for the day.  We will reconvene at 9:00 tomorrow morning with

8    the continuation of the defense summation and then the

9    government rebuttal summation, and then I will give you

10   instructions with respect to the law.

11        Please overnight do not talk to anybody about the case

12   and follow my instructions.  If anybody asks you about the

13   case, you're under instructions not to talk about it.

14        Please do not do any investigation or research

15   regarding the case.  And if you happen to be exposed to any

16   information about the case from outside of the courtroom,

17   please let my courtroom deputy, Mr. Fishman, know.  The same if

18   you're aware of somebody else who becomes exposed to

19   information, but do not talk about it amongst yourselves.

20        Have a good evening everybody.  See you bright and

21   early tomorrow at 9:00.

22        (Jury not present)

23        THE COURT:  Thank you, Ms. Lenox, for starting off.

24        As I started to say, I would like overnight a copy of

25   the revised indictment with the information that should not go

1   to the jury removed.  I am aware that the government shared a

2   version of that with the defense.  The defense just needs to

3   look at it, and the two of you need to talk and get it to me

4   this evening.

5           Is there anything else from the government's

6   perspective before we break?

7           MS. SASSOON:  Two things, your Honor.

8           For the Court's planning purposes, I do intend to take

9   the PCR test in the morning with the direct executive and use

10  the other podium.  So maybe there could be a break in between

11  defense closing and my rebuttal to set that up.

12          THE COURT:  I do intend to take a break after the

13  defense closing.  That will work fine.  I assume you will make

14  arrangements either to have the PCR test done before we start

15  at 9:00.

16          MS. SASSOON:  I already have.

17          Then the second thing is, if we could get an updated

18  estimate on defense closing.

19          THE COURT:  You estimated two hours.  Where do we

20  stand in terms of length?

21          MS. LENOX:  Whatever is left of that.

22          THE COURT:  That sounds like it's an hour and 40

23  minutes.

24          We tried to estimate how long my jury instructions

25  will go.  It's about two and a half hours.  So hopefully we

2850

1    will be able to get this case to the jury tomorrow.  That is

2    really my strong objective.  I'll try to keep lunch to 45

3    minutes in order to be able to do that.

4              Anything else from the defense perspective?

5              MS. LENOX:  No.  Thank you, your Honor.

6              THE COURT:  Have a good evening, everybody.  See you

7    bright and early tomorrow morning.

8              (Adjourned to Tuesday, April 5, 2022, at 9:00 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                 Page

JOHN B. MINOR

Direct By Ms. Glashausser  . . . . . . . . . .2684

Cross By Ms. Keenan  . . . . . . . . . . . . .2703

Redirect By Ms. Glashausser  . . . . . . . . .2721

 GLENN RIPA

Direct By Mr. Kelly . . . . . . . . . . . . . .2729

Cross By Ms. Keenan  . . . . . . . . . . . . .2732

Redirect By Mr. Kelly . . . . . . . . . . . . .2764

GOVERNMENT EXHIBITS

Exhibit No.                                 Received

 5007   . . . . . . . . . . . . . . . . . .2780

DEFENDANT EXHIBITS

Exhibit No.                                 Received

 P1, P2, and P7 . . . . . . . . . . . . . . .2688