M3FQray1Redacted                PORTIONS REDACTED

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          20 Cr. 110 (LJL)

5    LAWRENCE RAY,

6              Defendant.                  Trial

7    ------------------------------x

8                                          New York, N.Y.
                                           March 15, 2022
9                                          11:15 a.m.

10   Before:

11                    HON. LEWIS J. LIMAN,

12                                         District Judge
                                           and a jury

13                         APPEARANCES

14

15   DAMIAN WILLIAMS,
          United States Attorney for the
16        Southern District of New York
     DANIELLE R. SASSOON
17   MOLLIE BRACEWELL
     LINDSEY KEENAN
18        Assistant United States Attorneys

19   FEDERAL DEFENDERS OF NEW YORK, INC.
          Attorneys for Defendant
20   MARNE L. LENOX
     ALLEGRA GLASHAUSSER
21   NEIL P. KELLY
     PEGGY CROSS-GOLDENBERG

22
     Also Present:  Kelly Maguire, FBI
23                  Claudia Hernandez, Paralegal-USAO
                    Larissa Archondo, Paralegal-FDNY
24

25
```

M3FQray1Redacted              PORTIONS REDACTED

1           (Trial resumed; jury not present)

2           THE COURT:  Good morning, everybody.

3           It's good to see you, Mr. Ray.

4           Ms. Lenox, are we ready to proceed?

5           MS. LENOX:  We are, your Honor.  We spoke briefly with

6    Mr. Ray.  We are prepared to proceed.

7           I want to note Mr. Ray did suffer a seizure this

8    morning.  He remained at the MDC and was not taken to the

9    hospital, but he did suffer a seizure, and he is right now

10   suffering the aftereffects of that.  He feels well enough at

11   this time to proceed, but what I would ask, your Honor, is if

12   at any point during the day today Mr. Ray indicates to counsel

13   that he is not feeling well enough to proceed, that we be able

14   to have a sidebar and the jury be excused because I don't -- I

15   think it's important that Mr. Ray be able to participate in

16   these proceedings.

17          THE COURT:  I agree with you and will certainly give

18   you a sidebar.  In fact, I would instruct you that if at any

19   point Mr. Ray is not feeling up to the proceedings, that you

20   ask for a sidebar, and at the sidebar we'll discuss how to

21   proceed.

22          MS. LENOX:  Certainly, your Honor.  Thank you.

23          THE COURT:  With respect to what to tell the jury,

24   what I plan to do is to tell the jury that, as I've mentioned,

25   there are times when I need to discuss issues with respect to

1    the parties, and that I apologize with respect to any delay,

2    but they have to understand that that is sometimes delay built

3    into the proceedings.

4              Any objection to that kind of instruction, Ms. Lenox?

5              MS. LENOX:  No, your Honor.

6              THE COURT:  From the government?

7              MS. BRACEWELL:  No, your Honor.

8              THE COURT:  Before we bring the witness in, I know

9    there are a number of legal issues that are outstanding.  I

10   don't think they are with respect to the cross-examination, and

11   I can address them at 1:00.

12             Is there anything else from the government's

13   perspective and before we bring the witness in for cross?

14             MS. BRACEWELL:  Yes, your Honor.

15             So just one additional question on if Mr. Ray has any

16   kind of health problem, we would just request that the jury be

17   excused as quickly as possible to the extent that he starts

18   suffering sort of symptoms, we think it appropriate that that

19   happen, as much as we're able to do so, to do it outside the

20   presence of the jury.

21             THE COURT:  Okay.

22             MS. BRACEWELL:  We want to make sure it's clear, it's

23   possible that Ms. Drescher, our paralegal witness, will take

24   the stand this morning before the break.  I think that

25   implicates the two text message exhibits, so that might need to

M3FQray1Redacted                    PORTIONS REDACTED

1    be resolved before the lunch break.

2                 THE COURT:  We'll see what happens.

3                 Ms. Lenox.

4                 MS. LENOX:  Your Honor, with respect to the letter

5    that the government filed regarding prior consistent statements

6    this morning, we do intend to file a letter of our own on that

7    matter, and we plan to do that during lunch.

8                 THE COURT:  Okay.  I had not planned to address that

9    during lunch, so I will wait until I get your letter.

10                MS. LENOX:  Thank you, your Honor.

11                THE COURT:  Let's bring the witness in.

12                Mr. Fishman, do you want to steadily get ready to

13   bring the jury in.

14                MR. KELLY:  My apologies, your Honor.  May I approach

15   with an exhibit binder?

16                THE COURT:  Yes.  Mr. Kelly, you've provided a copy of

17   the binder to the government?

18                MR. KELLY:  I did, your Honor.

19            (Continued on next page)

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  You may be seated.

3          Members of the jury, I apologize for the delay that we

4     had this morning.  I hope you all had a good evening.  As I

5     think I've previously mentioned, there are times when I need to

6     discuss matters with the parties.  We try to do as much of that

7     as possible when you are not here, but it sometimes is

8     unavoidable for me to discuss things with the parties when you

9     are here.  We try to keep that to a minimum.

10          You are reminded that you are still under oath.

11          Mr. Kelly, you may proceed with cross-examination.

12     DAWN HUGHES, resumed.

13     CROSS-EXAMINATION

14     BY MR. KELLY:

15     Q.  Good morning, Dr. Hughes.

16     A.  Good morning.

17     Q.  You can hear me clearly?

18     A.  Yes.

19     Q.  If at any time you can't hear my question, please just ask

20     me to repeat it.

21     A.  Yes.  Thank you.

22     Q.  Dr. Hughes, you testified yesterday you're getting paid for

23     your work on this case, right?

24     A.  That's right.

25     Q.  And your hourly rate is $500 an hour?

M3FQray1                          Hughes - Cross

1  A.  That's correct.

2  Q.  And your rate for in court testimony is $4,000 a day?

3  A.  I do it as a half day or a full day.  Like today I have to

4  cancel my half day of patients in order to be here, so it's the

5  same 500, but billed at a half day or full day increment.

6  Q.  So yesterday would be half of the $4,000?

7  A.  Correct.

8  Q.  And today would be the other half of the 4,000?

9  A.  Well, yesterday was starting -- I was on call at noon, so

10  it would be five hours yesterday.

11  Q.  And you're getting paid by the government for your

12  testimony?

13  A.  Correct.

14  Q.  You also testified yesterday about some of your prior

15  in-court testimony in other cases, right?

16  A.  Correct.

17  Q.  You've never testified on behalf of someone who's accused

18  of sexual assault right?

19  A.  I've evaluated.  I haven't testified.  Sometimes you do

20  evaluations for the court, and they don't come to trial.

21  Q.  But you haven't testified on behalf of someone who's

22  accused of sexual violence?

23  A.  We don't testify on behalf of an individual.  I testify as

24  to the results of my evaluation.  So I have not testified as a

25  result of evaluation of someone who's been accused of sexual

1    assault, that is correct.

2    Q.   But in this case your testimony, as you stated, is being --

3    excuse me, withdrawn.

4         In this case you were hired by the government to

5    provide testimony, right?

6    A.   Correct.

7    Q.   You've never testified in a case where you were hired by

8    someone who is accused of sexual assault; you have never given

9    testimony in that circumstance?

10   A.   As I stated, I certainly have done consultations and

11   evaluations of a variety of individuals.  Not all of those go

12   to court where I would testify.  So I've worked on hundreds and

13   hundreds of cases.  I've only given deposition or testimony in

14   about 60 or 70.

15   Q.   Okay.  And you testified that you sometimes do work for the

16   defense, right?  You're hired by the defense in some cases?

17   A.   Correct.

18   Q.   And those are cases where the defendant is claiming that

19   they are the victim of some sort of abuse, right?

20   A.   I've done both.  I've been hired to evaluate individuals

21   who are being accused of crimes and who are also alleging that

22   they're the victims.

23   Q.   Okay.  But keeping your focus on just cases where you've

24   provided in-court testimony.

25   A.   Yeah, I know what you're asking me.  It's hard for me to

1  extricate where I've done testimony and where I've evaluated

2  people because I've done so much, so it's just hard for me to

3  know which ones went to court or trial.

4  Q.  Understood.  You do this a lot?

5  A.  Well, it's half of what I do.

6  Q.  Let's turn to your testimony about coercive control.  You

7  testified that coercive control is defined by certain

8  behaviors, right?

9  A.  Correct.

10  Q.  Manipulation?

11  A.  Correct.

12  Q.  Lying?

13  A.  Correct.

14  Q.  Obfuscation?

15  A.  Correct.

16  Q.  These are behaviors that are not unique to coercive

17  controlling situations, correct?

18  A.  Right.  Certainly someone can lie to you and not be

19  coercively controlling you.

20  Q.  Right.  These are common negative behaviors that can be

21  used in a variety of circumstances?

22  A.  Correct.

23  Q.  Including, as you said, in circumstances where no one is

24  being coercively controlled?

25  A.  Correct.  As I say, it's the constellation of all the

1  behaviors when they happen together for a particular purpose

2  that they become coercively controlled.

3  Q.  Now, the tactics you testified to yesterday, you testified

4  that isolation is very important, right?

5  A.  It's a very common tactic of coercive control for sure,

6  yes.

7  Q.  It's not just common; it's very important.  That was your

8  testimony yesterday, right?

9  A.  It's an important element, of course, because you're trying

10 to establish, you know, eliminate those outside influences and

11 establish dominance and control and dependence.  So certainly

12 it's a very common and crucial element of coercive control,

13 yes.

14 Q.  You're trying to eliminate those outside voices because the

15 person doesn't want a voice that can challenge them, right?

16 A.  Correct.

17 Q.  So a person trying to control someone would not encourage

18 outside voices?

19 A.  Well, depends on what the outside voice is.  If that

20 outside voice is not somebody that's going to be a particular

21 threat to this indoctrination and this underlying method of

22 what the perpetrator is trying to do, they might be like, yeah,

23 go at it, it doesn't make a difference.

24 Q.  But if the person thinks it would be a contrary view, they

25 would not encourage the person they're trying to control to

M3FQray1                          Hughes – Cross

1    solicit that view; they would try to isolate them from that

2    view?

3    A.  I mean, again, the answer depends.  If they think -- the

4    perpetrator thinks they have so much control over their

5    victims, them going to these outside voices, they would think

6    that the victim is not going to say anything anyway because

7    they're already exerting so much control.  So it depends.

8    Q.  So this all depends on the facts of the individual case?

9    A.  Correct.

10   Q.  Secrecy was another topic I believe you addressed

11   yesterday, right?

12   A.  Yes.

13   Q.  And similarly there, where a relationship is healthy,

14   there's no reason to keep it secret, right?

15   A.  Generally, yes.

16   Q.  And so the contrary view of that is in an abusive

17   relationship, the personal would not want to publicize that

18   abuse, right?

19   A.  The person being whom?

20   Q.  The person who is alleged to be inflicting abuse would not

21   want to publicize that.

22   A.  The perpetrator of the abuse would not want to publicize

23   it?

24   Q.  Yes.

25   A.  Generally that's true.

M3FQray1                          Hughes - Cross

1   Q.  You wouldn't want to draw attention to an abusive

2   relationship?

3   A.  If you're the perpetrator?

4   Q.  Yeah.

5   A.  Generally that's true.

6   Q.  So you wouldn't encourage someone to discuss that

7   relationship with their family or their doctor?

8   A.  Right.  It depends on what you're encouraging them to

9   discuss.

10  Q.  And you testified yesterday about something called formal

11  help seeking.  Do you recall that?

12  A.  Yes.

13  Q.  And you defined that to include activities such as speaking

14  to law enforcement, right?

15  A.  Correct.

16  Q.  Speaking to a psychologist, right?

17  A.  Correct.

18  Q.  Speaking to a medical professional, right?

19  A.  Correct.

20  Q.  And your testimony was that people who are being abused

21  generally don't undertake such formal help seeking, right?

22  A.  Well, some do and some don't.  What I testified to was the

23  more common strategies are the informal personal placating

24  compliance strategies, but certainly some do.  People come to

25  me and talk to me about situations that they're in even if they

M3FQray1                        Hughes - Cross

1   can't extricate themselves from that abusive relationship.

2   Q.  Sure.  But your testimony was that the crime victimization

3   statistics show that most people who are subject to abuse do

4   not engage in formal help seeking, right?

5   A.  What the crime victimization statistics show is reporting

6   to law enforcement.  So what we see in certainly sexual crimes

7   in the latest data in 2018, only 25 percent of victims went to

8   the police.  So if you have a hundred women who were raped or

9   sexually assaulted, 75 of them are not going to the police.  So

10  when I'm using that data, I'm talking about going to law

11  enforcement.  So we know it's very underreported with respect

12  to law enforcement.

13  Q.  But your testimony yesterday about formal help seeking

14  wasn't just limited to reporting to law enforcement, right?

15  A.  I'm just echoing what you said about when you asked me

16  about the crime victim statistics, that's what I'm referring

17  to.

18  Q.  Your testimony was that most people who are subject to

19  abuse don't engage in formal help seeking; that includes those

20  other reporting avenues, right?

21  A.  Yes.

22  Q.  You also used the term grooming during your direct

23  testimony.  Do you recall that?

24  A.  Yes.

25  Q.  And you testified that grooming is coercing a child into

M3FQray1                        Hughes - Cross

1    sexual activity and maintaining the secrecy of that abuse.

2    That's your definition of grooming?

3    A.  Yeah.

4    Q.  And that's consistent with the Centers for Disease

5    Control's definition of grooming, right?

6    A.  I believe so.

7    Q.  And the CDC describes grooming as a tactic to gain a

8    child's trust?

9    A.  I don't have the definition in front of me.  I've seen it

10   many times, but I believe that that would be accurate, correct.

11   Q.  And it's because children and adolescents -- withdrawn.

12            Children and adolescents are susceptible to grooming

13   because their brain development is not complete, right?

14   A.  In children, adolescents, and young adults.

15   Q.  I'm sorry.  My question was in children and adolescents,

16   they are susceptible to grooming because their brain

17   development is not complete, right?

18   A.  I believe what I said was that certainly the younger the

19   child, the more susceptible, the more vulnerable they are.  But

20   I also testified yesterday that there are other contexts in

21   which this grooming phenomena does occur, and that occurs in

22   our young adults and our adults when adult perpetrators use

23   those same tactics toward an adult victim.

24   Q.  Sure.  But my question right now is specific to children

25   and adolescents.  And the reason why you think they're

1    susceptible to grooming is because their brain development is

2    not complete, right?

3    A.   That would be one reason.  It wouldn't certainly be the

4    only reason.  I talked about those other vulnerability factors

5    that children may have being from an unstable home or other

6    psychological or psychiatric difficulties.  So that would be

7    true also in children and adults.

8    Q.   And in your direct testimony, you distinguish between

9    children, adolescents, young adults and fully formed adults,

10   right?

11   A.   Yes.

12   Q.   And fully formed adults have cognitive maturity, right?

13   A.   Most do.  Of course, some do not.

14   Q.   I didn't mean to interrupt.

15   A.   Some do.  I mean, of course people do have a variety of

16   difficulties and disabilities and, you know, psychological

17   difficulties where, you know, they're not cognitively

18   functioning to their -- as from a normative perspective, yes.

19   Q.   And, again, this is all fact dependent on the individual

20   person, right?

21   A.   Correct.

22   Q.   The individual circumstance?

23   A.   Correct.

24   Q.   And the individual relationship?

25   A.   Correct.

1   Q.  But generally adults have -- withdrawn.

2          The distinction you drew in your direct testimony

3   yesterday was that adults generally have more self-sufficiency,

4   right?

5   A.  Generally speaking, yes.

6   Q.  And that makes them less susceptible to the grooming

7   tactics.  That was your testimony yesterday?

8   A.  I'm not sure that was my testimony.  I mean, again,

9   certainly as you know, I treat adults, so I treat many adults

10  who have been in those contexts of what I described yesterday

11  of having been a victim of child sex abuse as a child of an

12  adult intimate partner but of an adult sort of a group closed

13  community of sex trafficking.  So I've worked with a lot of

14  adults who have similar characteristics happen to them as well.

15  Q.  That's when they have some of those other vulnerabilities

16  that you testified to, right?

17  A.  Most do.  Some don't, obviously.  We know there's not one

18  profile of a victim but we certainly know there are these risks

19  and vulnerabilities that could make them more susceptible, yes.

20  Q.  Now, you testified that in adults the building of a

21  relationship of trust is a normal behavior, right?

22  A.  Correct.

23  Q.  And the building of an attachment to someone is a normal

24  behavior?

25  A.  A healthy attachment, yes.

M3FQray1                         Hughes - Cross

1   Q.  Showing affection is a normal behavior?

2   A.  Yep.

3   Q.  As is being charming at the beginning of a relationship?

4   A.  I'm a little more skeptical given the work that I do, but

5   certainly, you know, people do try to put on their best foot

6   forward when you're in the beginning of a relationship.

7   Q.  And, in your view, it's only when there's later abuse that

8   these behaviors then become suspect to you?

9   A.  I'm not sure I'd agree with that.

10  Q.  So you can determine at the outset when someone is just

11  forming a healthy relationship whether that person is going to

12  be controlling?

13  A.  I think depends on the type of behaviors that the person is

14  using early on in the relationship.  If somebody is being

15  all-consuming and laying it on so thick, will that raise some

16  red flags for me as a clinician as a psychologist?  Certainly

17  yes.

18  Q.  But just the normal building of an attachment in and of

19  itself does not raise red flags?

20  A.  Correct.

21  Q.  You also talked on direct about normalizing sexual

22  behavior, and you mentioned talking about sex?

23  A.  Correct.

24  Q.  I'll give you a minute to --

25  A.  I'm okay, thank you.

M3FQray1                          Hughes - Cross

1   Q.  You talked about when a person asks about sexual

2   experiences?

3   A.  Correct.

4   Q.  Making jokes about sex?

5   A.  Correct.

6   Q.  Sharing pornography?

7   A.  Correct.

8   Q.  And people in healthy adult relationships can talk about

9   sex, right?

10  A.  Correct.

11  Q.  Even people who are not in relationships, when they're

12  adults, it's perfectly normal to talk about sex?

13  A.  Correct.

14  Q.  And sexual experiences?

15  A.  Correct.

16  Q.  And joke about sex?

17  A.  Correct.

18  Q.  Sex is a perfectly normal topic of conversation for adults?

19  A.  Again, it's the context in which it occurs and the

20  relationship between the person talking about it to the other

21  person.

22  Q.  Sure.

23  A.  Wouldn't be appropriate for you to talk to me about sex.

24  Q.  But there are innumerable contexts in which a conversation

25  about sex would be normal?

1    A.  Yes.

2    Q.  And there are innumerable pieces of popular media that are

3    focused on conversations about sex?

4    A.  Probably sure.

5    Q.  I mean, there are podcasts that talk about sex and sexual

6    encounters, right?

7    A.  I don't know myself.  I will take that if that's true,

8    sure.

9    Q.  You're not familiar with the *Death, Sex and Money* podcast

10   on WNYC?

11   A.  No.

12   Q.  Are you familiar with her *Call Her Daddy* podcast?

13   A.  No.

14   Q.  But you know there are TV shows, podcasts, radio shows

15   where the topic is sex?

16   A.  Yes.  You're telling me, and I'm sure there are other ones

17   as well.

18   Q.  And adults in healthy relationships can also watch

19   pornography with each other, right?

20   A.  If it's consensual, sure.

21   Q.  You talked yesterday about -- and a little bit today about

22   the difference between your clinical work and your forensic

23   work, right?

24   A.  Yes.

25   Q.  And in your clinical work, you're treating patients in your

M3FQray1                          Hughes - Cross

1  office?

2  A.  Correct.

3  Q.  And in your forensic work, you're performing an evaluation

4  or some review for a court proceeding, right?

5  A.  Correct, or legal proceeding.

6  Q.  A legal proceeding, correct.

7         And so the goal of your forensic work is different

8  than the goal of your clinical work?

9  A.  That's correct.

10 Q.  And your testimony in this case is based on your experience

11 performing forensic evaluations in other cases?

12 A.  I mean, my testimony here is a combination of all of my

13 skills and education, training and experience:  The clinical

14 work, the forensic work, the professional organizations, the

15 research, the teaching, consuming of the psychological

16 literature.  I think it's a combination of all of those facets

17 of what I do.

18 Q.  Sure.  And as we talked about a few minutes ago, you do do

19 a fair amount of forensic evaluation work?

20 A.  Yeah, this is half my time is clinical and half is about

21 forensic, correct.

22 Q.  And forensic evaluation is much more comprehensive than a

23 clinical evaluation, right?

24 A.  Most of the time, yes.

25 Q.  It's more complex than a clinical evaluation most of the

M3FQray1                        Hughes – Cross

1   time?

2   A.  Correct.

3   Q.  And when you perform a forensic evaluation, there's a

4   standard forensic methodology?

5   A.  Correct.

6   Q.  That involves looking at multiple sources of information?

7   A.  Correct.

8   Q.  Including medical records?

9   A.  Correct, if available and if there, yes.

10  Q.  It can include psychological testing?

11  A.  Correct.

12  Q.  And there are many psychological tests that you can

13  administer depending on the need?

14  A.  Correct.

15  Q.  There's something called a personality assessment

16  inventory?

17  A.  Correct.

18  Q.  And that's a wide scale inventory of psychological symptoms

19  that people might have?

20  A.  Correct.  Not just for forensic use.  You can use that in

21  clinical use as well.

22  Q.  There's something called a trauma symptom inventory?

23  A.  Correct.

24  Q.  And that's a test of trauma-based symptoms?

25  A.  Correct.

M3FQray1                        Hughes – Cross

1   Q.  And your forensic evaluations also include a structured

2   interview, right?

3   A.  A semi-structured interview, yes.

4   Q.  In a forensic evaluation, the level of scrutiny is

5   heightened, right?

6   A.  Correct.

7   Q.  There's a standard of objectivity?

8   A.  Correct.

9   Q.  And neutrality?

10  A.  Correct.

11  Q.  And there's a testing of multiple hypotheses?

12  A.  Correct.

13          MS. BRACEWELL:  Your Honor.  Objection.  The

14  relevance--

15          THE COURT:  Overruled.  I'll permit a little bit more

16  of it.

17  Q.  And one of the hypotheses you test in a forensic evaluation

18  is for malingering, right?

19  A.  Correct.

20  Q.  And malingering is the false presentation or gross

21  exaggeration of psychological symptoms?

22  A.  Malingering is the false production of psychological

23  symptoms, somebody saying they have these type of symptoms when

24  we know in the field that they're not presenting the way we

25  usually see them, so yes.

M3FQray1                          Hughes – Cross

1             MS. BRACEWELL:  Objection.  Move to strike.  Beyond

2      the scope of the expert testimony.

3             THE COURT:  What's the relevance of that testimony?

4             MR. KELLY:  May I be heard briefly at sidebar?

5             THE COURT:  Yes.

6          (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          MR. KELLY:  Your Honor, she didn't evaluate any of the

3    victims here.  I'm just going to elicit the fact that she

4    didn't perform any of these tests on the alleged victims, so

5    her testimony is unconnected to the facts of this case.  That's

6    a perfectly valid line of cross.  She's been crossed on in

7    every case she's ever done.

8          THE COURT:  I'm not interested in every other case

9    she's ever done.  I'm actually interested in this case.  And

10   the reason why I overruled the objection is because I had

11   understood that your prior questions went to establishing the

12   limits of what she did.  The government brought out that this

13   was not a case specific evaluation.  She didn't look at the

14   facts of this particular case.  It's appropriate for you to

15   explore that and bring that out a little bit more.

16         My question has to do with what does malingering have

17   to do with the cross-examination?

18         MR. KELLY:  It's one of the tests that she did not

19   administer in this case.

20         MS. BRACEWELL:  Your Honor, I think it's clear she

21   administered no tests because she is testifying as a blind

22   expert.  It's not appropriate to go through the litany of

23   psychological tests and insinuate a particular test type like

24   malingering that there is some hidden falsehood out there that

25   she could have and didn't access.

M3FQray1                          Hughes - Cross

1          MR. KELLY:  I have no more questions on this line.  I

2    was going to close with:  You haven't examined any of the

3    witnesses in this case, and that's the end of my cross.

4          THE COURT:  I am going to sustain the objection on the

5    malingering, but then you can ask that last question.

6          MS. BRACEWELL:  Just for clarification of the record,

7    will her answer on malingering be struck?

8          THE COURT:  Yes.

9          MR. KELLY:  Just so we're clear, I don't have one more

10   question.  I have a line that will establish she's never

11   evaluated any of the victims in this case.  I don't want to be

12   cut off after one question.

13         THE COURT:  How many questions do you have

14   approximately along this line?

15         MR. KELLY:  Six or seven.

16         THE COURT:  Okay.  We'll see how it goes.

17         MR. KELLY:  Thank you.

18         (Continued on next page)

19

20

21

22

23

24

25

M3FQray1                        Hughes - Cross

1              (In open court)

2              THE COURT:  The last question and answer are stricken,

3    and the jury is instructed to disregard.

4              Mr. Kelly, you may proceed.

5              MR. KELLY:  Thank you, your Honor.

6    BY MR. KELLY:

7    Q.  Dr. Hughes, we talked about the various steps you can take

8    in a forensic evaluation, right?

9    A.  Yes.

10   Q.  And you didn't take any of those steps in connection with

11   this case, right?

12   A.  I didn't evaluate anyone in this case, so I wouldn't take

13   those steps.

14   Q.  And you didn't review any case specific information?

15   A.  That's correct.

16   Q.  So you don't have any opinions about the specific

17   relationships at issue in this case?

18   A.  That's correct.

19   Q.  And as you testified a few minutes ago, all of these

20   opinions can ultimately turn on the specifics of a

21   relationship, right?

22   A.  I don't think that's what I testified to.  I think if you

23   look at the constellation of the abusive behaviors that I

24   talked about yesterday, you can make a conclusion as to whether

25   that relationship is abusive or not.

1   Q.  And you haven't reached that conclusion as to any of the

2   relationships in this case?

3   A.  I have not.

4            MR. KELLY:  No further questions, your Honor.

5            THE COURT:  Any redirect?

6            MS. BRACEWELL:  Very, very briefly, your Honor.

7   REDIRECT EXAMINATION

8   BY MS. BRACEWELL:

9   Q.  Dr. Hughes, on cross-examination, you testified about

10  healthy relationships and discussions about sex within those

11  healthy relationships.  Do you recall that testimony?

12  A.  Yes.

13  Q.  What would take those discussions outside the realm of a

14  normal relationship?

15  A.  So good question.  Clearly, if those other elements are

16  present that I testified to yesterday, if there is the

17  imposition of threats, of intimidation, of isolation, of

18  physical violence, of sexual violence, those sexual

19  conversations may take on an added meaning.  If there is an

20  imbalance in the relationship between the two parties, that

21  would not be appropriate to talk about sex, and it would not be

22  appropriate for a teacher to talk to a student about sex.  So

23  it depends on that relationship where that person would talk

24  about sex.  If you don't have free will, if you're not doing

25  this under your consent, if this is something that you want to

M3FQray1                        Hughes - Redirect

1    do, then that also would not be appropriate to talk about sex.

2    I'm sure there are other scenarios I can think of, but those

3    are sort of the top ones that come to the top of mind for me

4    right now.

5              MS. BRACEWELL:  Nothing further, your Honor.

6              THE COURT:  Any recross?

7              (Attorney indicating)

8              Dr. Hughes, you're excused.

9              THE WITNESS:  Thank you, your Honor.  Appreciate it.

10             (Witness excused)

11             THE COURT:  The government may call its next witness.

12             MS. SASSOON:  Your Honor, I would like to offer into

13   evidence a number of exhibits.  I can do that now before she --

14             THE COURT:  You can do it at the time with respect to

15   4061 and 4062.  Those will be received.  I can go through

16   during a break the specific reasons why those will be received.

17             Call your next witness.

18             MS. SASSOON:  Yes, your Honor.  The government calls

19   Sunny Drescher.

20    SUNNY DRESCHER,

21       called as a witness by the Government,

22       having been duly sworn, testified as follows: ask

23             DEPUTY CLERK:  Please state your full name for the

24   record and spell out your last name.

25             THE WITNESS:  My given name is Sarah Drescher, but I

M3FQray1                          Drescher - Direct

```
 1   go by Sunny, and my last name is spelled D-R-E-S-C-H-E-R.
 2              THE COURT:  You may inquire.
 3              MS. SASSOON:  Thank you, your Honor.
 4   DIRECT EXAMINATION
 5   BY MS. SASSOON:
 6   Q.  Good morning, Ms. Drescher.
 7   A.  Good morning.
 8   Q.  Can you hear me?
 9   A.  Yes.
10              THE COURT:  Ms. Drescher, let me ask you just to try
11   to keep your voice up and speak into the microphone, please.
12              THE WITNESS:  Yes, I will.
13   Q.  Where do you work?
14   A.  I work at the U.S. Attorney's Office for the Southern
15   District of New York.
16   Q.  What is your title there?
17   A.  I'm a paralegal.
18   Q.  How long have you worked at the U.S. Attorney's Office?
19   A.  I've worked here for about a year and a half.
20   Q.  What unit are you in?
21   A.  I work in the public corruption unit.
22   Q.  What are your job responsibilities there?
23   A.  I assist with ongoing investigations and prosecutions.
24   Q.  Apart from preparing for your testimony today, have you
25   been assigned to this case?
```

M3FQray1                        Drescher - Direct

```
 1   A.  No, I have not.
 2             MS. SASSOON:  Your Honor, I'd ask permission for
 3   Special Agent Maguire to hand the witness a binder of
 4   materials.
 5             THE COURT:  You may approach.
 6             Do you have an extra copy for me or no?  Is it within
 7   my binders?
 8             MS. SASSOON:  It's within your binder and everything
 9   will be pulled up on the screen, your Honor.
10   Q.  Ms. Drescher, you've been handed a binder of materials.  Do
11   you recognize what this is?
12   A.  Yes.
13   Q.  What is it?
14   A.  It's a set of exhibits that I reviewed in preparation for
15   today.
16   Q.  Who selected the materials in this binder?
17   A.  Members of the prosecution team.
18             MS. SASSOON:  Your Honor, at this time I would offer
19   Government Exhibit 3206 into evidence.
20             THE COURT:  Any objection?
21             MS. LENOX:  The only objections I have with respect to
22   any and all of these exhibits are those that have already been
23   covered.
24             THE COURT:  The rulings that I issued stand and I
25   think -- and that was received.
```

1          (Government's Exhibit 3206 received in evidence)

2    Q.  Ms. Hernandez, can you please publish for the witness and

3    the jury Government Exhibit 3206?

4          Ms. Drescher, I would ask you to look at the line that

5    says, "Begin forward message," and as part of your testimony

6    today, I'm going to ask you to read some exhibits.  Can you

7    please read who the original email is from?

8    A.  Santos Rosario, sjr.rosario@gmail.com.

9    Q.  What is the subject of the email?

10   A.  "My thoughts the past few days."

11   Q.  What is the date on that email?

12   A.  December 8, 2012.

13   Q.  To whom was this email sent?

14   A.  Lawrence Ray, larryray5@me.com and Lawrence Ray

15   lvr.santosrosario@gmail.com.

16   Q.  Ms. Drescher, can you please read this email, and whatever

17   is easiest for you, whether on your screen or from your binder.

18   A.  "Hi, Larry.  I started having thoughts of killing myself on

19   and off for roughly the past two weeks since I started fucking

20   up again and being hurtful towards others again.  It started

21   with just thoughts of 'I should just kill myself because I have

22   continued to be hurtful and I obviously can't/won't stop.'  I

23   managed my mind about it for a little while, every time I've

24   messed up or did something wrong by thinking that I just made a

25   mistake and that I can and will rectify my errors.

1          "It came to a head on Monday when you confronted me on

2     intentionally wasting your time and on hurting Felicia for the

3     past two weeks.  That's when I started to think about how I

4     should really kill myself.  I thought that I should just go buy

5     a bunch of pills at the Duane Reade near the apartment (between

6     93rd and 94th Street on 3rd Avenue).  I thought that it would

7     be better for myself because I won't have to deal with/bear

8     hurting people any more.  And that now is the time to leave

9     life, to check out in a sense because I fucked up my life too

10    much.  This was when I wanted to go home but you didn't let me.

11    But then I thought of reasons why I shouldn't and why I won't.

12         "Who am I kidding?  I am not going to kill myself.  I

13    don't have the courage or strength to do that.  Besides, that's

14    just my being dramatic and I hate when I am dramatic.  It's

15    stupid and unwarranted.  Larry would yell at me for being a

16    little bitch and drama queen.  Kill myself?  Am I really that

17    cowardly and selfish?  That would destroy my mom and cause

18    everyone a lot of trouble and hassle by having to deal with a

19    suicide.  I can't kill myself because I have to face justice

20    for all the shit that I did to people (Larry, Felicia, Talia,

21    Isabella, etc.).  It would be selfish of me to take that away

22    from them.  I can at least face the consequences for my

23    actions.

24         "No, I can't kill myself because if Larry is giving me

25    a chance to fix things, I have to take it and makes things

M3FQray1                          Drescher - Direct

better.

        "These were my thoughts on why I shouldn't kill myself.  I was a bit better on Tuesday when I gave you the money and I spent most of my day in the bookstore.  I felt safe, that I could pull this off (becoming better and paying you back).  But on Wednesday night when you confronted me on my being selfish again and being a liar and how I again was not forthcoming, I started having thoughts of killing myself a lot again.  They were the same thoughts but I just let myself think them more without managing them.

        "After I left the apartment that night, I went straight to the Duane Reade, thinking that I could buy some pills.  I didn't because I was paranoid that you were having me watched/followed (that guy wearing a construction vest that was sitting in the lobby when I entered the building was still there and only got up when I got out of the building at around 4:00 a.m.) and that if I bought pills, I would be arrested immediately.  I still wanted to hurt myself though and I was angry so I also thought about buying cigarettes, but then I just felt stupid because I knew I wasn't going to kill myself or do anything like that, so I just bought some donuts.

        "On Thursday I got myself together and spoke to my mom again to try and get her to help me more and to give me money to pay you back for the remaining California expenses and to replace the pots and tongs that I damaged.  When I spoke to you

1    that day and you said that I was doing the right thing and that

2    I did well, I felt better and spent the day at my house and

3    slept.  That night when I spoke to you again and you gave me

4    until Friday afternoon to come up with a solution, I was

5    determined to convince my mom and do what I could to finally

6    finish this.

7              "I  fell apart again today when I couldn't talk to my

8    mom and Felicia had pulled that stunt.  At this point I was

9    having really nasty thoughts of hurting myself and others that

10   I had been having on and off during the week but that I was

11   managing a bit more beforehand.  But today I didn't.  I

12   thought:  We (myself, Yali, Felicia, my mom and my dad) should

13   all die.  We are too hurtful and poisonous.  All we do is lie

14   and hurt people.  The best we could do is kill ourselves

15   because we're never going to change.  I want to/should burn the

16   house down.  I should turn on the gas stove and blow the house

17   up.  This disgusting evil house.  It would be cleaning the

18   world of something bad.  We should all go to jail.  We deserve

19   it."

20   Q.  Ms. Drescher, you can stop there.  I'd like to turn back to

21   the first page of this email.  Looking at the top of the email,

22   that was forwarded, can you please read when it was sent?

23   A.  December 16, 2017.

24   Q.  Who forwarded the email?

25   A.  Lawrence Ray, larryray5@me.com.

M3FQray1                        Drescher - Direct

1   Q.  To whom did he forward the email?

2   A.  Isabella Pollok, icpollok@gmail.com.

3           MS. SASSOON:  At this time the government offers

4   Government Exhibit 1594.

5           THE COURT:  That's received.

6           (Government's Exhibit 1594 received in evidence)

7   Q.  Ms. Hernandez, please publish Government Exhibit 1594 for

8   the witness and the jury.

9           THE COURT:  Ms. Sassoon, it would help in the future

10  when you offer exhibits if you could post them on the screen

11  for myself and for the defense, and then after I've ruled,

12  you'll publish it to the jury.

13          MS. SASSOON:  Absolutely, your Honor.

14  Q.  Ms. Drescher, can you please read the date in the

15  right-hand corner of this document.

16  A.  1/16/2013.

17  Q.  And, Ms. Hernandez, can you please go to the last page of

18  this document?

19          What name is at the bottom of this document?

20  A.  Talia.

21  Q.  Now going back to the first page, can you please read

22  Government Exhibit 1594?

23  A.  "Good afternoon reckless disregarders, active hurters and

24  admirably evolved friends.  Each of you must know where you

25  stand, i.e., in which group you choose to stand.

M3FQray1                          Drescher - Direct

1        "This morning I noticed that my big Pucci purse had

2    the smaller one carelessly stuffed in it.  This made me nervous

3    as I imagined the person who did this did not consider the

4    possibility that other contents in my bag might get crushed

5    this way.  I always take care to deliberately place my Emilio

6    wallet carefully so that the bag attached to -- so that the bow

7    attached to the front of it will not be bent or otherwise

8    disfigured under the pressure of another object.  Not

9    surprisingly, I found that the bow was indeed bent as I feared

10   when I re-arranged the idiotically or cruelly placed items

11   before leaving to go upstairs.  The wallet is not destroyed but

12   I will have to try bending the bow back in place.  It could

13   have always been worse.  Nonetheless, designer items are valued

14   on the basis of aesthetic pleasure that they give the owner not

15   just industry or durability or utility.  So please respect my

16   desire that should this be the type of thing anyone might have

17   done with some emotional drive, you do not brand such gifts

18   from my honey boy with your emotional bullshit.  I think I do

19   deserve to enjoy my father, my space and my belongings, all of

20   which I have shared and continue to share with each and every

21   one of you.  As Isabella is a fellow designer purse owner and

22   someone who has proven respectful of my belongings at least by

23   not choosing to personally damage them, I trust her to touch

24   them.  I am not going to encourage the preposterously absurd

25   notion that anyone in my home here today is not capable of

1    handling things like a wallet or a purse without destroying or

2    damaging them either accidentally or as a consequence of what

3    you are feeling in that moment.  Every single person here is

4    more than equipped to behave as kindly, considerately and

5    intelligently as I have to you all.  If your intentions fall

6    short of that, shame on you.  Therefore, I won't make

7    prohibitions on anyone.  I would rather let you each make the

8    choice that my father's unparalleled love and devotion to each

9    of you has made available to you as individuals possessing a

10   will, preferences, and choke -- and choice along with the

11   emotional and intellectual capacities to exercise all of those.

12   This is my home.  My stuff is obviously in it.  So are my

13   friends and loved ones and guests.  So please respect my

14   father, respect our space and our stuff and respect each other.

15   I hope this note means something to you.  Talia."

16          MS. SASSOON:  Ms. Hernandez, please place on the

17   screen for the parties and the Court Government Exhibit 3087

18   which the government offers into evidence.

19          THE COURT:  3087 is received but not for the truth.

20   Members of the jury, as I've instructed you in the past, there

21   are certain exhibits that are received not for the truth of any

22   underlying statements in them, but for the fact of what was

23   said in the documents.  3087 falls in that category.  You may

24   proceed.

25          (Government's Exhibit 3087 received in evidence)

M3FQray1                          Drescher – Direct

1   BY MS. SASSOON:

2   Q.  Ms. Hernandez, please publish 3087 for the jury.

3           Ms. Drescher, what is the subject of this document?

4   A.  "I stole money from Larry.  I stole 160,000."

5   Q.  Who is it from?

6   A.  Felicia Rosario, felicia.rosario@gmail.com.

7   Q.  What is the date?

8   A.  September 21, 2012.

9   Q.  Can you please read the document?

10  A.  "I stole money from Larry.  I stole $160,000.  I took

11  probably a hundred thousand dollars the first time.  That's

12  when he had the most money in his bag.  He would leave the bag

13  open and I took it.  I put it in my suitcase.

14          "I have hurt Larry enough.  I am going to pay for them

15  to run a financial check on me to find the money that I stole

16  from Larry and if I wasn't an escort already, I will become one

17  so I can pay Larry back for all the damage I caused him.  I

18  can't keep doing this to him, and if I keep refusing to

19  acknowledge my sexual behavior then so be it but he doesn't

20  have to pay for it any more.  I can't stand this."

21          MS. SASSOON:  Ms. Hernandez, please publish for the

22  Court and the parties Government Exhibit 3105.

23          The government offers Government Exhibit 3105.

24          THE COURT:  This is also not for the truth but for the

25  fact it was said.  3105 is received but not for the truth.

M3FQray1                     Drescher - Direct

1            (Government's Exhibit 3105 received in evidence)

2      BY MS. SASSOON:

3      Q.  Ms. Hernandez, please publish the document.

4            Ms. Drescher, what is the subject on this document?

5      A.  "Everything."

6      Q.  Who is it from?

7      A.  Felicia Rosario, felicia.rosario@gmail.com.

8      Q.  What is the date?

9      A.  March 15, 2013.

10     Q.  Can you please read this document?

11     A.  "OMG what have I done.  OMG, OMG, OMG, OMG.  I hurt Larry

12     and Talia.  OMG, OMG, OMG, OMG, OMG, OMG, OMG.  Holy crap.

13           "OMG they helped me so much, they saved my life, OMG,

14     OMG, OMG, OMG.  And I hurt them over and over and over for

15     months and months at critical times."

16     Q.  You can stop there.

17           MS. SASSOON:  Ms. Hernandez, can you please show the

18     Court and the parties Government Exhibit 3109, which the

19     government offers into evidence.

20           THE COURT:  3109 is received.

21           (Government's Exhibit 3109 received in evidence)

22     Q.  Ms. Hernandez, please publish it for the jury.

23           Ms. Drescher, what is the subject on this email?

24     A.  "I love you honey boy."

25     Q.  Who is it from?

1    A.   Talia Ray, talia.ray@me.com.

2    Q.   When was it sent?

3    A.   April 17, 2013.

4    Q.   Who was it sent to?

5    A.   Honey boy Ray, lvray21@gmail.com; Lawrence Ray.

6    larryray5@me.com.

7    Q.   Can you please read just that first line the first two

8    words of the email?

9    A.   "Hi honey boy."

10   Q.   Now, Ms. Hernandez, can you please zoom in on the second

11   full paragraph beginning "This brings me to another point."

12        Ms. Drescher, can you please read that paragraph?

13   A.   "This brings me to another point.  I do not feel like a

14   failure.  I would say I never have but there maybe have been

15   moments in my life in the past when I wondered if I would

16   discover one day that I am in fact a failure who has been

17   fooling herself and everyone else.  Well, that feeling pretty

18   much evaporated especially in the time since you've been back

19   in the world, in my world, as my dad."

20   Q.   Ms. Hernandez, can you zoom in on the second and third --

21   sorry -- can you zoom in on the next paragraph, please, and the

22   one after that.

23        Ms. Drescher, can you please read them?

24   A.   "What you've done with my friends is the most amazing and

25   beautiful and absolutely astounding thing I have ever seen, and

1  I don't think I have ever even dreamed anything more

2  astounding.  And no dream can be more brilliant than this

3  project you have taken on for me (a fact I never forget,

4  because I know it's the only drive that kept you at this

5  project of fixing these people who I so wanted to see if you

6  could fix (because nothing else real could even hold a candle

7  to this project.  Look at Claudia, look at Isabella, even Iban

8  and even Dan ...  That's just to name a few.  They are all the

9  better for what you did with them.  Eons into "for the better,"

10  truly.  If there is one thing I've learned about myself through

11  all the corruption, it's that I love justice."

12  Q.  Ms. Hernandez, can you please zoom in on the next three

13  paragraphs, the last ones on the page.

14        Ms. Drescher, can you please read them.

15  A.  "If there is one thing I've learned about the world since

16  you got out, it's that justice is real and that mere men can

17  indeed affect it.  That's huge, because that means I love

18  something very, very real.

19        "Anyway, I'm not upset about Yale anyway.  In the

20  scheme of things, it wasn't my best effort in applying by any

21  means and there is no law saying I had to go this fall.  There

22  is no convention that even says that.  So I'll reapply the

23  right way next year.  No big deal.  Really.

24        "I mean, how could I read anything into a mere

25  decision from a couple of old men and some woman named Asha who

1   have by conventional standards -- lived impressive lives when

2   my life and my character to date are impressive by any

3   standard, but, most importantly, by my own"

4   Q.  Ms. Hernandez, can you please turn to the third page of

5   this document and highlight the last full paragraph beginning

6   "I know you've been."

7        Ms. Drescher, can you please read this paragraph?

8   A.  "I know you've been having an incredibly difficult two

9   years and an incredibly trying week too.  I hope you know how

10  much I am already feeling the positive fruits of all your

11  meticulous attention and non-stop work though.  I mean, look,

12  not even a rejection letter from Yale can shake me.  Why should

13  it?  It's like you said, the kind of person I am makes me

14  someone any law school would want.  So I'll just have to make

15  sure that when I reapply, my application is as strong as it

16  could be, because this year it just wasn't.  And that's okay.

17  It needed to go the way it did, and I think the way that I'm

18  feeling about myself and about my life lately is worth a

19  thousand acceptance letters from Yale law.  I'm not trying to

20  build an image of myself.  I am already someone I love, and

21  what I do in life is merely what I happen to be doing.  The

22  point is this is a time to be happy and celebrate my and your

23  success as I wrap up my undergraduate education."

24  Q.  Can you please now read the last three lines of this

25  paragraph?

M3FQray1                          Drescher - Direct

1   A.  "I'm just glad that I have you and that you have me to

2   share my journey together.  Having that what could ever shake

3   me?  You're the best and I'm the best, which makes this journey

4   so dynamic and beautiful for us to share together forever.  I'm

5   having a great time so let's just keep having a great time

6   together, not let anyone or anything (be it an Isabella

7   tantrum, a Yali suicide or a rejection letter from Yale) rain

8   on our parade."

9   Q.  Can you please read the last two lines of the email?

10  A.  "I love you so much and I am so so proud of you.  Honey

11  girl."

12          MS. SASSOON:  Ms. Hernandez, can you please put up on

13  the screen for the parties and the Court Government Exhibit

14  3110, which the government offers into evidence.

15          THE COURT:  3110 is received, this and the last two

16  subject to connection.

17          (Government's Exhibit 3110 received in evidence)

18  Q.  Ms. Hernandez, please publish this for the jury.

19          And, Ms. Drescher, can you please read when this was

20  sent?

21  A.  May 29, 2013.

22  Q.  Who is it from?

23  A.  Talia Ray, tray@GM.slc.edu.

24  Q.  Who is it to?

25  A.  Talia.ray@me.com and lvray21@gmail.com.

M3FQray1                          Drescher – Direct

1    Q.  What is the subject?

2    A.  "Note from 4 Scarborough Place in Pinehurst."

3    Q.  Ms. Hernandez, can you zoom in on the next section of that

4    email, "things you will need" and the list.

5            Ms. Drescher, can you just read the first three

6    entries under "things you will need"

7    A.  "Wooden box, sand, peat."

8            MS. SASSOON:  You can take that down, Ms. Hernandez.

9            Please put up for the parties and the Court Government

10   Exhibit 3111.

11           The government offers Government Exhibit 3111.

12           THE COURT:  3111 is received but not for the truth.

13           (Government's Exhibit 3111 received in evidence)

14   Q.  Please publish Government Exhibit 3111 for the jury.

15           Ms. Drescher, who is this from?

16   A.  Felicia Rosario.

17   Q.  What is the date?

18   A.  July 8, 2013.

19   Q.  Can you please read everything below the "sent" row?

20   A.  "I destroyed the sod intentionally, and now I need to

21   replace the sod and pay for an excavation.  I intentionally

22   have been intentionally delaying for attention and I have been

23   intentionally interfering with Lawrence so that it doesn't get

24   completed all in order to get negative attention from him and

25   everyone here, including Talia, Isabella and Claudia."

M3FQray1                         Drescher - Direct

1           "I realize now I have been childish and a brat and

2      destructive.  To replace the sod it will cost 10k.  Chemicals,

3      Headway liquid $600, Propiconazole $800, Mefenoxam $300,

4      Heritage $500.  Excavation."

5           MS. SASSOON:  Ms. Hernandez, can you please place on

6      the screen for the parties and the Court Government Exhibit

7      3112.  The government offers Government Exhibit 3112.

8           THE COURT:  3112 is received subject to connection.

9           (Government's Exhibit 3112 received in evidence)

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              MS. SASSOON:  Ms. Hernandez, please publish Government

2    Exhibit 3112 for the jury.

3    Q.  And Ms. Drescher, can you please read who this email is

4    from.

5    A.  Talia Ray, tray@gm.slc.edu.

6    Q.  When was this sent?

7    A.  July 10, 2013.

8    Q.  And who are the recipients?

9    A.  Sattia Laren, Ph.D., sblarenphd@gmail.com; Honey Boy Ray,

10   lvray21@gmail.com; cdrury@gm.slc.edu; Isabella Pollok,

11   ipollok@gm.slc.edu.

12   Q.  Can you please read the second full paragraph beginning

13   "Like so many people."

14   A.  Like so many people who go undiagnosed, Isabella has

15   struggled with BPD - borderline personality disorder.  This is

16   also the specialty of an alum who you might have met at

17   graduation this year when you, my dad, and I spoke after the

18   ceremony.  Dr. Sattia Larren.  Like Kim, Isabella's Don, Sattia

19   has watched Isabella transform since our sophomore year at SLC

20   through the help she received in her relationship with my

21   father, who has very special expertise in matters of the mind,

22   as he has been a very high-level intel op in the DOD for many

23   years, which means access to all the best and most cutting-edge

24   science research that so many of our defense dollars go

25   towards.

1        MS. SASSOON:  Ms. Hernandez, can you please zoom in on

2   the paragraph beginning "As Isabella was receiving."

3   Q.  Ms. Drescher, can you please read this paragraph.

4   A.  As Isabella was receiving this special sort of help from my

5   father, my other friends approached him looking for answers to

6   the questions that plagued them.  This turned helping Isabella

7   into a group situation, where a number of my friends from

8   Slonim 9, the group housing I put together for us in soph year,

9   and my dad was able to use the group setting to transform each

10  of those friends.  Here's the part where it gets even more

11  interesting.  Every single student in that Slonim house was a

12  potential suicide; and every single student who became a part

13  of the little group that sought help from my dad had BPD.

14  Coincidence?  No.  Attachment theory at work.

15       MS. SASSOON:  Ms. Hernandez, can you please turn to

16  the second page and highlight the paragraph that begins,

17  "Anyway, I know we've talked."

18  Q.  Can you please begin reading that paragraph.

19  A.  Anyway, I know we've talked about the situation before, but

20  I figured I'd give you a bit of a refresher for context.  The

21  fact that I experienced my family taking so many hits in spite

22  of how clearly we kept making our position caused me to begin

23  to doubt the social reality of justice or the logos, as my dad

24  and I have always spoken of.  It seemed that we were the only

25  ones who believed in it, and that everyone else treated the

M3FVRAY2                      Drescher - Direct

1    fight we were in as impossible, a losing battle that would mean

2    the end of whoever took it on.

3         I remember when nobody thought Bernard Kerik would

4    ever go to jail, when he and Rudy Giuliani were on top of the

5    world.  Well, that all changed, and Kerik did step down from

6    Bush's Homeland Security position before being arrested and

7    sent to prison.  All of that is sort of another story from the

8    one I'm telling.  Yes, we prevented Kerik from stepping into

9    the cabinet position Bush created and chose him for, but my

10    life was in shambles, and I was left with my entire concept of

11    justice called into question.

12         I was also left with, unbeknownst to me, the issue of

13    a high-risk potential for a spontaneous suicide as a

14    consequence of the circumstances that gave me the experience I

15    had.  So my subconscious attached to a bunch of people who were

16    also at high risk for suicide, also unbeknownst to me, in my

17    conscious mind at least.  I then presented these people to my

18    dad and wanted him to "fix" them.  One of the reasons BPDs so

19    rarely are treated -- despite the fact that we know so much

20    about the disorder -- is that they are extremely difficult for

21    anyone to treat by virtue of the behavioral dynamic

22    characteristic of their disorder.

23         The experience of helping my friends this way has

24    given me something I critically needed:  contrast.  It was

25    another situation that most people would find impossible, and I

1    watched my dad pull it off.  These friends of mine came to know

2    justice, truth, and honor as I do, which kind of falsified the

3    reality of the logos for me, because these were not people who

4    held such perspectives ever before, and coming to know them

5    changed all of their lives for the better.  And I think that

6    means everywhere they go and everything they do going forward

7    will be for the better now, too.

8    Q.  You can stop there.

9         MS. SASSOON:  Ms. Hernandez, you can take down this

10   document and, please, for the Court and the parties, put on the

11   screen Government Exhibit 3113, which the government offers

12   into evidence.

13        THE COURT:  Exhibit 3113 is received, but not for the

14   truth; it's for the fact that it was stated.

15        (Government's Exhibit 3113 received in evidence)

16        MS. SASSOON:  Ms. Hernandez, please publish this

17   exhibit for the jury.

18   Q.  And Ms. Drescher, can you please read the subject.

19   A.  To-do list.

20   Q.  Who is it from?

21   A.  Felicia Rosario, felicia.rosario@gmail.com.

22   Q.  What is the date?

23   A.  August 5, 2013.

24   Q.  Can you please read the document.

25   A.  To-do list:  Get Maritza to help pay for the damage.  Go

M3FVRAY2                           Drescher - Direct

1    talk to her.  Still want to get married.  Go through the mail.

2              MS. SASSOON:  Your Honor, at this time the government

3    is going to offer into evidence several photographs.  I can

4    offer them at once or one-by-one, however the Court prefers to

5    receive them.

6              THE COURT:  Why don't you offer them one-by-one.

7              MS. SASSOON:  I'll actually start with a video.

8              Ms. Hernandez, can you please place on the screen for

9    the Court and the parties the beginning of Government Exhibit

10   1884.

11             THE COURT:  1884 is received.

12             (Government's Exhibit 1884 received in evidence)

13             MS. SASSOON:  Ms. Hernandez, please play from the

14   beginning of Government Exhibit 1884 for the jury.

15             (Video played)

16             MS. SASSOON:  Ms. Hernandez, please place on the

17   screen the beginning of Government Exhibit 1885 for the Court

18   and the parties, which the government offers into evidence.

19             THE COURT:  1885 is received.

20             (Government's Exhibit 1885 received in evidence)

21             MS. SASSOON:  Thank you.

22             Ms. Hernandez, please publish the exhibit and play it

23   for the jury.

24             (Video played)

25             MS. SASSOON:  Ms. Hernandez, please place on the

M3FVRAY2                          Drescher - Direct

1    screen Government Exhibit 2115 for the Court and the parties,

2    which the government offers into evidence.

3              THE COURT:  2115 is received.

4              (Government's Exhibit 2115 received in evidence)

5              MS. SASSOON:  Ms. Hernandez, please play Government

6    Exhibit 2115 for the jury.

7              (Video played)

8              MS. SASSOON:  Ms. Hernandez, please place on the

9    screen Government Exhibit 1862 for the parties and the Court,

10   which the government offers into evidence.

11             THE COURT:  Received.

12             (Government's Exhibit 1862 received in evidence)

13             MS. SASSOON:  Please publish for the jury Government

14   Exhibit 1862.

15             Ms. Hernandez, please place on the screen Government

16   Exhibit 1869 for the Court and the parties, which the

17   government offers into evidence.

18             THE COURT:  Received.

19             (Government's Exhibit 1869 received in evidence)

20             JUROR:  Your Honor?

21             THE COURT:  Yes.

22             JUROR:  The images are not coming up fast enough for

23   the jury to see.

24             MS. SASSOON:  I will slow down.

25             THE COURT:  Thank you, members of the jury.

M3FVRAY2                        Drescher - Direct

1              MS. SASSOON:  So let's start by publishing Government

2    Exhibit 1862 again.

3              Ms. Hernandez, now please publish Government Exhibit

4    1869.

5              Please place on the screen Government Exhibit 1866,

6    which the government offers into evidence.

7              THE COURT:  That's received.

8              (Government's Exhibit 1866 received in evidence)

9              MS. SASSOON:  Ms. Hernandez, please publish this

10   exhibit for the jury.

11             Ms. Hernandez, please place on the screen Government

12   Exhibit 1845, which the government offers into evidence.

13             THE COURT:  Received.

14             (Government's Exhibit 1845 received in evidence)

15             MS. SASSOON:  Please publish this exhibit.

16             Please place on the screen Government Exhibit 1840,

17   which the government offers into evidence.

18             THE COURT:  Received.

19             (Government's Exhibit 1840 received in evidence)

20             MS. SASSOON:  Please publish 1840 for the jury.

21             Please place on the screen Government Exhibit 1856,

22   which the government offers into evidence.

23             THE COURT:  Received.

24             (Government's Exhibit 1856 received in evidence)

25             MS. SASSOON:  Please publish Government Exhibit 1856.

M3FVRAY2                          Drescher - Direct

1          Please place on the screen Government Exhibit 2119,

2     which the government offers into evidence.

3          THE COURT:  Received.

4          (Government's Exhibit 2119 received in evidence)

5          MS. SASSOON:  Ms. Hernandez, please publish Government

6     Exhibit 2119.

7          Ms. Hernandez, please place on the screen the video

8     marked Government Exhibit 2127 for the Court and the parties,

9     which the government offers into evidence.

10          THE COURT:  Received.

11          (Government's Exhibit 2127 received in evidence)

12          MS. SASSOON:  Ms. Hernandez, please play Government

13     Exhibit 2127 for the jury.

14          (Video played)

15          MS. SASSOON:  Ms. Hernandez, please place on the

16     screen Government Exhibit 2144, which is a video which the

17     government offers into evidence.

18          THE COURT:  Received.

19          (Government's Exhibit 2144 received in evidence)

20          MS. SASSOON:  Ms. Hernandez, please play for the jury

21     from the beginning of the video through 21 seconds.

22          (Video played)

23          MS. SASSOON:  Ms. Hernandez, please play from minute

24     three and three seconds to three minutes and 17 seconds.

25          (Video played)

1          MS. SASSOON:  Please now play from three minutes and

2    26 seconds to five minutes and 40 seconds.

3          (Video played)

4          MS. SASSOON:  Ms. Hernandez, please play from 12

5    minutes and 20 seconds to 13 minutes and 33 seconds.

6          (Video played)

7          MS. SASSOON:  Ms. Hernandez, the last clip I'm going

8    to ask you to play is from 18 minutes to 19 minutes and 40

9    seconds.

10          (Video played)

11          MS. SASSOON:  Ms. Hernandez, please place on the

12    screen Government Exhibit 3119 for the Court and the parties,

13    which the government offers into evidence.

14          THE COURT:  Received.

15          (Government's Exhibit 3119 received in evidence)

16          MS. SASSOON:  Please publish Government Exhibit 3119.

17    BY MS. SASSOON:

18    Q.  Ms. Drescher, who is this from?

19    A.  Felicia Rosario, felicia.rosario@gmail.com.

20    Q.  What is the date?

21    A.  December 7, 2013.

22    Q.  Can you please read the document.

23    A.  I'm upset, Larry.  I don't want to go away and I don't want

24    Yali and Santos to go to jail.  And I want to be happy so that

25    I can go to work and marry you.  I want a happy ending to the

1    Rosario and Ray story, not a bad ending.

2              I am sad, Larry. I don't want to go away from you.

3    Sad face. I'll still get it together and I don't want to go.

4    The hospital, I just realized, I did the wrong thing.  I want

5    to go home and go back to work.  I'll do tw right thing still.

6    Please don't give up on us, Larry.  I want to marry you.  Winky

7    face.  I want to marry you too.  Smiley face.  I still want to

8    marry you.  Smiley face.  We were supposed to be together

9    always and forever.

10             MS. SASSOON:  Ms. Hernandez, can you please put up on

11   the screen for the Court and the parties Government Exhibit

12   2111, which the government offers into evidence.

13             THE COURT:  Received.

14             (Government's Exhibit 2111 received in evidence)

15             MS. SASSOON:  Ms. Hernandez, please publish Government

16   Exhibit 2111.

17   Q.  Ms. Drescher, can you please read the upper row of this

18   document?

19   A.  Chase deposit.  Checking, with a checkmark for the box with

20   checking.

21   Q.  What is the date entered underneath today's date?

22   A.  2/11/14.

23   Q.  What about the customer name?

24   A.  Talia Ray.

25   Q.  And can you please read the number indicated next to cash

M3FVRAY2                          Drescher - Direct

1    on the right-hand side?

2    A.   295.

3    Q.   And at the bottom where it says memo, what does it say

4    after memo?

5    A.   "Repayment for damage."

6              MS. SASSOON:  Ms. Hernandez, can you please pull up

7    Government Exhibit 1886 for the Court and the parties, which is

8    a video that the government offers into evidence.

9              THE COURT:  That's received, I think, subject to

10   connection.

11             (Government's Exhibit 1886 received in evidence)

12             MS. SASSOON:  Ms. Hernandez, please play Government

13   Exhibit 1886 for the jury.

14             (Video played)

15             MS. SASSOON:  Ms. Hernandez, please pull up for the

16   Court and the parties Government Exhibit 3136, which the

17   government offers into evidence.

18             THE COURT:  Received.

19             (Government's Exhibit 3136 received in evidence)

20             MS. SASSOON:  Ms. Hernandez, please publish Government

21   Exhibit 3136.

22   BY MS. SASSOON:

23   Q.   What is the date on this email?

24   A.   September 4, 2014.

25   Q.   What is the subject?

M3FVRAY2                       Drescher - Direct

1   A.  Cyanide, arsenic, mercury, lead amounts, and duration.

2   Q.  Who is it from?

3   A.  Claudia Drury, cdf.drury@gmail.com.

4   Q.  And who is it to?

5   A.  Lawrence Ray, lvray21@gmail.com; Lawrence Ray,

6   larryray5@me.com; Lawrence Ray, lvr.claudia@gmail.com.

7   Q.  And do you see there are a number of attachments to the

8   email?

9   A.  Yes.

10          MS. SASSOON:  Ms. Hernandez, can you please turn to

11  page 3 of this document.  Can you go one more page, I think I

12  have the wrong page.

13  Q.  Do you see in the middle of the page where it says

14  "Pinehurst"?

15  A.  Yes.

16  Q.  Can you read the bullet point underneath the word

17  "Pinehurst."

18  A.  Poisoned all nonperishable items that could conceal

19  wetness:  Peanut butter, cooking oils, open pasta, chips,

20  crackers, with one half to one quarter tablespoon, depending on

21  size.

22          MS. SASSOON:  Ms. Hernandez, can you go to page 2 of

23  this document.

24  Q.  Ms. Drescher, can you read the top row?

25  A.  List.  The poisons I, Claudia Drury, gave to LVR.

M3FVRAY2                          Drescher - Direct

1    Q.  And underneath that where it says substance, what follows

2    the colon?

3    A.  Cyanide.

4              MS. SASSOON:  Ms. Hernandez, you can take this down.

5              Ms. Hernandez, please pull up Government Exhibit 3137

6    for the parties and the Court, which the government offers into

7    evidence.

8              THE COURT:  Received.

9              (Government's Exhibit 3137 received in evidence)

10             MS. SASSOON:  Please publish it for the jury.

11   Q.  Ms. Drescher, who is this email from?

12   A.  Lawrence Ray.

13   Q.  And who is it to?

14   A.  Talia Ray.

15   Q.  What is the subject?

16   A.  Recording Yalitza.

17   Q.  What is the date?

18   A.  September 7, 2014.

19   Q.  And what is the name of the attachment?

20   A.  Yalitza LVR poison, Felicia, WS700245 copy.wma.

21             MS. SASSOON:  Ms. Hernandez, please pull up Government

22   Exhibit 3147 which the government offers into evidence.

23             THE COURT:  Received.

24             (Government's Exhibit 3147 received in evidence)

25             MS. SASSOON:  Please publish it for the jury.

M3FVRAY2                          Drescher - Direct

1   Q.  Ms. Drescher, who is this email from?

2   A.  Talia Ray, talia.ray@me.com.

3   Q.  What is the subject?

4   A.  Yali.

5   Q.  Who is it to?

6   A.  Honey Boy Ray, lvray21@gmail.com.

7   Q.  And what is the date?

8   A.  January 11, 2015.

9   Q.  Looking at the bottom of the email underneath view file,

10  can you read the file name beneath that?

11  A.  Yalitza Rosario, 10 January 2015 end 2227 hrs.mov.

12  Q.  Directing your attention back to the top, can you please

13  read the email from Talia Ray.

14  A.  Too quiet for us, esp Gordon to hear.  When you make these

15  videos, what is the sound input set at in system preferences?

16  It might be that you need to make that set to its highest level

17  for future videos.  Can you increase the volume on this one?

18  Love, Honey Girl.

19              MS. SASSOON:  Ms. Hernandez, can you please pull up

20  Government Exhibit 3148, which the government offers into

21  evidence.

22              THE COURT:  Received.

23              (Government's Exhibit 3148 received in evidence)

24              MS. SASSOON:  Please publish this exhibit for the

25  jury.

M3FVRAY2                        Drescher - Direct

1   Q.  Who is it from?

2   A.  Talia Ray, talia.ray@me.com.

3   Q.  What is the subject of this email?

4   A.  Notes on Yalitza Rosario 28Feb2015 mp4.

5   Q.  What is the date?

6   A.  March 1, 2015.

7   Q.  And who is the first recipient on this email?

8   A.  Lawrence Ray, lvray21@gmail.com.

9   Q.  What is the title of the attachment to the email?

10  A.  YR-28 Feb 2015 notes.pdf.

11  Q.  Can you please read the email from Talia?

12  A.  Dad, the video freezes at one hour, ten seconds, and does

13  not play back at any point after that.  So there's a second

14  hour I can't view.  Sorry I didn't catch this last night when I

15  was jumping through.  Note to self:  Play back beginning, end,

16  and middle clearly for a minute or so each.  Duh.  Attached are

17  my notes that I took on what I could watch.  Love, Talia.

18          MS. SASSOON:  Ms. Hernandez, can you please turn to

19  the attachment on the second page.

20  Q.  Ms. Drescher, can you read the date on the right-hand side?

21  A.  1/1/2015.

22  Q.  And can you read the first two lines of handwriting that

23  are underlined?

24  A.  Evidence review, Yalitza Feb. 28, 2015.mp4.

25  Q.  Can you please read the slanted notes on the left-hand

M3FVRAY2                        Drescher - Direct

1    side?

2    A.  Can hear phone vibrating incessantly.  Must be Izzy.  YR

3    not so forthcoming in this vid.  Isabella knocking.

4    Q.  Can you please read the first paragraph of notes underneath

5    Yalitza, Feb. 28, 2015.

6    A.  Dad on phone with me.  YR starts talking at 17.24.  IPR

7    told her to interfere with all of the repair work LVR was doing

8    in NC 2013 summer.  At 1910, because IPR wanted to destroy G,

9    destroy the property, to fix the divorce in her favor.  Make it

10   look like LVR involved in the destruction.  IPR gonna get all

11   this $ for destroying LVR.

12   Q.  Can you please read the next two lines.

13   A.  YR hesitating at 2300.  Dad confronts her.  She admits fear

14   of getting in more trouble.

15   Q.  Can you please go further down in the document and read the

16   sentence that begins, "Goes with the 500K."

17   A.  Goes with the 500K amount.  Stated before after $1 million.

18   Q.  And what does it say right above that?

19   A.  Very unwilling to simply be forthcoming.

20             MS. SASSOON:  Ms. Hernandez, you can take that down.

21             I'd like to read from a stipulation, Government

22   Exhibit 5000.  I'm unsure if that stipulation was already

23   admitted; if not, I would seek to admit it.

24             THE COURT:  Any objection to the stipulation?

25             MS. LENOX:  No objection.

M3FVRAY2                          Drescher - Direct

1           THE COURT:  Received.

2           (Government's Exhibit 5000 received in evidence)

3           MS. SASSOON:  At this time I'd like to read paragraphs

4    3 and 4 of this stipulation between the parties.

5           Government Exhibit 4065 contains the iCloud subscriber

6    information for the Apple ID icpollok@gmail.com.  This account

7    is registered in the name of Isabella Pollok, and it was

8    created on October 17, 2011.  The subscriber address for this

9    account is 229 East 85th Street, Unit 1356, New York, New York.

10   The telephone number associated with this account is

11   732-943-6344.  The Apple login alias for this account is

12   icpollok@icloud.com.

13          Government Exhibits 4051 through 4064, and Defense

14   Exhibits N-1 through N-16 are excerpts of the Apple iCloud

15   backup for the iCloud account described in paragraph 3.

16          At this time, the government offers Government Exhibit

17   4065, which was the subscriber information, as well as

18   Government Exhibit 4062, one of the excerpts from this iCloud

19   account.

20          THE COURT:  Any objection?

21          MS. LENOX:  The same as prior.

22          THE COURT:  Those are received.

23          (Government's Exhibits 4062, 4065 received in

24   evidence)

25          MS. SASSOON:  Your Honor, may I see the parties and

1      the Court briefly at sidebar?

2                (At sidebar)

3                MS. SASSOON:  I apologize for not raising this this

4      morning, but the government had transmitted updated versions of

5      these two exhibits that included the read column.  We're happy

6      to use either version, but I wanted clarity on which version of

7      these exhibits if the Court --

8                THE COURT:  What's the read column?

9                MS. SASSOON:  So we had submitted a letter about the

10     admissibility of these exhibits, and submitted a new version

11     that had an additional column that extracted from the iCloud

12     data that each message was, in fact, read.  So there's now a

13     column that says read.

14               To the extent that supports the admissibility of these

15     records, I'm happy to work from those updated exhibits.  I have

16     hard copies I can hand to the Court and to the defense, and we

17     also have electronic versions that we're going to pull up.  But

18     because these are substituted exhibits, before I did that, I

19     wanted to let the parties know what I'm doing and the Court.

20               THE COURT:  Okay.  Any objection?

21               MS. LENOX:  I would object to the substituted

22     exhibits, yes.

23               THE COURT:  On what basis?

24               MS. LENOX:  On the basis that those were just provided

25     to us last night.  We haven't had a chance to fully review

1   them.  And the reality is they're being offered now for what

2   seems like a different purpose than was intended originally,

3   and so I have concerns about that.

4         THE COURT:  Is there, Ms. Sassoon, an issue with you

5   offering now through this witness the exhibits that are not the

6   substituted exhibits, and then you'll give the defense an

7   opportunity to review substituted exhibits, and you can offer

8   them after they've had an opportunity to review them?

9         MS. SASSOON:  We don't need to use them at all; we can

10  stick with the originals.  I tried in my Q&A to have page

11  numbers for both, so bear with me if I refer to the wrong one,

12  but we'll use the original exhibits.

13        THE COURT:  Okay.  It's just about 1 o'clock.  Unless

14  you want to ask one or two more questions, should I just let

15  the jurors go?

16        MS. SASSOON:  Why don't we do that.  Then I'll make

17  sure my page numbers are correct over the lunch break.

18        MS. LENOX:  That's great.

19        THE COURT:  Okay.

20        (In open court)

21        THE COURT:  Members of the jury, it's now just about 1

22  o'clock, so we're going to let you take a break for lunch.

23        We'll reconvene at 2 o'clock.  Have a good lunch.

24        Don't talk about the case amongst yourselves or any of

25  the participants.  See you back here at 2 o'clock.

M3FVRAY2                         Drescher - Direct

1          (Jury not present)

2          THE COURT:  Be seated.

3          All right.  A couple of things.

4          First of all, the witness may step down.

5          (Witness steps down)

6          THE COURT:  There have been a number of exhibits that

7    have been received subject to connection.  I'm going to need,

8    before the government closes its case, a list from the defense

9    as to the exhibits subject to connection that the defense

10   objects to and argues that a connection has not yet been

11   established.

12          Anything that has been -- if a document has been

13   admitted subject to connection, but is not contained in the

14   list that I receive at the close of the government's case right

15   before the government closes, I will deem that exhibit to be

16   received into evidence without the need for any further

17   connection.

18          And I think we should know, Ms. Sassoon, what the last

19   witness is, right?  You'll be able to tell us with some

20   advanced notice as to who the last witness is?

21          MS. SASSOON:  Yes, your Honor.

22          THE COURT:  And that, I assume, is going to be Agent

23   Maguire; is that right?  Is that the expectation?

24          MS. SASSOON:  She's expected to testify in the last

25   week, but it might be somebody else.

1          THE COURT:  Okay.  So, Ms. Lenox, I'd like the letter

2     before the testimony begins of the last government witness.

3          MS. LENOX:  Understood, your Honor.

4          THE COURT:  Next, with respect to 4061 and 4062, I

5     received those.  Let me give you my reasoning.

6          The defense had moved to exclude Government Exhibits

7     4061 and 4062 as hearsay.  The exhibits contain chat messages

8     from Claudia Drury, the alleged victim of the sex trafficking

9     charge in the indictment, and Isabel Pollok, defendant's

10    alleged co-conspirator.  The exhibits contain messages from

11    Drury about prostitution appointments she has with the location

12    and the proceeds from the appointments.  There are occasional

13    chats in response from Pollok to the effect of "we'll be there

14    in five mins," or with bank account information for an account

15    in the name of Isabella Pollok, or referencing poisoning.

16    There are also messages where Pollok asks where Drury is now or

17    the two of them discuss a meeting time.

18         The defense relies upon *United States v. Barone*, 913

19    F.2d 46 at 49 (2d Cir. 1990); and *United States v. Thomas*, 2015

20    WL 237337 (D. Conn. 2015) for the proposition that the chat

21    messages cannot be received for the truth.  Those cases,

22    however, involve adoptive admissions in the case of *Thomas*, or

23    a statement offered to provide context for an otherwise

24    admissible statement in the case of *Barone*.  At one point in

25    the *Barone* decision, the court holds that the defendant's

failure to respond to one part of a two-part remark in a chat

is not admissible as an adoptive admission noting, "the lister

might be preoccupied and overlook the part to which he does not

respond, or he might want to address the other part before

returning to the rest of the statement.  The possibility is

even greater in the medium of text messaging in which one party

to the conversation might do no more than glance at the

message." *Id.* at *7.  That last sentence is the key one.

          *Barone* states that informant statements on a

tape-recorded call may be received in evidence without calling

the informant, so long as the statements are not presented for

the truth of the matter asserted, but only to establish a

context for the recorded statements of the accused.  913 F.2d

49.  *United States v. Chilia*, 2005 WL 1514042 (S.D.N.Y. 2005),

also cited by the defense, also involves the admission of a

statement to provide context.

          The objection is overruled.

          The government has established the authenticity of the

documents, and has represented that it will establish that the

messages are ones sent by Drury to Pollok.  They are not being

offered at the moment for the truth of the matter asserted, but

for the fact that the information in the chats was conveyed to

Pollok, i.e., to show her knowledge of and participation in the

sex trafficking of Drury.  That is a permissible nonhearsay

basis for the introduction of the exhibits.

1        The relevance of the chats is that they were sent to

2   Pollok.  The relevance also was established by the fact on the

3   face of the chats that Pollok responded to them.  The

4   government also proffers that it will demonstrate and offer

5   evidence from which the jury could infer that Pollok read them

6   and responded to them, the evidence coming from call logs and

7   cell site evidence and other documentary evidence, as well as

8   from Drury's testimony.

9        In fact, at a different point in the *Thomas* decision,

10  the court explains that an out-of-court statement can be

11  offered for its effect on the witness, including to establish

12  the recipient's knowledge of illegal conduct.  That's *Thomas*,

13  2015 WL 237337 at *4.

14       Moreover, certain statements within the exhibits may

15  be independently admissible either as a statement of present

16  intent that Pollok or Drury, at the time of the message,

17  intended to take certain acts, or, in the case of certain of

18  the Pollok statements, as co-conspirator statements.

19       Finally, this order is without prejudice to the

20  government later offering document for the truth of the matter,

21  if it is able to articulate a permissible basis for its

22  introduction for that purpose, including as a prior consistent

23  statement.

24       What more -- Ms. Sassoon.

25       MS. SASSOON:  I was just going to ask the Court, now

M3FVRAY2                        Drescher - Direct

 1    that these are not being introduced immediately and the jury is
 2    on lunch break, it is our preference to introduce the updated
 3    versions of the exhibit that was circulated last night in
 4    response to a defense argument.  In the event that they are
 5    going to be arguing that Isabel Pollok did not read these
 6    chats, we'd like to put forward our best proof that includes
 7    data showing that these chats were read.
 8              THE COURT:  I'm not sure what you're asking me.
 9              MS. SASSOON:  I'm asking if we can use the updated
10    exhibits when we come back from lunch.
11              THE COURT:  As I understood it, the defense --
12              MR. KELLY:  Your Honor, I'm sorry to interrupt.  I
13    think we need to take a minute.  Your Honor, we need to take a
14    minute.
15              THE COURT:  Okay.
16              MR. KELLY:  Your Honor, do we have medical staff in
17    the building?
18              THE COURT:  Yes.  Matt, can you get medical staff.
19              MS. LENOX:  Your Honor, perhaps if we can take a
20    recess.
21              THE COURT:  We'll take a recess.  And I'm going to ask
22    for the court to be cleared for medical purposes.
23              MS. LENOX:  Thank you, your Honor.
24              (Luncheon recess)
25              (Continued on next page)

AFTERNOON SESSION

2:00 p.m.

1    (Jury not present)

THE COURT:  Good afternoon.

Ms. Lenox, have you had an opportunity to confer with
the government about what I should tell members of the jury?

MS. LENOX:  I have, your Honor.

We, the defense, are fine with your Honor's proposal
to inform the jury that Mr. Ray had a medical issue that is
unrelated to Covid and that is the reason for the break in
proceedings today.  I do believe that the government perhaps
has a different perspective on what the jurors should be
informed of, so I would let them speak on that.

THE COURT:  Who wants to address the Court from the
government?

MS. BRACEWELL:  I will.  Mollie Bracewell for the
government.

Our view is that an explanation should be given that
does not involve either the defendant's health condition or
reference the evidence of the case or the witnesses.  Something
to the effect of, you know, issues arise, and on your Honor's
docket sometimes delays are unavoidable.  We very much respect
your time, but nevertheless can't continue this afternoon.
That's for good reason because here Mr. Ray's health, the idea
of a conspiracy about him and being poisoned bears very much on

1    the evidence of the case.  We think an instruction that implies

2    there's some ongoing medical condition could give credence to

3    some of the underlying allegations and is simply not necessary

4    to address this afternoon's session being canceled.

5          THE COURT:  My concern, Ms. Bracewell, is the

6    following:  First of all, when the members of the jury come in,

7    they will notice that Mr. Ray is not at counsel table.

8          Second, there is a distinct possibility that we will

9    not be able to convene tomorrow, and this is a matter I want to

10   discuss further with the parties after we excuse the jurors and

11   we'll discuss in the robing room, but I would like to make sure

12   we're able to tell the jurors as soon as possible if we're not

13   able to see them.  It's not quite honest to say that it's

14   because of the Court's schedule, and I think it's also not

15   quite helpful to the process.

16         I'm prepared to give a direction to the defense that

17   they are not to make any argument or suggestion that Mr. Ray's

18   absence from court or his health issues have anything to do

19   with the underlying facts of the case.  And I can also give

20   that instruction to the jury itself at the appropriate time.

21         MS. BRACEWELL:  Yes.  I understand your Honor's point

22   about the excuse not being truthful, but that, you know, in

23   many instances, an MDC shutdown, you know, there's necessity

24   that causes the jury explanation to be incomplete or slightly

25   inaccurate, and I don't think that should prevent us from doing

M3FQray3

1   that here.

2           I hear your Honor's concern about tomorrow.  We would

3   like a chance to address that.  We have numerous witnesses who

4   have traveled to testify.  We would like to make sure Mr. Ray

5   gets whatever medical treatment is needed before we decide that

6   tomorrow's session can't go on.  And so, respectfully, if it's

7   necessitated that future sessions get canceled, we could

8   address whether at that point such an instruction is

9   appropriate, but here just with respect to this afternoon, in

10  our view, a more neutral instruction might be appropriate.

11          THE COURT:  I have heard the objection.  I am going to

12  give the jury an instruction that a medical issue has arisen.

13  It has nothing whatsoever to do with Covid.  I take it from the

14  defense perspective, no objection to say it has nothing

15  whatsoever to do with the facts of the case?

16          MS. LENOX:  That's fine, your Honor.

17          THE COURT:  Any objection to me adding that,

18  Ms. Bracewell?  I know you don't want me to instruct about the

19  medical issue; but if I do, I am going to say nothing

20  whatsoever to do with the facts of the case.

21          MS. BRACEWELL:  No objection to that addition.

22          THE COURT:  And that we are not going to be able to

23  sit this afternoon.  That's all I'm going to say.  My deputy is

24  going to make sure that he has contact in other.

25          I guess the other thing that I will say, because we

M3FQray3

1    have lost some time today, we are going to work to see if we

2    can figure out ways to make up the time.

3          MS. SASSOON:  We would be in favor of sitting a full

4    day Friday, in part, because, as you know, Claudia was expected

5    to take the stand.  She's traveled here.  She's

6    understandably --

7          THE COURT:  I understand that issue, Ms. Sassoon.  We

8    will talk about it in the robing room.  I'm very attentive, not

9    so much to Ms. Drury, not to minimize it, but primarily to the

10   jurors and to making sure that we're able to conclude this

11   trial within the time period that they've expected.  So why

12   don't we bring the jury back in, and then we'll excuse them.

13         And then I'll meet with you all in the robing room.

14         (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

M3FQray3

1              (Jury present)

2              THE COURT:  Welcome back, members of the jury.

3              A medical issue has arisen with respect to Mr. Ray

4    that has to be taken care of.  It has nothing whatsoever to do

5    with Covid.  It has nothing whatsoever to do with the facts of

6    this case, but it does need to be taken care of.  So we are

7    going to excuse you for the afternoon.  We will expect you

8    tomorrow morning.  My expectation is that we will begin trial

9    again tomorrow morning.  We are also going to look at ways to

10   pick up some time to make sure that -- to pick up some time in

11   account of the fact that we lost some time today because of the

12   Court's conferences.

13             So, with that, I'm going to excuse you.  I'm going to

14   again give you the instructions:  Don't talk to anybody about

15   the facts of the case.  If anybody tries to talk to you about

16   the case, tell them that you are under direction from the judge

17   not to talk about the case.  Do not do any research or

18   investigation into the case yourselves, and we'll see you

19   tomorrow morning.

20             Good afternoon.

21             (Continued on next page)

22

23

24

25

M3FQray3

1           (Jury not present)

2           THE COURT:  I will see the counsel in the robing room

3    in a moment.  Give us a moment just to set up there with the

4    court reporter and then my clerk and deputy will come out to

5    get you.

6           (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

XM3FQray3redacted                    PORTIONS REDACTED

XM3FQray3redacted            PORTIONS REDACTED

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

XM3FQray3redacted                 PORTIONS REDACTED

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

XM3FQray3redacted              PORTIONS REDACTED

```
1
2
3
4
5
6
```

7    there's a similar occurrence.

8              MS. SASSOON:  We're honestly amenable to a conference.

9              THE COURT:  Do you see issues on a scheduling

10    conference with the defendant not being there?

11             MS. SASSOON:  No.  I just wonder if we'll have enough

12    information by 6:00 p.m.  An alternative is to perhaps tell the

13    jury to come at 10:00, speak to the parties in the morning at

14    9:00 or 8:30, where maybe we know whether he's been discharged

15    and his condition.  I don't know if my 6:00 we're going to have

16    enough information.

17             THE COURT:  I hear what you say and it may be at 6:00

18    we decide that that's what we should do, but I would like to

19    see what more information we have.

20             MS. SASSOON:  Absolutely.

21             THE COURT:  Let me just confer with my deputy about

22    what the right time is in order to just give the jurors notice.

23             (Court consults)

24             THE COURT:  So we will have an in-camera call at 6:00

25    tonight with the regular dial-in.  The transcript of this

1   proceeding is under seal everything that's in the robing room

2   for reasons of medical privacy.

3           Any objection to that from the government?

4           MS. SASSOON:  No.

5           THE COURT:  From the defense?

6           MS. LENOX:  No.

7           MS. SASSOON:  I would also just note that the

8   government is in agreement with the defense that to the extent

9   if possible to have personnel that's alert to potential medical

10  issues or somebody that is more on call to address this as it

11  arises.  We obviously support that request.

12          THE COURT:  And the other issue is the schedule going

13  forward and the prognosis.  I think I'm going to need some help

14  from the parties with respect to that.  The operating

15  assumption now is that Mr. Ray is going to be here tomorrow,

16  and we're going to be able to proceed.  A short interruption is

17  one thing and may present some challenges with respect to the

18  jury.  A longer interruption raises other issues that I at

19  least need to think about.  And so I would like to have the

20  views of the parties, I guess, mostly with respect to the

21  government on what to do if there is a delay in the

22  proceedings.

23          Ms. Lenox, I'm obviously also going to want to have

24  your views.  I understand that at a certain point that you are

25  going to have motions that you might make.  I'm not inviting a

XM3FQray3redacted                PORTIONS REDACTED

1    motion.  I think it would be extraordinarily premature at this

2    time, but I would like at least have some information from the

3    government and defense is obviously free to weigh in on the

4    legal stands and issues.

5            MS. SASSOON:  I might not be understanding.  Are you

6    asking about the length of the trial?

7            THE COURT:  At what point I would have to, frankly,

8    declare a mistrial if Mr. Ray is not available.  To put it

9    quite bluntly, that's what I'm talking about.  If it's a day or

10   two, that's one thing.  If it's weeks, that may present another

11   issue.  You need to think about that issue.

12           MS. BRACEWELL:  Sure.  We will think about it.  One

13   thing I think we thought your Honor might be alluding to was an

14   adjustment of the trial schedule to make up for any time.

15           THE COURT:  I am thinking about that.  With respect to

16   the legal issues in terms of a prolonged absence, there's no

17   rush on that now, but maybe you can give that some thought and

18   submit a letter in the next day or two if it turns out that

19   Mr. Ray is not here and able to participate tomorrow.

20           MS. SASSOON:  Got it.  I do think we're not at that

21   point yet.

22           THE COURT:  We're not close to that point.  I think I

23   might made it quite clear, we are not close to that point.

24   Things happen during trials all the time for all kinds of

25   reasons, including the unavailability of the judge,

1    unavailability of lawyers, etc., so we're not at all close to

2    that point.

3            With respect to the trial schedule, I think we're

4    going to consult with the jurors.  If we can sit a full day on

5    Friday, I'm going to want to sit a full day on Friday.  If we

6    can start earlier, let's say, 9:00 or go to 4:30 or 5:00 and

7    pick up some time, I'm going to want to do that.

8            I've heard counsel on both sides say that the lawyers

9    in this case have other obligations, but my main concern is

10   with the jury, and if you have to make adjustments to your

11   schedules to build in half an hour or hour on either side,

12   that's just one of the things that comes with the job of trying

13   a case.  I don't mean to be callous about it.  I'm not callous

14   about it, but I do want to make sure we don't lose the jury.

15   That also may be premature because we're going to have to

16   consult with the jurors.  The jurors may all have made plans.

17           So, Ms. Lenox, anything else?

18           MS. LENOX:  No.  Thank you, your Honor.

19           THE COURT:  Ms. Sassoon?

20           MS. SASSOON:  Just one thing that I thought of that

21   could help streamline tomorrow to the extent we sit.  There are

22   some objections that I expect the defense to have to the

23   exhibits that we intend to introduce tomorrow.  I don't know if

24   your Honor would like a letter from the defense or some other

25   way of teeing this up so that they could be addressed tomorrow

XM3FQray3redacted             PORTIONS REDACTED

1    early.

2              THE COURT:  These are Claudia Drury exhibits?

3              MS. SASSOON:  Mmm-hmm.

4              THE COURT:  I don't want to hear argument on it,

5    obviously, because we don't have Mr. Ray present, but it would

6    be helpful to have a letter with identifying the exhibits that

7    you have objections to and the basis for it.

8              MS. LENOX:  Certainly, your Honor.  And just to be

9    clear, we have provided that list already to the government, so

10   the government is aware of the exhibits to which we object and

11   flagged some of those in its letter for your Honor this morning

12   that we intend to respond to today, and so in that letter we

13   will include the exhibits to which we object.

14             THE COURT:  Ms. Lenox, I know you didn't get it to me

15   over lunch, for good reason, you had other things going on at

16   lunch.  How about before the 6:00 call?

17             MS. GLASHAUSSER:  It hasn't been written yet, your

18   Honor.

19             THE COURT:  On the other hand, you didn't expect to

20   have the afternoon free, so do your best, but I need it

21   tonight.

22             MS. LENOX:  Understood.

23             MS. BRACEWELL:  And just one sort of housekeeping

24   issue, also in the interest of time.  We had conferred with

25   defense counsel about the outstanding Hulu subpoena.  We

XM3FQray3redacted                  PORTIONS REDACTED

1   provided our initial production today and an intern delivered a

2   drive to MDC whenever Mr. Ray returns.  We have conferred with

3   Hulu, and our understanding from defense counsel is that the

4   subpoena to Hulu is held in abeyance right now on defense

5   counsel's instructions.  And so Hulu intends to move to quash,

6   but at this point, given that the subpoena is stayed, they are

7   not intending to file any such motion until the stay is lifted.

8   We would just sort of note that because our hope is that it can

9   be teed up and resolved before witness testimony gets under

10  way.

11         THE COURT:  What's the status of the Hulu subpoena?  I

12  was a little bit surprised, actually, having received a call

13  from somebody representing themselves to be counsel for Hulu

14  saying they were imminently going to file a motion.

15         MS. CROSS-GOLDENBERG:  Sure, your Honor.  And this, I

16  think, goes beyond housekeeping.

17         THE COURT:  It does.  Why don't you put it in a letter

18  to me sometime tonight.  Just give me the status of the Hulu

19  subpoena.

20         MS. CROSS-GOLDENBERG:  Sure, your Honor.  That's fine.

21         THE COURT:  Anything else from the government?

22         (Indicating)

23         THE COURT:  From the defense?

24         (Indicating)

25         THE COURT:  I hope Mr. Ray gets better.

XM3FQray3redacted                    PORTIONS REDACTED

1          Thank you all.

2          (Recess)

XM3FQray3redacted                    PORTIONS REDACTED

XM3FQray3redacted                    PORTIONS REDACTED

XM3FQray3redacted                 PORTIONS REDACTED

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

XM3FQray3redacted                    PORTIONS REDACTED

1

2

3

4

5

6

7

8

9

10

11

12

13                    (Adjourned to March 17, 2022 at 9:30 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1

2                          INDEX OF EXAMINATION

3    Examination of:                              Page

4     DAWN HUGHES

5    Cross By Mr. Kelly . . . . . . .543

6    Redirect By Ms. Bracewell  . . .564

7     SUNNY DRESCHER

8    Direct By Ms. Sassoon  . . . . .566

9                          GOVERNMENT EXHIBITS

10   Exhibit No.                                Received

11    3206     . . . . . . . . . . . . . . . . 568

12    1594     . . . . . . . . . . . . . . . . 572

13    3087     . . . . . . . . . . . . . . . . 574

14    3105     . . . . . . . . . . . . . . . . 576

15    3109     . . . . . . . . . . . . . . . . 576

16    3110     . . . . . . . . . . . . . . . . 580

17    3111     . . . . . . . . . . . . . . . . 581

18    3112     . . . . . . . . . . . . . . . . 582

19    3113     . . . . . . . . . . . . . . . . 586

20    1884     . . . . . . . . . . . . . . . . 587

21    1885     . . . . . . . . . . . . . . . . 587

22    2115     . . . . . . . . . . . . . . . . 588

23    1862     . . . . . . . . . . . . . . . . 588

24    1869     . . . . . . . . . . . . . . . . 588

25    1866     . . . . . . . . . . . . . . . . 589

1   1845   . . . . . . . . . . . . . . . . . 589

2   1840   . . . . . . . . . . . . . . . . . 589

3   1856   . . . . . . . . . . . . . . . . . 589

4   2119   . . . . . . . . . . . . . . . . . 590

5   2127   . . . . . . . . . . . . . . . . . 590

6   2144   . . . . . . . . . . . . . . . . . 590

7   3119   . . . . . . . . . . . . . . . . . 591

8   2111   . . . . . . . . . . . . . . . . . 592

9   1886   . . . . . . . . . . . . . . . . . 593

10  3136   . . . . . . . . . . . . . . . . . 593

11  3137   . . . . . . . . . . . . . . . . . 595

12  3147   . . . . . . . . . . . . . . . . . 595

13  3148   . . . . . . . . . . . . . . . . . 596

14  5000   . . . . . . . . . . . . . . . . . 599

15  4062, 4065   . . . . . . . . . . . . . . 599

16

17

18

19

20

21

22

23

24

25